**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ST. PAUL MERCURY INSURANCE COMPANY**<br>**Plaintiff,**<br>**v.**<br>**PHILADELPHIA HOUSING AUTHORITY**<br>**Defendant.** | **CIVIL ACTION NO. 02-3511** |

**DEFENDANT PHILADELPHIA HOUSING AUTHORITY'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Philadelphia Housing Authority ("PHA"), by its undersigned counsel, moves for partial summary judgment on the claims set forth in Counts I, III and IV of Plaintiff's Complaint. Plaintiff has previously consented in its bond to the acts of which it now complains. Furthermore, Count III is barred by Pennsylvania's "gist of the action" doctrine. In support of this Motion, PHA relies upon and incorporates the attached Memorandum of Law.

Respectfully submitted,

**BLANK ROME LLP**

Date: 6/23/03

BY: [signature]
DENIS JAMES LAWLER
DANIEL E. RHYNHART
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendant,
Philadelphia Housing Authority

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ST. PAUL MERCURY INSURANCE COMPANY**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PHILADELPHIA HOUSING AUTHORITY**<br><br>**Defendant.** | **CIVIL ACTION NO. 02-3511** |

## ORDER

AND NOW, this ________ day of ___________________, 2003, upon consideration of Defendant Philadelphia Housing Authority's Motion for Partial Summary Judgment and any response thereto, it is ORDERED and DECREED that Defendant's Motion is GRANTED. Counts I, III and IV of Plaintiff's Complaint are DISMISSED with prejudice.

BY THE COURT:

______________________________ J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ST. PAUL MERCURY INSURANCE COMPANY** <br> **Plaintiff,** <br> **p750X** <br> **v.** <br> **PHILADELPHIA HOUSING AUTHORITY** <br> **Defendant.** | : | **CIVIL ACTION NO. 02-3511** |

**DEFENDANT PHILADELPHIA HOUSING AUTHORITY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Philadelphia Housing Authority ("PHA"), by its undersigned counsel, submits this Memorandum of Law in support of its Motion for Partial Summary Judgment.

## I. INTRODUCTION

Plaintiff St. Paul contends that it is entitled to damages because PHA allegedly paid the contractor, San Lucas Construction Company, for more work than San Lucas actually performed. Although PHA has ample evidence that it properly paid San Lucas for work actually performed, this factual issue can be set aside because St. Paul's contention is legally unsupportable. Counts I, III and IV of St. Paul's Complaint fail for the same reason: St. Paul agreed in its Performance Bond that PHA could extend "forbearance" to the contractor, San Lucas, "either by the grant of an extension of time . . . or otherwise," and further agreed that PHA could fail or refuse to withhold monies from San Lucas. As a consequence, St. Paul's obligations are unaffected by the matters of which it complains, an alleged failure to withhold monies from the contractor, and Counts I, III and IV should be dismissed. In addition, Count III of the Complaint, St. Paul's

negligence claim, should be dismissed under the "gist of the action" doctrine, which precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims.

## II.    STATEMENT OF FACTS

St. Paul's claims arise out of a Contract for Construction ("Construction Contract") relating to a project owned and managed by PHA, the Richard Allen Homes public housing project ("the Project"). See Complaint, ¶¶5, 6. (A copy of the Construction Contract is attached to Plaintiff's Complaint as Exhibit "1.") Under the terms of the Construction Contract, San Lucas Construction Co., Inc. ("San Lucas") was to renovate certain existing single-family units and construct or renovate other buildings in the Project, for the fixed price of $11,890,000. See Complaint, ¶¶6, 7.

In connection with the Project, San Lucas requested that St. Paul, as surety, issue payment and performance bonds. Id. at ¶19. On or about October 16, 1997, in exchange for payment of a $108,588.00 premium,[1] St. Paul issued a Performance Bond and a Materialmen's Bond. Id. at ¶¶23, 24. (A copy of the Performance Bond is attached to Plaintiff's Complaint as Exhibit "6" and attached hereto as Exhibit "A.") Pursuant to those bonds, St. Paul held itself out as jointly and severally bound with San Lucas to PHA for the entire amount of the $11,890,000 contract. See Exhibit "A."

Under the terms of the contract, PHA was required to make progress payments to San Lucas "approximately every 30 days as the work progresses, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." See General Conditions of the Contract for Construction ("General Conditions"), ¶27, attached to Plaintiff's Complaint as Exhibit "2" and hereto as Exhibit "B."

---

[1] St. Paul attached the Takeover Agreement to its Complaint as Exhibit 10. Exhibit "D" to the Takeover Agreement recites the bond premium as the first expense item.

San Lucas was required to submit to PHA periodic progress reports for approval before payment would be made. Id. at ¶27(d); Complaint at ¶10.

The PHA General Conditions contain a provision providing for retainage, and authorizing the payment to the contractor of one-half of the retainage after half of the work has been completed as follows:

24. **Contract Provision for Retainage**

> PHA shall follow State Law with regard to retainage. Ten percent shall be retained until 50% of the contract is completed. When the contract is 50% completed, one-half of the amount retained by PHA shall be returned to the contractor:
>
> Provided, That the architect or engineer approves the application for payment: And provided further, That the contractor is making satisfactory progress and there is no specific cause for greater withholding. . . .

By December 6, 1999, San Lucas had submitted to PHA twenty-three payment applications and estimated that eighty-two percent (82%) of the work under the contract was complete, with an adjusted contract value of $9,850,032.72. See Complaint at ¶30. In response to those twenty-three applications, PHA had paid a total of $9,357,531.08 to San Lucas, which represented eighty-two percent (82%) of the adjusted contract value, less five percent (5%) in retainage. Id. at ¶31. St. Paul alleges that San Lucas had at that time completed "materially less" than eighty-two percent (82%) of the work on the Construction Contract. Id. at ¶30. St. Paul further asserts that PHA improperly reduced its retainage in violation of the contract. Id. at ¶33.

On January 24, 2000, after St. Paul demanded that PHA stop payment to San Lucas, and after San Lucas abandoned the Project, PHA terminated the Construction Contract with San Lucas. Id. at ¶39. PHA and St. Paul entered into a Takeover Agreement, after which St. Paul engaged a completion contractor to complete the work. Id. at ¶40. The remaining balance under

the Construction Contract at the time of San Lucas' termination was $2,711,413.84. Id. at ¶40. St. Paul hired a contractor to complete the work for $6,150,000. Id. at ¶42.

St. Paul has filed suit against PHA principally to recoup alleged excess progress payments made by PHA to San Lucas, and for failing to maintain the ten percent (10%) retainage. Id. at ¶¶32, 47, 48, 51, 60, 64, 65. St. Paul contends that it should be released and discharged from liability as a result of PHA's alleged deviations from the contract payment procedures. See e.g., Id. at ¶51.

However, St. Paul's bond waives any such right of release in the event of any forbearance on the part of the Authority to the Contractor, as follows, in pertinent part:

> The undersigned Principal Obligor and Surety hereby agree that no . . . forbearance on the part of either the Authority or of the Contractor to the other, either by the grant of an extension of time for the performance of the contract or otherwise, shall be deemed to release the undersigned or either of them, their or either of their heirs, executors, administrators or assigns, from their liability thereunder, notice to the Surety of any such modification, alteration, extension or forbearance hereby being waived.

See Performance Bond, Exhibit "A" at 2.

Moreover, the General Conditions expressly provide that the failure or refusal of PHA to withhold moneys from San Lucas, will not effect a release of any of St. Paul's obligations under its bonds. General Conditions, Exhibit "B" at ¶ 27(k). Here, St. Paul contends that PHA should have withheld moneys from San Lucas because, it alleges, work which San Lucas claimed to have completed was either not done at all, or not done in accordance with contractual requirements. PHA contends that the moneys paid to San Lucas were due, and that position is supported by the U.S. Army Corps of Engineers' representative, Mr. Ivaniw, who visited the Project monthly, and reported on the percentage of completion to HUD, which had contracted

with the Corps to, among other things, make certain that HUD funds were only disbursed on account of work properly completed.

Even if St. Paul could show that PHA had overpaid San Lucas, i.e. that it had failed to withhold moneys from San Lucas, that failure cannot have any effect on St. Paul's obligations:

> The PHA shall not (1) determine or adjust any claims for payment or disputes arising thereunder between the Contractor and its subcontractors or material suppliers; or, (2) withhold any moneys for the protection of the subcontractors or material suppliers. The failure or refusal of the PHA to withhold moneys from the Contractor shall in nowise impair the obligations of any surety or sureties under any bonds furnished under this contract.

See General Conditions, Exhibit "B" at ¶ 27(k) (emphasis added).

Despite this clear contractual language, St. Paul filed a four-count Complaint, demanding money damages from PHA in an amount in excess of $3,000,000. Although St. Paul has variously described its claim as being in contract (Count I), for negligence (Count III), or as a third party beneficiary of the construction contract (Count IV), all of these claims are premised on the same allegations of overpayments for deficient work. As a result, Counts I, III and IV fail for the same reason, i.e., St. Paul agreed that PHA could forbear from demanding strict compliance with the contract, when it agreed that PHA could extend "forbearance" to San Lucas, "either by the grant of an extension of time . . . or otherwise"; and it could fail or refuse to withhold moneys from San Lucas; all with no effect on St. Paul (See Aniero Concrete Co., Inc. v. New York City Constr. Auth., No. 94 Civ. 9111, 95 Civ. 3506, 1998 WL 148324, n.13 (S.D.N.Y. Mar. 30, 1998): ". . . all three [affirmative defenses] rely on the same legal theory defense of discharge of a surety by acts or omissions of the obligee. I therefore treat the three defenses as one for purposes of this discussion.")[2]

[2]Count II sets forth a separate claim for breach of the Takeover Agreement, claiming $83,060 for the cost of constructing an administrative office (¶55) and approximately $116,000 in retainage (¶56). This motion does not address Count II.

As set forth more fully below, St. Paul's Complaint fails to state a claim because St. Paul has no contractual right to seek damages for conduct to which it consented in advance. In addition, Count III should be dismissed as it is barred by Pennsylvania's "gist of the action" doctrine.

## III. STANDARD

### A. For Granting a Motion for Partial Summary Judgment.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. PROC. 56(c). While the moving party has the initial burden of showing that no genuine issue of material fact exists, once that burden is met, the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence to show that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

### B. For Interpreting a Surety Bond.

The Third Circuit had occasion recently to state the law with respect to interpretation of surety contracts:

> The paramount goal of contract interpretation is to determine the intent of the parties. *Meeting House Lane, Ltd. v. Melso*, 427 Pa. Super. 118, 628 A.2d 854, 857 (1993) (guaranty contracts subject to same rules of interpretation as other agreements). There is no special standard of interpretation for contracts creating secondary obligations. Restatement (Third) of Suretyship & Guaranty § 14 cmt. c (1996).

Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc., 273 F.3d 332, 335 (3d Cir. 2001). In Pennsylvania, a corporate compensated surety is considered the practical equivalent of an

insurance company.  Young v. American Bonding Co. of Baltimore, 228 Pa. 373, 77 A. 623 (1910).

## IV.    ARGUMENT

### A.    St. Paul Consented to any Forbearance by PHA in favor of San Lucas and any Failure by PHA to Withhold Moneys from San Lucas.

In its Performance Bond, St. Paul agreed that no forbearance by PHA in favor of San Lucas nor any failure by PHA to withhold moneys from San Lucas would result in St. Paul's release, and it waived all notice of any such forbearance.  Forbearance is the "act of refraining from enforcing a right, obligation, or debt."  BLACK'S LAW DICTIONARY 656 (7th ed. 1999).  St. Paul's Complaint, which at its heart alleges that PHA (1) extended excessive forbearance to San Lucas when evaluating its pay estimates, and (2) should have withheld more money from San Lucas, should be dismissed because any forbearance by PHA in favor of San Lucas, as well as any failure by PHA to withhold moneys from San Lucas, were consented to by St. Paul in its Performance Bond.[3]

The Performance Bond and the General Conditions together establish that no forbearance by PHA in favor of San Lucas nor any failure by PHA to withhold moneys from San Lucas shall be deemed to release the Surety from its liability, notice to the Surety of any such forbearance

---

[3] This Court in North American Spec. Ins. Co. v. Chichester School District, Civ. A. 99-2394, 2000 WL 1052055 (E.D. Pa. Jul. 20, 2000), appeal docketed, Consol. Nos. 01-1624 and 01-4038, and Consol. Cross-Appeals Nos. 01-1744, 01-4056 and 02-1355 (3d Cir. Oct. 4, 2001 and thereafter), dealt with a case in which a surety sued an owner for alleged overpayments.  In Chichester, this Court held that the payments by the owner caused a material departure from contractual terms.  However, Chichester is inapplicable to the key issue here: St. Paul's consent to any forbearance by PHA in favor of San Lucas or any failure by PHA to withhold moneys from San Lucas.  In Chichester, there was no discussion as to whether or not the surety had consented to forbearances, nor was that argument raised by the parties.  See Chichester 2000 WL 1052055 at *12.

The performance bond of the bonding company in Chichester included a provision with language similar to the Performance Bond at issue in this case; however, it only addressed notice to the surety of contractual changes. The relevant provision stated, "The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related contracts, purchase orders and other obligations."  Chichester Performance Bond at ¶8.  However, this provision is not discussed in the Court's opinion, nor was it mentioned by the parties.  The Chichester opinion is inapposite to this case, because the performance bond was not explicit as to the surety's consent to forbearance by the owner in favor of the contractor and, more important, the issue was not raised or discussed.

being expressly waived. See Performance Bond, Exhibit "A," at 2; General Conditions, ¶ 27(k). As surety, St. Paul agreed to insure San Lucas' completion of its portion of the Project, and under the above provision it agreed to do so whether or not PHA forbore from taking any action against San Lucas and regardless of whether PHA failed to withhold moneys from San Lucas. While PHA disputes St. Paul's assertion that overpayments were made, even if payments to San Lucas were made in excess of those strictly due, St. Paul waived notice of such forbearance and agreed that no such action would affect its liability to PHA on the Performance Bond. An owner, such as PHA, may have good reason to forbear, to refrain from enforcing every right against the contractor, in order to help a contractor finish a job. PHA has no obligation to justify its forbearance to St. Paul; St. Paul agreed that PHA could forbear from taking action against San Lucas in any way ("either by the grant of an extension of time for the performance of the contract or otherwise"; emphasis added).

St. Paul is seeking to relieve itself of its liabilities under the Performance Bond by suing the owner (PHA) for monies St. Paul expended in fulfilling its obligation as surety. A surety who consents to the modification of a contract is not discharged of its liabilities as surety by such a modification, and this consent may be given in advance. See Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co., 33 F. Supp.2d 235 (S.D.N.Y. 1998) (change order added $250,000 blasting work to contract; no release of surety because "the performance bond itself specifically waives notice to the surety of any alteration made by the owner."); State v. Am. Motorists Ins. Co., 463 N.E.2d 1142, 1149 (Ind. Ct. App. 1984) (narrower changes clause; "[t]he State…shall have the right to make, from time to time and without notice to any sureties or assignees, changes as to packing, testing destination, specifications, designs and delivery schedule."; summary judgment in favor of bonding company set aside); Bloom v. Bender, 313 P.2d 568, 572

(Cal. 1957) (no release of surety; "[t]he liability hereby assumed shall not be affected by...the acceptance of any settlement or composition offered by...[debtor], either in liquidation, readjustment, receivership, bankruptcy or otherwise.").

In Massachusetts Bonding & Ins. Co. v. John R. Thompson Co., 88 F.2d 825 (8th Cir. 1937), the court of appeals addressed a similar argument to St. Paul's, in a case where the language of the bond was for all intents and purposes the same as St. Paul's bond. The bond of the Massachusetts Bonding and Insurance Company stated:

> And Provided, that any alterations which may be made in the terms of the Contract, or in the work to be done under it, or the giving by the Owner of any extension of time for the performance of the Contract, or any other forbearance on the part of either the Owner or the Principal to the other shall not in any way release the Principal and the Surety or Sureties, or either or any of them, their heirs, executors, administrators, successors or assigns from their liability hereunder, notice to the Surety or Sureties of any such alteration, extension or forbearance being hereby waived.

Id. at 827. The court held that those bond provisions made clear that any forbearance by the owner (here, PHA) would not act to release the surety, as follows:

> By the express terms of the bond in suit, no alterations in the terms of the construction contract, no alterations in the work to be done under it, no extension of time for the performance of the contract, and no other forbearance on the part of either party to the other, are to release the principal or the surety. This, we think, is the clear import of the language used.

Id. at 829. That rationale applies equally here, as the language of the St. Paul bond is nearly identical.

The following chart compares the provisions of the Massachusetts Bonding & Insurance Company form to the comparable provisions of the St. Paul Mercury Insurance Company form:

| **Massachusetts Bonding & Insurance Company** | **St. Paul Mercury Insurance Company** |
|---|---|
| refers to "alterations" | refers to "modifications or alterations" |

| **Massachusetts Bonding & Insurance Company** | **St. Paul Mercury Insurance Company** |
|---|---|
| refers to "terms of the Contract" | refers to "the terms of the above-mentioned contract" |
| refers to changes in "the work to be done under it [the contract]" | refers to changes in "the work to be done under it [the contract]" |
| refers to the owner giving an extension of time for performance to the contractor or any other forbearance between the owner and the contractor | refers to forbearance between the parties "either by the grant of an extension of time for the performance of the contract or otherwise" |
| provides that any such action "shall not in any way release the principal and the surety or sureties" | states that none of those activities "shall be deemed to release the undersigned or either of them" |
| provides "notice to the Surety or Sureties of any such alteration, extension or forbearance being hereby waived" | provides "notice to the Surety of any such modification, alteration, extension or forbearance hereby being waived." |

Thus, there are no material differences between the provisions of the two bonds and the same conclusion reached by the Massachusetts Bonding court should be reached by this Court. PHA requests that the Court enforce the language in the bond so that no forbearance by PHA in favor of San Lucas nor any failure by PHA to withhold moneys from San Lucas will affect St. Paul's liability under its bond.

In Employers' Cas. Co. v. Irene Independent School Dist., 286 S.W. 539 (Tex. Civ. App. 1926), the court addressed a similar case. There, a contractor was paid in full by the owner before a construction project was completed; the contractor subsequently abandoned the project. In that case, like this one, the construction contract required the owner to advance payments only after receipt of estimates and subject to a retainage. The owner nonetheless ignored these requirements and advanced all contract funds to the contractor. The surety, as in the present

case, sought to discharge its liability based on this alleged forbearance by the owner. The bond, however, contained a clause almost identical to that in the St. Paul bond, as follows:

> Any alterations made by agreement between the contractor and the owner in the terms of the contractor [sic] the nature of the work to be done or the granting to the contractor, his executors, administrators, heirs or assigns, any extension of time for the performance of the contract or of any of the stipulations therein contained, or any forbearance on the part of the owner, or any change in the plans and specifications, shall in nowise release the principal or the sureties hereon.

Id. at 540. Accordingly, the court disposed of the bonding company's argument as follows:

> The casualty company contends that it is not liable to the school district, because the school district failed to retain the 20 per cent of the contract price as provided in paragraph 13 of the contract above quoted. We cannot agree with this contention. The authority given under the provisions of the bond above quoted authorizing alterations and changes to be made is as broad and complete as it is possible to write, and, where the bond gives the contracting parties the right to make any alterations or changes in the terms of the contract and the nature of the work to be done, any changes made will not affect the surety's liability.

Id. (emphasis added). The same rationale should dispose of St. Paul's argument in the instant case.

In Smith v. Molleson, 42 N.E. 669, 672 (N.Y. 1896), a surety was deemed to have assented to contractual modifications when the original contract, incorporated into the bond by reference, provided, "[s]hould the owner, at any time during the progress of the said work, request any alterations, deviations, additions, or omissions from the said contract, he shall be at liberty to do so, and the same shall in no way affect or make void the contract." The court explained that:

> The defendant, having, by reference, in effect made the contract a part of the bond, must be deemed to have assented to this provision, and to any changes or deviations in performance from the building contract made under it. She has, in effect, guarantied the performance of a written contract between other parties, which, by its terms, permitted the parties to change it or deviate from it. While it is not important to consider the real scope of this clause, since we prefer to dispose of the questions in the case upon the ground that there was no material departure from the contract, when properly construed, it should be noted that she

> consented in advance to changes of some character which are permitted by the contract in language quite broad and comprehensive. It would not be difficult to show that the plaintiff might, under this provision at least, dispense with the formality of a certificate when called upon by the contractors, from time to time, for some portion of the contract price, without discharging the surety, even though it was more important to the defendant's interest and protection than it appears to be. It is manifest that the provision was intended for the benefit of the owner alone, and he could waive it without affecting the defendant's liability.

42 N.E. at 672.

Likewise, in Wharton v. Fidelity Mut. Life Ins. Co. of Philadelphia, 156 S.W. 539 (Tex. Civ. App. 1913), the court refused to discharge the surety where there had been an increase in the payment to be made to the contractor for traveling expenses. The bond had referred to the underlying contract, as well as "any change or modification of the same." Id. at 541. Accordingly, the court stated:

> The appellant is in no position to complain along this score, for the appellee in the bond signed by appellant made provision for this condition by binding him to all changes or modifications made in the [construction] contract . . . . Being thus bound, appellant is liable for such changes. We understand the general rule of law to be that when a material change is made in a contract without the consent of the surety it will avoid a contract as to him, but not as in this case, where the surety agreed that changes could be made.

Id. at 541 (emphasis added).

**B. The Restatement (Third) of Suretyship & Guaranty Supports Enforcement of St. Paul's Consent to any Forbearance by PHA in favor of San Lucas or any Failure by PHA to Withhold Moneys from San Lucas.**

As discussed above, courts have specifically held that sureties have consented to modifications, changes and other forbearances through contractual provisions in the bond or the construction contract. See Aniero Concrete Co., Inc. v. New York City Constr. Auth., No. 94 Civ. 9111, 95 Civ. 3506, 1998 WL 148324 (S.D.N.Y. Mar. 30, 1998). In Aniero, one of the surety's defenses to liability was the same argument made by St. Paul: that the owner made

overpayments to the original contractor, thereby discharging the surety of its duties under the performance bond:

> Aetna next seeks to raise a discharge defense based on alleged overpayments made by the SCA [Owner] to Carlin [Contractor]. In its answer, Aetna alleges that the SCA and/or its agents approved and paid for work that Carlin had not completed, work that Carlin had not completed in the amounts set forth in Carlin's requisitions, and materials that Carlin had not installed at the project. . . . On the basis of these allegations, Aetna contends that it is discharged from any further obligations on the performance bond because the SCA and/or its agents failed to duly perform their obligations under the Carlin Contract. . . . Alternatively, Aetna seeks to be discharged *pro tanto* to the extent that it was prejudiced by the diminishment and impairment of Aetna's security in the Carlin contract balances.
>
> . . . .
>
> In raising these issues, Aetna seeks to invoke the defense of discharge of a surety by acts or omissions of the obligee.
>
> . . . .
>
> The SCA responds convincingly that Aetna cannot avail itself of the discharge defense because it waived its right to do so in the performance bond. As the SCA points out, it is well settled that the discharge defense can be waived by the terms of a particular performance bond. *See, e.g.,* Restatement (3d) of Suretyship & Guaranty § 48(1) (1996).

Id. at *12.

The performance bond in Aniero provided, in relevant part:

> The Surety, for value received, for itself and its successors and assigns, hereby stipulates and agrees that the obligation of said Surety and its bond shall in no way be impaired or affected by any extension of time, modification, omission, addition, or change in or to the said contract or the work to be performed thereunder, or by any payment thereunder before the time required therein . . ."

Aniero, 1998 WL 148324 at *13 (emphasis added). The Court stated, "[i]t is well settled that the discharge defense can be waived by the terms of a particular performance bond. . . . In this case, the performance bond could not be more explicit. . . . Because [the surety] waived its right to complain that payments were not made at the time or in the manner stipulated in the contract, it

is barred from asserting a discharge defense." Id. at *12-13; see also Zang v. Hubbard Bldg. & Realty Co., 125 S.W. 85, 87 (Tex. Civ. App. 1910) ("We do further agree that any change in the method and amount of the payments stipulated to be made by the said J.F. Zang [owner] in said contract (original contract), shall not affect our liability on the bond.")

**1. The Waiver May Be Accomplished By Either Specific Or General Language.**

Certainly, the performance bond in Aniero was more specific than St. Paul's Performance Bond, because it expressly addressed "any payment [made] thereunder before the time required therein." However, such specific language is not required. The Aniero Court relied on the Restatement (Third) of Suretyship & Guaranty § 48(1), which provides:

> The secondary obligation is not discharged pursuant to § 39(c)(ii)-(iii), § 40(b), § 41(b)(ii), § 42(1), § 43, or § 44 [dealing with impairment of the surety's performance] to the extent that, in the contract creating the secondary obligation or otherwise, the secondary obligor consents to acts that would otherwise be the basis of the discharge, agrees that such discharges are unavailable to the secondary obligor, or waives such discharges. Consent may be express or implied from the circumstances. Such consent, agreement, or waiver, if express, may be effectuated by specific language or by general language indicating that the secondary obligor waives defenses based on suretyship.

Restatement (Third) of Suretyship & Guaranty § 48(1) (1995) (emphasis added).

By way of example, 5A Am Jur Legal Forms 2d, Contractors' Bonds § 67:54 (1997) suggests use of the following language where the drafter intends that modification of a contract is not to affect the surety's liability:

> **§ 67:54 Modification of contract not to affect surety's liability**
>
> Surety agrees that no modification, omission, or addition in or to the terms of the contract, or to the plans or specifications, shall in any manner affect the obligations of surety on its bond.

Such a provision, although stated in general terms, is crystal clear.[4]

As the Restatement makes clear, the requisite consent, agreement or waiver may be effectuated by general language. Restatement (Third) of Suretyship & Guaranty § 48(1) (1995). In Enterprise Hotel Co. v. Book, 85 P. 333 (Or. 1906), the court simply applied the relevant language, holding:

> ... the bond itself expressly provides that payments made at any other time or in any other manner than as stipulated, should in no wise affect the obligation of the sureties. It necessarily follows, therefore, that even if the defendants are correct in their interpretation of the contract, and that the payments for extra work should not have been made at the time the work was performed, not until final payment on the building, the premature payment thereof did not release the sureties, or relieve them from liability.

Id. at 64.

The provisions in the Performance Bond and General Conditions at issue in this matter state, in no uncertain terms, that the surety is not released from its obligations due to forbearance by PHA in favor of San Lucas or any failure by PHA to withhold moneys from San Lucas. There is no ambiguity. St. Paul contractually consented to such actions, and should not now be permitted to avoid or limit its obligations.

---

[4] It should not be necessary for the bond to provide, as was the case in Enterprise Hotel Co. v. Book, 85 P. 333 (Or. 1906), that:

> It is expressly understood and agreed that any departure from the plans, drawings, and specifications, or if any additions to, or alterations of, or any omissions be made in said building, the same shall in no way affect or make void this undertaking, but the costs of the same shall be added to or deducted from the amount of said contract price of said building by a fair and reasonable valuation. And it is expressly further agreed and understood that any extension of time in which to complete said building, or should any changes or deviations be made from said contract in respect to the payments therein stipulated to be made, or should payments be made at any other time or manner than therein stipulated, the same shall in no wise affect the validity of this obligation or release the sureties hereto from liability. It is the intention of the parties to this undertaking to provide that any changes or alterations in the construction of said building or extension of time in which to construct the same, or change in the time or manner of making payment, shall not in any wise release the sureties hereto from their obligations on this bond.

C. **Cases relied upon by St. Paul narrowly construe waiver language in performance bonds and should be rejected.**

In 1928, the Court of Civil Appeals of Texas held that a surety had not consented to changes in payment terms where the contractor failed to retain the required twenty (20%) percent. Aetna Cas. & Sur. Co. v. Robertson Lumber Co., 3 S.W.2d 895, 896-97 (Tex. Civ. App. 1928). However, in that case, the contract provided that the owner reserved only the right "to alter or modify the plans and this specification in any particular [way]." Id. at 897. The architect could only "make any deviation in the construction, detail or execution" without voiding the contract. Id.[5] The consensual provision in this case encompasses all forbearances by PHA in favor of San Lucas as well as any failure by PHA to withhold moneys from San Lucas, not simply modifications to construction plans and specifications.

In 1931, the Fifth Circuit decided a case in which a surety company brought suit in equity against a school district arising out of the construction of a school building. Fort Worth Indep. Sch. Dist. v. Aetna Cas. & Sur. Co., 48 F.2d 1, 2 (5th Cir. 1931). The surety alleged that the district had wrongfully turned over funds to the contractor that should have been paid to laborers and materialmen. Id. The school district was required to withhold fifteen (15%) percent of its payments in retainage, which it did, but which it eventually paid to the contractor. Id. at 3. The school district claimed that a provision in the surety's bond permitted payment of the retainage to the contractor because, through that provision, the surety "had authorized the school board and architect to alter the time and manner of payment to the contractor." Id. That provision, admittedly quite similar to the language at issue in this case, provided that:

[5] If the changes clause is limited to changes in the structure to be erected, courts have sometimes refused to construe such a clause to cover changes in the method and amount of payments. See, for example, Blackburn v. Morel, 79 S.E. 492, 493 (Ga. Ct. App. 1913).

> [a]ny alterations which may be made in the terms of the Contract, or in the work to be done under it, or the giving by the Owner of any extension of time for the performance of the Contract, or any other forbearance on the part of either the Owner or the Principal to the other shall not in any way release the Principal and the surety. . .notice to the Surety or Sureties of any such alteration, extension or forbearance being hereby waived. Id.

The Fifth Circuit held that the provision was not intended to allow a change to the requirements of the contract with respect to the retainage. Id. at 5. See also, Hochevar v. Maryland Cas. Co., 114 F.2d 948 (6th Cir. 1940); Southern Gulf Util., Inc. v. United Ben. Fire Ins. Co., 179 So.2d 618 (Fla. Dist. Ct. App. 1965).

PHA respectfully suggests that such analysis is out of touch with the law of compensated, professional, corporate sureties. Such a decision essentially imposes a limit on a broad contractual waiver, with no basis in the contract for doing so. After all, if a surety states in its bond that no forbearance by PHA in favor of San Lucas, nor any failure by PHA to withhold moneys from San Lucas, will release it, why should the court carve out an exception for progress payments to the contractor? Assuming, as we must for purposes of this motion, that the alleged overpayments occurred, PHA merely forbore from holding San Lucas to the strictest compliance with contractual requirements or, differently stated, failed to withhold moneys from San Lucas, all of which was covered by St. Paul's consent in the Performance Bond and the General Conditions.

**D. St. Paul Should Be Held To The Unambiguous, Common Sense Reading Of The Bond.**

The Performance Bond states in no uncertain terms that no forbearance by PHA in favor of San Lucas "shall be deemed to release the undersigned . . . from their liability thereunder . . ." See Exhibit "A," at 2. "Generally, the plain and unambiguous words of a contract should be given their natural and ordinary meaning [citations omitted] and should not be twisted to create

vagaries or strained to produce ambiguity where none would otherwise exist." Tookmanian v. Safe Harbor Water Power Corp., 505 F. Supp. 920, 922 (E.D.Pa. 1981).

In clear, unambiguous language, St. Paul agreed that no forbearance by PHA in favor of San Lucas nor any failure by PHA to withhold moneys from San Lucas would release it from liability. Now, St. Paul complains that PHA extended San Lucas too much forbearance, and failed to withhold money from San Lucas, and seeks $3 million dollars from PHA.

### E. The Pennsylvania "Gist of the Action Doctrine" Bars Count III of the Complaint

At the beginning of an October 21, 2002 motion hearing in this case, the following exchange occurred:

> THE COURT: We're going to hear argument on the motion to dismiss in the case of St. Paul Mercury Insurance Company v. The Philadelphia Housing Authority. There is a motion to dismiss Counts 1, 3 and 4.
> I have two comments: You don't need to address Count 3 because there's no motion to dismiss it for the grounds that it should be dismissed, but if a motion for summary judgment is filed at the final pretrial I'll grant it because this case is determined under Pennsylvania law; is that not correct? Nobody has claimed –
>
> MR. LAWLER: I believe so, your Honor.
>
> THE COURT: Yes, well, under Pennsylvania law you can't convert a contract to a tort, so this is obviously a case in contract and we will not consider the negligence claim. That doesn't mean that the conduct alleged couldn't be a breach of contract, but it's not a tort, so that we'll ignore that for the purposes of this argument . . . .

Tr. of October 21, 2002 Motion Hearing, at 2 (attached hereto as Exhibit "B"). Based on the Court's inclination and invitation to dismiss Count III of St. Paul's Complaint sounding in negligence, the Authority moves for dismissal. The Court's theory of dismissal expressed at the motion hearing is premised upon an application of the "gist of the action" doctrine.

### 1. The "Gist of the Action" Doctrine Maintains Important Distinctions Between Contract and Tort

As the Superior Court of Pennsylvania observed most recently in its decision in Etoll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 2002 WL 31491011, *3 (Pa. Super. Nov. 8, 2002), the gist of the action doctrine has not yet been expressly adopted by the Supreme Court of Pennsylvania.[6] However, the Superior Court recognized it for the first time in Bash v. Bell Tel. Co., 411 Pa. Super. 347, 601 A.2d 825 (1992). Etoll, 2002 WL 31491011 at *3.

"Generally, the doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims." Id. (citing Bash, 601 A.2d at 829). See also, Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc., 246 F. Supp.2d 394, 402 (E.D. Pa. 2002) (applying Pennsylvania law). "As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." Id. The Bash court explained the difference between contract claims and tort claims as follows:

> [a]lthough they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals . . . . To permit a promisee to sue his promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

Bash, 601 A.2d at 829 (citing Iron Mountain Sec. Storage Corp. v. American Specialty Foods, Inc., 457 F. Supp. 1158, 1165 (E.D.Pa. 1978)).[7] Thus, "[a]lthough mere non-performance of a contract does not constitute a fraud[,] it is possible that a breach of contract also gives rise to an actionable tort[.] To be construed as in tort, however, the wrong ascribed to defendant must be

---

[6] Importantly, however, the district court in Werner Kammann Maschinenfabrik, GmbH v. Max Levy Autograph, Inc., Civ. A. No. 01-1083, 2002 U.S. Dist. LEXIS 1460, *18 (E.D. Pa. Jan. 31, 2002) has predicted that the Supreme Court of Pennsylvania would adopt the gist of the action test.

[7] Superseded by rule on other grounds as stated in Keefer v. Keefer, 741 A.2d 808 (Pa. Super. 1999).

the gist of the action, the contract being collateral." Bash, 601 A.2d at 829 (citing Closed Circuit

Corp. v. Jerrold Electronics Corp., 426 F. Supp. 361, 364 (E.D.Pa. 1977)).

"The important difference between contract and tort actions is that the latter lie from the

breach of duties imposed as a matter of social policy while the former lie for the breach of duties

imposed by mutual consensus." Etoll, 2002 WL 31491011, *3 (citing Redevelopment Auth. v.

International Ins. Co., 454 Pa. Super. 374, 685 A.2d 581, 590 (1996) (en banc), appeal denied,

548 Pa. 649, 695 A.2d 787 (1997) (quoting Phico Ins. Co. v. Presbyterian Med. Srvs. Corp., 444

Pa. Super. 221, 663 A.2d 753, 757 (1995)); Blue Mountain Mushroom Co., 246 F.Supp.2d at

402. "In other words, a claim should be limited to a contract claim when the parties' obligations

are defined by the terms of the contracts, and not by the larger social policies embodied by the

law of torts." Etoll, 2002 WL 31491011, at *3 (citing Bohler-Uddeholm Am., Inc. v. Ellwood

Group, Inc., 247 F.3d 79, 104 (3rd Cir. 2001), cert. denied, 534 U.S. 1162 (2002) (quoting Bash,

601 A.2d at 830) (footnote omitted)); Blue Mountain Mushroom Co., 246 F.Supp.2d at 402.

### 2.     The "Gist of The Action" Doctrine Warrants Dismissal of Count III.

As observed by the Superior Court in Etoll: "[P]ersuasive authority interpreting

Pennsylvania law has restated the gist of the action doctrine in a number of similar ways. These

courts have held that the doctrine bars tort claims: (1) arising solely from a contract between the

parties ... ; (2) where the duties allegedly breached were created and grounded in the contract

itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially

duplicates a breach of contract claim or the success of which is wholly dependent on the terms of

a contract.  Etoll, 2002 WL 31491011, at *7 (citations and internal quotation marks omitted).

Without question, this dispute arises solely from contracts among the parties, the

Authority, San Lucas and St. Paul.  Count I seeks relief for the Authority's alleged breach of

surety rights, and represents St. Paul's many accusations that the Authority, among other things, departed from, and failed to administer, the Contract. See Complaint, ¶¶ 45-51. Count II is for breach of the Takeover Agreement, another contract. Id. ¶¶ 52-57. And Count IV is yet another contract claim -- of the third-party beneficiary variety -- arising from the Authority's alleged failures of performance under "the contract" between the Authority and San Lucas. Id. ¶¶ 62-66.

The allegations in St. Paul's Count III for negligence (Id. ¶¶ 58-61) do not in any way reveal an independent cause of action that is conceptually distinct from the Authority's duties under the Contract. The duty to inspect San Lucas's work before making payments arises from "the Contract." See Id., e.g., ¶¶ 9, 14, 17. The Authority's alleged breach resulting in damage to St. Paul's security interest (Id. ¶¶ 60-61) hardly can be described as collateral to the Contract. Indeed, St. Paul has merely made a transparent attempt to re-cast what are essentially contractual duties by adding language that the Authority somehow failed "to use reasonable care" in carrying out its duties. Id. ¶ 59. Simply by adding talismanic language sounding in tort will not suffice to convert a contract action into a tort action.

Factory Mkt., Inc. v. Schuller Int'l., Inc., 987 F. Supp. 387 (E.D. Pa. 1997) is further instructive. There, the parties entered into a contract under which the defendant agreed to repair a chronically leaking roof. When the roof continued to leak despite many attempts to repair it, the plaintiff brought suit alleging breach of contract, negligence, and fraud. The plaintiffs alleged that the defendant knew at the time of the agreement that the only way to make the roof watertight would be to replace the entire roof. Instead, defendant fraudulently agreed to a series of futile attempts to repair it. Id., 987 F. Supp. at 395. The court, however, held that the plaintiff's negligence claims were barred under the gist of the action doctrine, and reasoned that the obligation to make the roof watertight was imposed by the contract, not in tort. Indeed,

without the contract, the plaintiff would have no claim at all. Id. It should go without saying that absent the contractual duties relied on so heavily by St. Paul throughout its Complaint, St. Paul likewise would have no claim at all in this case.

## V. CONCLUSION

Counts I, III and IV of St. Paul's Complaint should be dismissed. This result is not only dictated by the plain language of the bond, but is consistent with public policy. It is the public, here in the person of PHA, who bears the cost of the required bond. Plaintiff, as a compensated surety, is in the business of taking risks in return for premium dollar. If this defendant's motion is granted, all that will have occurred is that St. Paul will have fulfilled, at its own expense, the obligations which it undertook when it elected to post the performance bond in this matter.

Defendant requests that summary judgment be entered in its favor on Counts I, III and IV of Plaintiff's Complaint.

Respectfully submitted,

**BLANK ROME LLP**

Date: 6/23/03

BY: ______________________

DENIS JAMES LAWLER
DANIEL E. RHYNHART
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

Attorneys for Defendant,
Philadelphia Housing Authority

# Exhibit A

PERFORMANCE BOND

BOND NO. JX9663

| | |
|---|---|
| CONTRACTOR: | SAN LUCAS CONSTRUCTION COMPANY INC |
| CONTRACTOR'S STATE: | STATE OF NEW JERSEY |
| CONTRACTOR'S ADDRESS: | 534 SOUTH 15TH STREET PHILADELPHIA PA 19146 |
| TYPE OF ORGANIZATION: | CORPORATION |
| WORK DESCRIPTION: | RICHARD ALLEN HOMES-HOPE VI SITE B2 & B3 GENERAL CONSTRUCTION |
| SPECIFICATION DATE: | JULY 29, 1997 |
| FUNDING SOURCE: | 194 |
| LINE ITEM NO.: | 930006 |
| ACCOUNT CODE: | 146000 |
| CONTRACT NO.: | 9589 |
| CONTRACT AMOUNT: | ELEVEN MILLION EIGHT HUNDRED NINETY THOUSAND DOLLARS ($11,890,000.00) |
| PROJECT: | RICHARD ALLEN |
| PROJECT NO.: | PA 2-03 |
| PROJECT ADDRESS: | 1015 PARRISH DRIVE PHILADELPHIA PA |
| AGREEMENT DATE: | NOV 0 6 1997 |

KNOW ALL MEN BY THESE PRESENTS, That we, the above-listed CONTRACTOR, as the above-listed TYPE OF ORGANIZATION, organized and existing under the laws of the above-listed CONTRACTOR'S STATE, located at the above-listed CONTRACTOR'S ADDRESS, (hereinafter called the "Principal Obligor"), and

Surety, are jointly and severally held and firmly bound unto the Philadelphia Housing Authority, in the sum of the above-listed CONTRACT AMOUNT lawful money of the United States of America, to be paid to the said Authority, its successors and assigns; to which payment well and truly to be made, we do bind ourselves and each of us, and each of our heirs, executors, and administrators, successors and assigns, jointly and severally, firmly by these presents.

Sealed with the seal of the said Principal Obligor and with the corporate seal of the said Surety, duly attested by the proper offices thereof.

Dated the 16TH day of OCTOBER , 1997 .

WHEREAS, the above bounden Principal Obligor, in and by a certain contract with the Philadelphia Housing Authority of even date herewith, agreed to perform all work required for the above-listed WORK DESCRIPTION for the Philadelphia Housing Authority, in strict accordance with the Specification, which have been made a part hereof and designated as the above-listed SPECIFICATION NO., as is in said contract more fully set forth.

NOW, THE CONDITION OF THIS OBLIGATION IS SUCH, That if the said Principal Obligor shall and do well and truly, in all respects, comply with all terms, conditions and covenants contained in the above mentioned contract, and shall and do pay unto the Philadelphia Housing Authority, upon demand, any and all loss, damage and expenses which the Philadelphia Housing Authority may or shall sustain by reason of the failure of the said Principal Obligor to comply with the terms of the said contract, it being hereby understood and agreed that the decision of the Authority as to such failure in complying with the terms of the said contract and as to the amount of loss or damage sustained by reason thereof, being binding and conclusive upon the parties hereto, then this obligation to be null and void; otherwise, to be and remain in full force and effect.

The undersigned Principal Obligor and Surety hereby agree that no modification of the terms of the above mentioned contract or alteration in the work to be done under it, and forbearance on the part of either the Authority or of the Contractor to the other, either by the grant of an extension of time for the performance of the contract or otherwise, shall be deemed to release the undersigned or either of them, their or either of their heirs, executors, administrators or assigns, from their liability thereunder, notice to the Surety of any such modification, alteration, extension or forbearance hereby being waived.

And we do for ourselves and each of us, our and each of our heirs, executors, administrators, successors and assigns, hereby authorize and empower any attorney of any court of record in Pennsylvania or elsewhere by him deputized for the purpose, upon the filing of this instrument or a copy thereof, duly attested as correct, to appear for us or either of us, our or either of our heirs, executors or administrators, successors or assigns, and in our names, or in the name of either of us, our or either of our heirs, executors or administrators, successors or assigns, confess a judgment against us or either of us, our or either of our heirs, executors, administrators, successors or assigns in favor of the Philadelphia Housing Authority, for the sum named in this bond, without defalcation, with costs of suit, release of errors, and with five per centum added for collection fees; hereby waiving the benefit of all exemption laws and the holding of inquisition in any real estate that may be levied upon by virtue of such judgment voluntarily condemning such real estate and authorizing the entry of such condemnation upon any writ of fieri facials and agreeing that said real estate may be sold under the same; and further waiving all errors, defects and imperfections whatsoever in the entering of the said judgment or any process thereon, and hereby agreeing that no writ of error objection or motion or rule to open or strike off judgment or to stay execution or appeal, shall be made or taken thereto.

The right and power to appear and to enter or confess judgment hereinabove provided for and the right to assess damages under any such judgment shall not be exhausted by one or more uses thereof. And for the doing of these acts, this instrument or a copy thereof, attested as aforesaid, shall be full warrant authority.

IN WITNESS WHEREOF, the above bounden parties have executed this Instrument

under their several seals, the day and year first above written, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

ATTEST:

Secretary Urkia Hernandez

CONTRACTOR:

San Lucas Construction Company, Inc.
Name of Contractor

President Galo A. Gutierrez

ATTEST

SURETY COMPANY

St. Paul Mercury Insurance Company

Attorney-in-Fact, William L. Rushton

The rate of premium on this bond is $ SEE BACK per thousand. The total amount of premium charges is $ 84,690.00

(The above must be filled in by the corporate surety.)

CERTIFICATE AS TO CORPORATE PRINCIPAL

I, Galo A. Gutierrez, certify that I am the President of the corporation named as Principal in the within bond; that I, who signed the said bond on behalf of the Principal was then President of said corporation; that I know his signature, and his signature thereto is genuine; and that said bond was duly signed, sealed, and attested to for and in behalf of said corporation by authority of its governing body.

Sign and Seal

Surety 385 Washington Street, St. Paul, Minnesota 55102 AUTHORITY NO.

CERTIFIED COPY NO. For verification of the authenticity of this Power of Attorney you may telephone toll free 1-800-421-3880 and ask for the Power of Attorney Clerk. Please refer to the Certificate of Authority No. and the named individual(s).

M-15038

# GENERAL POWER OF ATTORNEY - CERTIFIED COPY
(Original on File at Home Office of Company. See Certification.)

401014

KNOW ALL MEN BY THESE PRESENTS: That St. Paul Mercury Insurance Company, a corporation organized and existing under the laws of the State of Minnesota, having its principal office in the City of St. Paul, Minnesota, does hereby constitute and appoint:

James D. Toennies, William J. Parkes, William L. Rushton, Joseph P. Hassett, Sharon Highsmith, individually, Conshohocken, Pennsylvania

its true and lawful attorney(s)-in-fact to execute, seal and deliver for and on its behalf as surety, any and all bonds and undertakings, recognizances, contracts of indemnity and other writings obligatory in the nature thereof, which are or may be allowed, required or permitted by law, statute, rule, regulation, contract or otherwise,

NOT TO EXCEED IN PENALTY THE SUM OF TWENTY-FIVE MILLION DOLLARS($25,000,000)EACH

and the execution of all such instrument(s) in pursuance of these presents, shall be as binding upon said St. Paul Mercury Insurance Company, as fully and amply, to all intents and purposes, as if the same had been duly executed and acknowledged by its regularly elected officers at its principal office.

This Power of Attorney is executed, and may be certified to and may be revoked, pursuant to and by authority of Article V,-Section 6(C), of the By-Laws adopted by the Shareholders of ST. PAUL MERCURY INSURANCE COMPANY at a meeting called and held on the 28th day of April, 1978, of which the following is a true transcript of said Section 6 (C):

"The President or any Vice President, Assistant Vice President, Secretary or Service Center General Manager shall have power and authority
(1) To appoint Attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the Seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings obligatory in the nature thereof, and
(2) To appoint special Attorneys-in-fact, who are hereby authorized to certify to copies of any power-of-attorney issued in pursuance of this section and/or any of the By-Laws of the Company, and
(3) To remove, at any time, any such Attorney-in-fact or Special Attorney-in-fact and revoke the authority given him."

Further, this Power of Attorney is signed and sealed by facsimile pursuant to resolution of the Board of Directors of said Company adopted at a meeting duly called and held on the 12th day of December, 1967, of which the following is a true excerpt:

"Now therefore the signatures of such officers and the seal of the Company may be affixed to any such power of attorney or any certificate relating thereto by facsimile, and any such power of attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by facsimile signatures and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached."

IN TESTIMONY WHEREOF, St. Paul Mercury Insurance Company has caused this instrument to be signed and its corporate seal to be affixed by its authorized officer, this 30th day of November, A.D. 1990.

ST. PAUL MERCURY INSURANCE COMPANY

STATE OF NEW JERSEY } ss.
County of Somerset

KENNETH J. RYAN, Secretary

On this 2nd day of July, 19 97, before me came the individual who executed the preceding instrument, to me personally known, and, being by me duly sworn, said that he/she is the therein described and authorized officer of St. Paul Mercury Insurance Company; that the seal affixed to said instrument is the Corporate Seal of said Company; that the said Corporate Seal and his/her signature were duly affixed by order of the Board of Directors of said Company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal, at the township of Bedminster, New Jersey, the day and year first above written.

LINDA SMETHERS, STATE OF NEW JERSEY, NOTARY PUBLIC

SP000252

LINDA SMETHERS, Notary Public, Middlesex, N
My Commission Expires December 16, 200

## CERTIFICATION

I, the undersigned officer of St. Paul Mercury Insurance Company, do hereby certify that I have compared the foregoing copy of the Power of Attorney and affidavit, and the copy of the Section of the By-Laws of said Company as set forth in said Power of Attorney, with the ORIGINALS ON FILE IN THE HOME OFFICE OF SAID COMPANY, and that the same are correct transcripts thereof, and of the whole of the said originals, and that the said Power of Attorney has not been revoked and is now in full force and effect.

IN TESTIMONY WHEREOF, I have hereunto set my hand this 16th day of October, 19 97.

MICHAEL W. ANDERSON, Secretary

Only a certified copy of Power of Attorney bearing the Certificate of Authority No. printed in red on the upper right corner is binding. Photocopies, carbon copies or other reproductions of this document are invalid and not binding upon the Company.

ANY INSTRUMENT ISSUED IN EXCESS OF THE PENALTY AMOUNT STATED ABOVE IS TOTALLY VOID AND WITHOUT ANY VALIDITY.

21801 Rev. 12-96 Printed in U.S.A.

# Exhibit B

(3) Enforce all warranties for the benefit of the PHA/IHA.

(g) In the event the Contractor's warranty under paragraph (a) of this clause has expired, the PHA/IHA may bring suit at its own expense to enforce a subcontractor's, manufacturer's or supplier's warranty.

(h) Unless a defect is caused by the negligence of the Contractor or subcontractor or supplier at any tier, the Contractor shall not be liable for the repair of any defect of material or design furnished by the PHA/IHA nor for the repair of any damage that results from any defect in PHA/IHA furnished material or design.

(i) Notwithstanding any provisions herein to the contrary, the establishment of the time periods in paragraphs (a) and (c) above relate only to the specific obligation of the Contractor to correct the work, and have no relationship to the time within which its obligation to comply with the contract may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to its obligation other than specifically to correct the work.

(j) This warranty shall not limit the PHA's/IHA's rights under the Inspection and Acceptance of Construction clause of this contract with respect to latent defects, gross mistakes or fraud.

24. Prohibition Against Liens

The Contractor is prohibited from placing a lien on the PHA's/IHA's property. This prohibition shall apply to all subcontractors at any tier and all materials suppliers.

## Administrative Requirements

25. Contract Period

The Contractor shall complete all work required under this contract within 606 calendar days of the effective date of the contract, or within the time schedule established in the notice to proceed issued by the Contracting Officer.

26. Order of Precedence

In the event of a conflict between these General Conditions and the Specifications, the General Conditions shall prevail. In the event of a conflict between the contract and any applicable state or local law or regulation, the state or local law or regulation shall prevail; provided that such state or local law or regulation does not conflict with, or is less restrictive than applicable federal law, regulation, or Executive Order. In the event of such a conflict, applicable federal law, regulation, and Executive Order shall prevail.

27. Payments

(a) The PHA/IHA shall pay the Contractor the price as provided in this contract.

(b) The PHA/IHA shall make progress payments approximately every 30 days as the work proceeds, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer. The PHA/IHA may, subject to written determination and approval of the Contracting Officer, make more frequent payments to contractors which are qualified small businesses.

(c) Before the first progress payment under this contract, the Contractor shall furnish, in such detail as requested by the Contracting Officer, a breakdown of the total contract price showing the amount included therein for each principal category of the work, which shall substantiate the payment amount requested in order to provide a basis for determining progress payments. The breakdown shall be approved by the Contracting Officer and must be acceptable to HUD. If the contract covers more than one project, the Contractor shall furnish a separate breakdown for each. The values and quantities employed in making up this breakdown are for determining the amount of progress payments and shall not be construed as a basis for additions to or deductions from the contract price. The Contractor shall prorate its overhead and profit over the construction period of the contract.

(d) The Contractor shall submit, on forms provided by the PHA/IHA, periodic estimates showing the value of the work performed during each period based upon the approved breakdown of the contract price. Such estimates shall be submitted not later than ____ days in advance of the date set for payment and are subject to correction and revision as required. The estimates must be approved by the Contracting Officer with the concurrence of the Architect prior to payment. If the contract covers more than one project, the Contractor shall furnish a separate progress payment estimate for each.

(e) Along with each request for progress payments and the required estimates, the Contractor shall furnish the following certification, or payment shall not be made:

I hereby certify, to the best of my knowledge and belief, that -

(1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements; and,

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

(Name)

______________________________

(Title)

______________________________

(Date)

______________________________

(f) Except as otherwise provided in State law, the PHA/IHA shall retain ten (10) percent of the amount of progress payments until completion and acceptance of all work under the contract; except, that if upon completion of 50 percent of the work, the Contracting Officer, after consulting with the Architect, determines that the Contractor's performance and progress are satisfactory, the PHA/IHA may make the remaining payments in full for the work subsequently completed. If the Contracting Officer subsequently determines that the Contractor's performance and progress are unsatisfactory, the PHA/IHA shall reinstate the ten (10) percent (or other percentage as provided in State law) retainage until such time as the Contracting Officer determines that performance and progress are satisfactory.

(g) The Contracting Officer may authorize material delivered on the site and preparatory work done to be taken into consideration when computing progress payments. Material delivered to the Contractor at locations other than the site may also be taken into consideration if the Contractor furnishes satisfactory evidence that (1) it has acquired title to such material; (2) the material is properly stored in a bonded warehouse, storage yard, or similar suitable place as may be approved by the Contracting Officer; (3) the material is insured to cover its full value; and (4) the material will be used to perform this contract. Before any progress payment which includes delivered material is made, the Contractor shall furnish such documentation as the Contracting Officer may require to assure the protection of the PHA's/IHA's interest in such materials. The Contractor shall remain responsible for such stored material notwithstanding the transfer of title to the PHA/IHA.

(h) All material and work covered by progress payments made shall, at the time of payment become the sole property of the PHA/IHA, but this shall not be construed as (1) relieving the Contractor from the sole responsibility for all material and work upon which payments have been made or the restoration of any damaged work; or, (2) waiving the right of the PHA/IHA to require the fulfillment of all of the terms of the contract. In the event the work of the Contractor has been damaged by other contractors or persons other than employees of the PHA/IHA in the course of their employment, the Contractor shall restore such damaged work without cost to the PHA/IHA and to seek redress for its damage only from those who directly caused it.

(i) The PHA/IHA shall make the final payment due the Contractor under this contract after (1) completion and final acceptance of all work; and (2) presentation of release of all claims against the PHA/IHA arising by virtue of this contract, other than claims, in stated amounts, that the Contractor has specifically excepted from the operation of the release. Each such exception shall embrace no more than one claim, the basis and scope of which shall be clearly defined. The amounts for such excepted claims shall not be included in the request for final payment. A release may also be required of the assignee if the Contractor's claim to amounts payable under this contract has been assigned.

(j) Prior to making any payment, the Contracting Officer may require the Contractor to furnish receipts or other evidence of payment from all persons performing work and supplying material to the Contractor, if the Contracting Officer determines such evidence is necessary to substantiate claimed costs.

(k) The PHA/IHA shall not (1) determine or adjust any claims for payment or disputes arising thereunder between the Contractor and its subcontractors or material suppliers; or, (2) withhold any moneys for the protection of the subcontractors or material suppliers. The failure or refusal of the PHA/IHA to withhold moneys from the Contractor shall in nowise impair the obligations of any surety or sureties under any bonds furnished under this contract.

## 28. Contract Modifications

(a) Only the Contracting Officer has authority to modify any term or condition of this contract. Any contract modification shall be authorized in writing.

(b) The Contracting Officer may modify the contract unilaterally - (1) pursuant to a specific authorization stated in a contract clause (e.g., Changes); or (2) for administrative matters which do not change the rights or responsibilities of the parties (e.g., change in the PHA/IHA address). All other contract modifications shall be in the form of supplemental agreements signed by the Contractor and the Contracting Officer.

(c) When a proposed modification requires the approval of HUD prior to its issuance (e.g., a change order that exceeds the PHA's/IHA's approved threshold), such modification shall not be effective until the required approval is received by the PHA/IHA.

## 29. Changes

(a) The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes:

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) PHA/IHA-furnished facilities, equipment, materials, services, or site; or,

(4) Directing the acceleration in the performance of the work.

(b) Any other written order or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances and source of the order and (2) that the Contractor regards the order as a change order.

(c) Except as provided in this clause, no order, statement or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for a adjustment based on defective specifications, no proposal for any change under paragraph (b) above shall be allowed for any costs incurred more than 20 days (5 days for oral orders) before the Contractor gives written notice as required. In the case of defective specifications for which the PHA/IHA is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause, or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting a written statement describing the general nature and the amount of the proposal. If the facts justify it, the Contracting Officer may extend the period for submission. The proposal may be included in the notice required under paragraph (b) above. No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

(f) The Contractor's written proposal for equitable adjustment sh[illegible] be submitted in the form of a lump sum proposal supported with an itemized breakdown of all increases and decreases in the contract in at least the following details:

(1) Direct Costs. Materials (list individual items, the quantity and unit cost of each, and the aggregate cost); Transportation and delivery costs associated with materials; Labor breakdowns by hours or unit costs (identified with specific work to be performed); Construction equipment exclusively necessary for the change; Costs of preparation and/or revision to shop drawings resulting from the change; Worker's Compensation and Public Liability Insurance; Employment taxes under FICA and FUTA; and, Bond Costs - when size of change warrants revision.

(2) Indirect Costs. Indirect costs may include overhead, general and administrative expenses, and fringe benefits not normally treated as direct costs.

(3) Profit. The amount of profit shall be negotiated and may vary according to the nature, extent, and complexity of the work required by the change.

The allowability of the direct and indirect costs shall be determined in accordance with the Contract Cost Principles and Procedures for Commercial Firms in Part 31 of the Federal Acquisition Regulation (48 CFR 1-31), as implemented by HUD Handbook 2210.18, in effect on the date of this contract. The Contractor shall not be allowed a profit on the profit received by any subcontractor. Equitable adjustments for deleted work shall include a credit for profit and may include a credit for indirect costs. On proposals covering both increases and decreases in the amount of the contract, the application of indirect cost and profit shall be on the net-change in direct costs for the Contractor or subcontractor performing the work.

**CERTIFICATE OF SERVICE**

I, Lisa F. Troilo, hereby certify that I am an employee of Blank Rome LLP, as secretary to Denis James Lawler, Esquire, and that a true and correct copy of the foregoing Pretrial Memorandum of Defendant Philadelphia Housing Authority was served this 23rd day of June, 2003 by United States First Class Mail, postage prepaid, upon counsel of record as noted below:

James Dunbar, Esquire
Venable Baetjer & Howard, LLP
1800 Merchantile Bank & Trust Bldg.
2 Hopkins Plaza
Baltimore, MD 21201-2978

William J. Devlin, Jr., Esquire
Devlin & Devine
100 West Elm Street, Suite 200
Conshohocken, PA 19428

Lisa F. Troilo