IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, : | |
| : | |
| Plaintiff, : | |
| : | |
| vs. : | CIVIL ACTION |
| : | NO. 02-3511 |
| PHILADELPHIA HOUSING AUTHORITY, : | |
| : | |
| Defendant. : | |
| : | |

### DEFENDANT PHILADELPHIA HOUSING AUTHORITY'S MOTION *IN LIMINE* TO LIMIT OR PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES

Defendant Philadelphia Housing Authority ("PHA"), by and through its undersigned counsel, respectfully moves this Court for an Order substantially in the form submitted herewith, precluding or limiting the expert testimony of Plaintiff St. Paul Mercury Insurance Company's expert witnesses. PHA relies upon and incorporates its memorandum of law, attached hereto, as support for its Motion.

Respectfully submitted,

BLANK ROME LLP

By: _____
Denis James Lawler, Esquire
Daniel Rhynhart, Esquire
Rebecca Ward, Esquire
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

*Attorneys for Defendant*
*Philadelphia Housing Authority*

Dated: June 23, 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ST. PAUL MERCURY INSURANCE COMPANY, :
                                             :

                Plaintiff,           :

                                           :

              vs.                  :      CIVIL ACTION
                                         :      NO. 02-3511

PHILADELPHIA HOUSING AUTHORITY,    :

                                         :

              Defendant.      :

### ORDER

AND NOW, this ____ day of _____, 2003, upon consideration of the motion *in limine* of Defendant Philadelphia Housing Authority to Preclude or Limit the Testimony of St. Paul Mercury Insurance Company's expert witnesses, and any response thereto, it is hereby ORDERED and DECREED that the Motion is GRANTED, and the proposed expert testimony of Anthony Creamer and William A. Manginelli is precluded for the reasons set forth in the motion.

                                                 _____
                                                 Honorable Norma L. Shapiro
                                                 United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, : <br> : <br> Plaintiff, : <br> : <br> vs. : <br> : <br> PHILADELPHIA HOUSING AUTHORITY, : <br> : <br> Defendant. : <br> : | CIVIL ACTION <br> NO. 02-3511 |

## MEMORANDUM OF LAW OF DEFENDANT PHILADELPHIA HOUSING AUTHORITY IN SUPPORT OF ITS MOTION *IN LIMINE* TO LIMIT OR PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES

Defendant Philadelphia Housing Authority ("PHA"), by and through its undersigned counsel, respectfully submits this memorandum of law in support of its motion *in limine* to preclude or limit the testimony of Plaintiff St. Paul Mercury Insurance Company's expert witnesses, Anthony Creamer and William A. Manginelli.

## PRELIMINARY STATEMENT

Plaintiff St. Paul Mercury Insurance Company ("St. Paul") has identified two experts in this matter: Anthony Creamer, a certified public accountant, and William A. Manginelli, a mechanical engineer and construction manager. As set forth below, the opinions of these expert witnesses should be precluded, or at least severely limited, for they are based upon the thinnest of reeds, a series of baseless assumptions and irrelevant conclusions.

## I.    FACTUAL BACKGROUND

### A.    The Terms of the Construction Contract.

St. Paul's claims arise out of a Contract for Construction ("Construction Contract") relating to a project owned and managed by PHA, the Richard Allen Homes public housing project ("the Project").   (A copy of the Construction Contract is attached to Plaintiff's Complaint as Exhibit "1").   Under the terms of the Construction Contract, San Lucas Construction Co., Inc. ("San Lucas") was to renovate certain existing single-family units and construct or renovate other buildings in the Project, for the fixed price of $11,890,000.  In connection with the Project, San Lucas requested that St. Paul, as surety, issue payment and performance bonds.   On or about October 16, 1997, in exchange for payment of a $108,588.00 premium, St. Paul issued a Performance Bond and a Materialmen's Bond.  (A copy of the Performance Bond is attached to Plaintiff's Complaint as Exhibit "6").  Pursuant to those bonds, St. Paul held itself out as jointly and severally bound with San Lucas to PHA for the entire amount of the $11,890,000 contract.

Under the terms of the contract, PHA was required to make progress payments to San Lucas "approximately every 30 days as the work progressed, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer."   See General Conditions of the Contract for Construction ("General Conditions"), ¶ 27, attached to Plaintiff's Complaint as Exhibit "2." San Lucas was required to submit to PHA periodic progress reports for approval before payment would be made.  Id. at ¶ 27(d).  PHA was entitled to retain ten percent (10%) of the amount of its progress payments during the course of the work until the Project was fifty

-2-

percent (50%) completed. See General Conditions at ¶ 27(f). The PHA General Conditions (attached to the Complaint as Exhibit "3") authorize the payment to the contractor of one-half of the retainage after half of the work has been completed:

> PHA shall follow State Law with regard to retainage. Ten percent shall be retained until 50% of the contract is completed. When the contract is 50% completed, one-half of the amount retained by PHA shall be returned to the contractor: Provided, That the architect or engineer approves the application for payment: And provided further, That the contractor is making satisfactory progress and there is no specific cause for greater withholding. The sum or sums withheld by the contracting body from the contractor after the contract is 50% completed shall not exceed 5% of the value of completed work based on monthly progress payment requests . . . .

PHA General Conditions at ¶ 24.

## B.    San Lucas' Performance of the Construction Contract.

By December 6, 1999, San Lucas had submitted to PHA twenty-three payment applications and estimated that eighty-two percent (82%) of the work under the contract was complete, with an adjusted contract value of $9,850,032.72. In response to those twenty-three applications, PHA paid a total of $9,357,531.08 to San Lucas, which represented eighty-two percent (82%) of the adjusted contract value, less five percent (5%) in retainage.

On January 24, 2000, after St. Paul demanded that PHA stop payment to San Lucas and after San Lucas abandoned the Project, PHA terminated the Construction Contract with San Lucas. PHA and St. Paul entered into a Takeover Agreement, after which St. Paul engaged a completion contractor to complete the work. The remaining balance under the Construction Contract at the time of San Lucas' termination was $2,711,413.84. St. Paul hired a contractor to complete the work for $6,150,000.00.

100847.00610/21160990v2

C.    <u>St. Paul's Claims Against PHA.</u>

St. Paul alleges that San Lucas had at that time completed "materially less" than eighty-two percent (82%) of the work on the Construction Contract. St. Paul further asserts that PHA improperly reduced its retainage in violation of the contract.

St. Paul has filed suit against PHA principally to recoup alleged excess progress payments made by PHA to San Lucas, and for failing to maintain the ten percent (10%) retainage. Here, St. Paul contends that PHA should have withheld funds from San Lucas because, it alleges, work which San Lucas claimed to have completed was either not done at all, or not done in accordance with contractual requirements. PHA contends that the funds paid to San Lucas were due, and that position is supported by the U.S. Army Corps of Engineers' representative, Mr. Ivaniw, who visited the Project monthly, and reported on the percentage of completion to HUD, which had contracted with the Corps to, among other things, make certain that HUD funds were only disbursed on account of work properly completed.

Even if St. Paul could show that PHA had overpaid San Lucas, *i.e.,* that it had failed to withhold funds from San Lucas, that failure was explicitly, "in nowise [to] impair the obligations of" St. Paul:

> The PHA shall not (1) determine or adjust any claims for payment or disputes arising thereunder between the Contractor and its subcontractors or material suppliers; or, (2) withhold any moneys for the protection of the subcontractors or material suppliers. <u>The failure or refusal of the PHA to withhold moneys from the Contractor shall in nowise impair the obligations of any surety or sureties under any bonds furnished under this contract.</u>

<u>See</u> General Conditions, Exhibit "B" at ¶ 27(k) (emphasis added).

D.    <u>St. Paul's Expert Witnesses</u>.

St. Paul has served the reports of two proposed expert witnesses:  Anthony Creamer ("Creamer"), a certified public accountant with Navigant Consulting, Inc., and William A. Manginelli ("Manginelli"), a mechanical engineer and construction manager with Trauner Consulting Services, Inc.

Creamer's expert opinion can be summarized very briefly.  Creamer compared San Lucas' internal cost control reports, which listed checks cut by San Lucas to its subcontractors and suppliers, with the amounts paid by PHA to San Lucas.  Creamer apparently expected a dollar-for-dollar match between those two amounts.  When he found that on a month-to-month basis San Lucas paid out to its subcontractors and vendors less than it received from PHA, Creamer leapt to the conclusion that PHA must have improperly paid "too much" to San Lucas for its partial performance of the contract.

Manginelli offers a number of opinions.  He sets forth three methods by which he calculated St. Paul's purported damages.  First, Manginelli adopts a version of the disfavored and discredited "total cost method," under which he simply subtracts the amount still due under the original contract from the amount St. Paul paid for the completion contract, after consideration but no quantification of a purported "completion premium."   Second, Manginelli uses yet another flavor of the "total cost method," taking PHA's post-termination estimate of the work remaining to be done, and then subtracting <u>that</u> amount from the completion contract, again after consideration but no quantification of a purported "completion premium."  Finally, Manginelli looks at numerous line-item estimates of the

-5-

work left to be done after San Lucas' termination, and consistently takes the lowest estimate for each line-item, concluding that the most pessimistic estimate must be the most accurate.

Manginelli offers other questionable opinions. He states that St. Paul is entitled to recover damages for an "improper" reduction of retainage under the contract with San Lucas without providing any bases for his conclusion. He further opines that St. Paul suffered damages from PHA's failure to withhold funds for bond claims. These opinions, however, fly in the face of the governing contract language, which permitted PHA to take exactly the actions it took here.

For these reasons, and for the reasons set forth below, both Creamer's and Manginelli's expert opinions should be precluded, or at the very least limited.

## II.    ARGUMENT

### A.    Standard for Expert Witnesses.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The rule sets forth:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

As the United States Court of Appeals for the Third Circuit has explained, Rule 702 imposes two discrete requirements which must be satisfied before an expert is allowed to provide testimony at trial. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (1994). First, "a witness proffered to testify to specialized knowledge must be an expert." Id. Second, the opinions and testimony of the proposed expert must be reliable. Put another way, the

proposed expert's testimony must be trustworthy.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 2795, n. 9 (1993).

In Daubert, the Supreme Court of the United States, pursuant to Rule 104(a), imposed a "gatekeeping" obligation on district courts in situations where expert testimony is elicited.  Id. at 2786.  In particular, the Supreme Court instructed that in such situations, courts are to conduct a "preliminary assessment of whether the reasoning or methodology underlying [an expert's] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Id. at 2796; see also General Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512 (1997) (concluding that the Federal Rules of Evidence make it clear that it is the judge's duty to determine whether proposed expert testimony is admissible).  Importantly, the party seeking to introduce the expert testimony has the burden of proving the admissibility of the expert testimony.  See Oddi v. Ford Motor Co., 234 F. 3d 136, 144 (3d Cir. 2000).

This "gatekeeping" obligation was recently determined to encompass not only testimony based on "'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1170 (1999).  Courts have especially noted the need for strict scrutiny of the admissibility of opinions on economic damages because they amount "to an array of figures conveying a delusive impression of exactness in an area where a [fact-finder's] common sense is less available than usual to protect it."  Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2d Cir. 1962), cert. denied, 369 U.S. 865 (1962).  Cf. JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc., 1998 WL 175888 (E.D. Pa.), aff'd, 178 F.3d

1279 (1999) (<u>Daubert</u> review of expert opinion on damages); <u>Frymire-Brinati v. KPMG Peat Marwick</u>, 2 F.3d 183 (7th Cir. 1993)(applying the <u>Daubert</u> analysis to the testimony of an accountant); <u>Robert Billet Promotions v. IMI Cornelius</u>, 1998 WL 151806 (E.D. Pa. Apr. 1, 1998) (holding that <u>Daubert</u> applies to the proffered testimony of a damages expert).

### 1.    The Court must assess the facts upon which an expert opinion is purportedly based.

The concept of reliability or trustworthiness is founded in Rules 702 and 703 of the Federal Rules of Evidence. Rule 703 sets forth, in pertinent part, that if an expert's opinion is not based on admissible evidence, the opinion must be based on the type of facts or data that is "reasonably relied upon by experts in the particular field." Rule 702, in turn, establishes that expert testimony will be permitted if it "will assist the trier of fact." In this regard, "when a trial judge analyzes whether an expert's data is of a type reasonably relied upon by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." <u>Paoli Railroad</u>, 35 F.3d at 749, <u>Daubert</u>, 113 S. Ct. at 2795.

In this regard, "[a]lthough facts not otherwise admissible in evidence may form the basis for assumptions by an expert witness, the court must make a factual inquiry and finding as to what data experts in the field find reliable." <u>Advent Systems Ltd. v. Unisys Corp.</u>, 925 F.2d 670, 682 (3d Cir. 1991). In fact, in <u>Advent</u>, the court noted that "an opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse." <u>Id.</u> Consequently, if a court determines that an expert's opinion is based upon unproven or false facts, the technique or methodology utilized by the expert is flawed or the expert's opinion is based on "speculation or conjecture," the expert

-8-

must be precluded by the court from testifying.  See Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 75 (3d Cir. 1996)(citations omitted); Roberson v. City of Philadelphia, Civ. A. No. 99-3574, 2001 WL 210294, at *4-5 (E.D. Pa. Mar. 1, 2001) (finding expert opinions based upon speculation to be unreliable).

### 2.    The Court also must assess the methodology used by the witness in forming his opinion.

Once the facts underlying an expert's opinion are scrutinized, a district court is entrusted with analyzing the methodology utilized by the expert in formulating his opinion. Controlling precedent requires that an expert's method must be reliable and cannot reply upon speculation and/or conjecture.  Daubert, 113 S. Ct. at 2795, Fedorczyk, 82 F.3d at 75, Paoli Railroad, 35 F.3d at 75, Advent, 925 F.2d at 682.  In Joiner, the Supreme Court recently expressed the common sense rule as follows:

> Trained experts commonly extrapolate from existing data.  But nothing in Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit*[1] of the expert.  A court may conclude that *there is simply too great an analytical gap between the data and the opinion proffered.*

118 S. Ct. at 519 (emphasis added).  Cf. Target Market Publ'g, Inc. v. ADVO, Inc., 136 F.3d 1139 (7th Cir. 1998)(approving exclusion of damage expert testimony based on optimistic assumptions and which was implausible in the light of existing evidence); Boucher v. United States Suzuki Motor Corp., 73 F.3d 18 (2d Cir. 1996)(upholding district court's exclusion of expert testimony based on unrealistic assumptions of plaintiff's earning potential); Cummins

---

[1]"He himself said it; *a bare assertion resting on the authority of an individual.*"  BLACK'S LAW DICTIONARY 828 (6th Ed. 1990)(emphasis added).

100847.00610/21160990v2

v. Lyle Ind., 93 F.3d 362 (7th Cir. 1996) (affirming district court decision to exclude expert testimony predicated on expert's own untested observations without reliance on scientific method); Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137 (4th Cir. 1994) (excluding expert testimony that was speculative and not supported by the record); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549 (D.C. Cir. 1993)(excluding expert testimony "based solely on guesswork, speculation, and conjecture" in a situation where the court believed that "the decision to receive expert testimony was simply tossed off to the jury under a 'let it all in' philosophy").

Both Creamer's and Manginelli's expert opinions fail to meet these standards for admissibility.

### B.    Creamer's Testimony Should Be Precluded or Limited, Because His Opinions Are Based on Unsupported Assumptions.

Creamer's opinion is misleading in its simplicity – it is nothing more than a comparison of the numbers reflected on San Lucas' internal cost control reports for checks written to suppliers and subcontractors with numbers on the pay estimates submitted to and approved by various representatives of PHA.  From this review, Creamer concludes that since San Lucas had been required to pay out less than it took from PHA within given time frames, then it must have submitted (and PHA accepted) "excess billings" for work that had not been completed.  Creamer concludes that PHA overpaid approximately $1.18 million.[2]

---

[2] Interestingly, this analysis undercuts St. Paul's claim that only 55% of the work had been completed on the contract – under Creamer's reasoning, San Lucas had completed in excess of 65% of the work.  Further, Creamer's conclusions about overpayments is considerably higher than even the most pessimistic line-item review performed by St. Paul's other expert witness, Manginelli, who found only $813,075.00 in supposed overpayments.  See Report of William A. Manginelli (hereinafter "Manginelli Report") at 2.  Notably, under Manginelli's analysis, PHA properly paid San Lucas for completion of more than 70% -- and perhaps as much as 80% -- of the contract.

-10-

Creamer's analysis, however, has several fundamental flaws. First, Creamer simply assumes the unaudited reports' accuracy, though their method of preparation is unknown. Further, Creamer ignores the fact that PHA awarded a firm, fixed-price, not a "cost-plus" contract, and was not required to simply match the costs incurred and paid by San Lucas. Instead, PHA was required to pay for <u>percentage of work completed</u>. Thus, the assumption that the pay estimates should track the costs is directly contradicted by the contract itself.[3]

Creamer's opinion also implicitly assumes that there can be no other explanation for the differences between the pay estimates and the cost control reports. This fails to account for any number of easily probable reasons for the divide. First, and most significantly, Creamer ignores the fact that San Lucas was entitled to make a profit on the contract in question – and that percentage-of-work-completed billing permitted it to recognize such profit from the very first pay estimate. Simply put, San Lucas was not required to wait until the end of the contract to receive a lump-sum payment for its entire profit.

Second, Creamer's opinion implicitly assumes that for each time period in question, the internal cost control reports captured all potential liabilities to San Lucas' vendors and subcontractors. Creamer makes no effort to consider whether some vendors or subcontractors had not submitted bills for any given time period or whether San Lucas had contested the amounts and thus had not recorded liabilities in the internal cost control reports. Finally, Creamer fails to consider whether San Lucas – having successfully bid on a firm fixed-price contract – managed to negotiate favorable pricing with its suppliers and

---

[3] In fact, even under a "cost-plus" contract, the pay estimates would be expected to reflect a percentage "plus" above the actual costs incurred.

subcontractors, which might likewise explain the differences between the cost reports and the pay estimates.

This complete failure to actually explore the factual bases for the differences between the cost control reports and the pay estimates is a true indicator that Creamer has not relied upon "good grounds" in formulating his opinions. Daubert, 113 S. Ct. at 2795; Paoli Railroad, 35 F.3d at 749. Such expert testimony based upon speculation or conjecture, or "assumptions that are so unrealistic and contradictory as to suggest bad faith," should be excluded. Boucher, 73 F.3d at 21; Guillory v. Domtar Indus., Inc., 95 F.3d 1320, 1331 (5th Cir. 1996); Roberson, 2001 WL 210294, at *4-5. More specifically, an expert opinion regarding damages must be excluded if based on assumptions that are unsupported by the record. Boucher, 73 F.3d at 21-23; Tyger, 29 F.3d at 142-145.

In sum, Creamer simply makes a leap of illogic without a net to catch him – there is far "too great an analytical gap between the data" of the cost control reports and the pay estimates, and the opinion proffered (i.e., that PHA improperly accepted "excessive billings" from San Lucas). Joiner, 118 S. Ct. at 519. Creamer's expert opinion must be precluded.

C.    Manginelli's Opinions Rely Upon Unsupported Conjecture and Unreliable Methodology.

Manginelli offers several different, yet equally faulty, calculations of St. Paul's alleged damages. Each opinion has such shaky foundations that it cannot survive Daubert/Kumho Tire scrutiny.

-12-

1.    Manginelli's calculation based upon a "Completion
Costs Method" is nothing more than an unreliable
"Total Cost Method," and must be precluded.

Manginelli first calculates St. Paul's alleged damages using the "total cost method."
Manginelli Report at 4-8. Under that method, damages are calculated by determining the
difference between a contractor's actual costs and its original bid. See Net Construction Inc.
v. C & C Rehab and Constr., Inc., ___ F. Supp. 2d ___, 2003 WL 1870563, *4 (E.D. Pa.,
Apr. 9, 2003); E. C. Ernst, Inc. v. Koppers Co., Inc., 626 F.2d 324 (3d Cir. 1980); Glasgow,
Inc. v. Commw. of Pennsylvania, Dept. of Transp., 529 A.2d 576, 579 (Pa. Commw. 1987).
Similarly, Manginelli determines St. Paul's claimed damages by subtracting the remaining
balance on the San Lucas bid from the amount of the completion contract awarded by St.
Paul. With a single exception – a questionable calculation of the effect of inflation –
Manginelli attributes the entire difference to PHA's alleged "overpayments" to San Lucas.

As the federal and state courts of Pennsylvania have acknowledged repeatedly,
however, the "total cost method" is disfavored, and for good reason: It is inherently
unreliable and often results in little more than speculative calculations of damages. Net
Construction, 2003 WL 1870563 at *4; Lichter v. Mellon-Stuart Co., 305 F.2d 216, 219 (3d
Cir. 1962); Glasgow, 529 A.2d at 579; In re Meyertech Corp., 831 F.2d 410, 419-420 (3d Cir.
1987); John F. Harkins Co., Inc. v. School Dist. of Philadelphia, 460 A.2d 260, 263 (Pa.
Super. 1983) ("[b]ecause the total cost method . . . is imprecise, it is fraught with danger and
must be applied with caution"); Binks Mfg. Co. v. Bedwell Co., Civ. A. No. 96-2554, 1997
WL 461908, *10-11 (E.D. Pa., July 29, 1997).

-13-

    **a.**    **Manginelli has not and cannot meet the standards for application of the "total cost method."**

        **i.**    **Manginelli has not and cannot establish that there are no other means of measuring St. Paul's claimed damages.**

Given the fundamental unreliability of the "total cost method," such analysis cannot be used unless the proponent can meet a four-prong test. The first prong emphasizes that this method is a last-choice means of calculating damages in cases such as this one. Harkins, 460 A.2d at 263-64 (this method "has been tolerated only when no other mode was available and when the reliability of the supporting evidence was fully substantiated") (emphasis added); Glasgow, 529 A.2d at 579 (courts will only utilize this method when there is no other means of determining damages") (emphasis added). Thus, as a threshold matter, before they may rely upon the imprecise and speculative "total cost method," St. Paul and Manginelli must first establish that there simply is no other means to measure St. Paul's claimed damages. Binks, 1997 WL 461908 at *10; Harkins, 460 A.2d at 263-264 (method "should be used only when the circumstances are exceptional" and "no other method" of determining damages is available).

That burden cannot be met here. In fact, as Manginelli's own report makes clear, there are other methods of determining St. Paul's damages. First, and most simply, assuming *arguendo* that PHA improperly paid San Lucas for work that had not yet been completed – either $813,000 (as found by Manginelli) or $1.18 million (as found by Creamer) in alleged overpayments – then that amount should measure St. Paul's damages. Further, if

-14-

St. Paul can prove liability, a properly performed line-item analysis[4] of (a) the work completed on the Project and the work remaining; (b) a quantification of a completion contract "premium;" (c) the changed market in the number of contractors available to bid on the Project; and (d) the effect of things such as weather, vandalism and the like would yield a more accurate calculation of damages than the simplistic "total cost" method selected here.

Therefore, Manginelli's "Completion Costs Method" fails this first, crucial prong of the Harkins test" and must be precluded for this reason alone.

### ii.    Manginelli does not even attempt to establish that San Lucas' original bid was realistic.

The second prong of the test for admission of the "total cost method" requires the proponent to prove that the original bid for a construction project was, in fact, realistic before it can be used as a starting point for a damages calculation. Binks, 1997 WL 461908 at *10; Harkins, 460 A.2d at 263. In other words, if the contract was underbid from its inception, neither San Lucas nor St. Paul can hold PHA responsible for costs that should have been captured in the initial bid. Harkins, 460 A.2d at 263 ("[t]he necessity for showing an accurate bid estimate prior to utilization of the total cost method is basic"). For instance, this is a case in which San Lucas apparently thought it could employ non-union labor!

Manginelli, however, does not even raise this issue. Rather, his opinion implicitly assumes that San Lucas' original bid was realistic, and therefore any escalation of costs in excess of the remaining balance must be PHA's responsibility. Such an assumption,

---

[4] As set forth more fully below, Manginelli undertakes such a line-item analysis. However, his execution of those calculations is so flawed that his expert opinions on those matters likewise must be precluded.

-15-

however, is not permitted, and renders Manginelli's expert opinion inadmissible. See, e.g., Harkins, 460 A.2d at 263-264; Binks, 1997 WL 461908 at *10.

Thus, Manginelli's opinion on the "Completion Costs Method" fails the second prong of the Harkins test, and must be excluded for this reason as well.

### iii. Manginelli assumes, without explanation and without apparent basis, that the actual costs on the completion contract were reasonable.

The next prong of the Harkins test requires the proponent of a "total cost" calculation to prove that the actual costs incurred in performance of a contract were, in fact, reasonable. Harkins, 460 A.2d at 263-264; Binks, 1997 WL 461908 at *10. Again, Manginelli's report reflects no meaningful analysis of this issue. Manginelli merely makes the conclusory assertion that the price of the NDK completion contract "was the best price that market conditions and the circumstances of the project allowed." Manginelli Report at 4. Even when he raises the possibility that a premium might have been charged by NDK,[5] Manginelli dismisses the need to deduct such a premium from St. Paul's damages – he does not, in fact, even say what an expected premium should have been, but simply declares that the entire increase in costs must be attributable to PHA's alleged overpayments to San Lucas. Id. at 8.

This is precisely the type of "*ipse dixit*" decried by Joiner, and is especially troubling for two reasons. As Manginelli acknowledges, San Lucas' original bid was lower than the next highest by approximately $1.5 million more, and NDK's bid on quadrant B-2 was, for

---

[5]NDK may very well have been able to inflate its bid simply because it was the only remaining bidder for the completion contract after its sole competitor was eliminated from consideration by St. Paul due to delays in obtaining a performance bond.

no discernible reason, more than $2 million above the original successful completion contract bidder, The Delta Organization, Inc. ("Delta").[6] Further, Manginelli's calculations account for only approximately $1.6 million in additional costs,[7] leaving roughly half of St. Paul's increased costs on the completion contract completely unexplained. In sum, the "analytical gap" between the data examined by Manginelli and his conclusion on this point is more like a gaping chasm.

Thus, Manginelli's "Completion Costs" opinion fails the third prong of the <u>Harkins</u> test, and must be precluded.

### iv. Manginelli does not establish that none of the increased costs are the responsibility of the contractors, San Lucas and NDK.

The final prong of the <u>Harkins</u> test of admissibility requires the proponent of the "total cost method" to establish that none of the escalated costs were caused by the contractor itself.[8] <u>Harkins</u>, 460 A.2d at 263-264; <u>Binks</u>, 1997 WL 461908 at *10. Manginelli fails to make even the most *pro forma* examination of this issue. Rather, his entire opinion is based upon the implicit assumption that not even a single penny of the increased costs can

---

[6] St. Paul terminated Delta after Atlantic Underwriting Agency ("AUA") delayed its decision to award a surety bond because of AUA's concerns over the troubled history of the Richard Allen project, and after refusing to relax its deadlines for submission of a bond so that Delta could meet that contract requirement. In fact, St. Paul's failure to work with Delta to obtain a bond substantially increased its costs on the B-2 phase – through no fault of PHA.

[7] Approximately $813,000 for alleged overpayments on line-items, $275,000 for escalation in labor and materials rates, and $492,000 for alleged improper reduction in the retainage.

[8] In this case, this requires Manginelli to examine whether either San Lucas or NDK caused any of the cost escalations.

-17-

be attributed to the conduct of either San Lucas or NDK[9]   Again, Manginelli's failure to consider a completion premium is a glaring problem:  He acknowledges that completion contractors such as NDK typically charge a premium in such situations, to give themselves a comfortable "cushion" that can either be used to absorb unexpected additional costs or (in the absence of such contingencies) to provide an additional profit margin.  Further, as a single bidder, NDK could easily have increased its bid without worrying about a competitor underbidding it.  Yet, Manginelli does not say what a typical, expected "cushion" would be – he simply declares the total increased costs to be PHA's responsibility.

Again, Manginelli assumes too much, and his "Completion Costs" opinion fails the fourth prong of the Harkins test for admissibility.

> **b.    Manginelli's "Completion Costs" method is undermined by other unsupported assumptions.**

The tenuous nature of Manginelli's "Completion Costs" calculation becomes even more apparent upon scrutiny of other underlying details.

> **i.    Manginelli's assumptions regarding the appropriate escalation rate for increases in the costs of materials lack any foundation.**

Manginelli first errs when he attempts to calculate the appropriate escalation rate to account for increases in the costs of materials from the date of the original bid.[10]  Manginelli uses the Consumer Price Index for All Urban Consumers ("CPI-U") as the basis for his

---

[9] Further, as set forth more fully below, Manginelli apparently does not consider whether third-parties, or other factors such as weather damage while the Project was shut down, might be responsible for at least some of the increased costs.

[10] This calculation is important because even Manginelli acknowledges that escalation in labor and materials must be deducted from St. Paul's damages.

calculation– although the CPI-U focuses upon price changes in consumer[11] expenses rather than residential construction materials. See, e.g., In re the Petition of the County of Essex, 691 A.2d 846 (N.J. Super. App. Div. 1997) (CPI escalator not appropriate for solid waste contract rate increases, because CPI reflected inflation in areas such as food, housing and electronic goods and bore little relationship to solid waste industry); Franklin County Welfare Rights Org. v. Public Utilities Comm'n, 377 N.E.2d 990, 997 (Ohio 1978) (gas utility properly allowed to escalate rates at double CPI because CPI "has no validity as an indicator" of changes in pricing in gas industry). Manginelli's error is apparent in light of the fact that the Bureau of Labor Statistics (BLS) itself publishes Producer Price Indices for various industries, including those that manufacture materials for residential construction.

Manginelli makes a second error – he presumes, without any apparent basis, that "50 percent of the balance [on the original contract] consisted of materials costs, and 50 percent consisted of labor costs[.]" Manginelli Report at 7. Manginelli makes this assumption, without even a perfunctory analysis of the numerous detailed estimates prepared after San Lucas' termination, or NDK's own cost records from its work on the completion. Any reasonable methodology surely would involve a review of the actual records from the Project. Yet Manginelli again relies upon baseless assumption. This is nothing more than

---

[11] The BLS has categorized the consumer expenditures in the CPI in eight broad categories: (a) food and beverages, such as cereal, milk, chicken, and snacks; (b) housing costs, such as rent, fuel oil, and furniture; (c) apparel, such as shirts, dresses and jewelry; (d) transportation costs, such as vehicle purchases, airline fares, and auto insurance; (e) medical care, such as drugs, eyeglasses, and physician care; (f) recreation, such as cable television, pets, and movie tickets; (g) education and communication, such as tuition and telephone; and (h) other goods and services, such as personal services and funeral expenses. See FREQUENTLY ASKED QUESTIONS, "What Goods and Services Does the Consumer Price Index (CPI) Cover?", http://www.bls.gov/dolfaq/bls_ques3.htm.

sheer speculation of the sort that renders an expert opinion inadmissible under Daubert/Kumho Tire. Fedorczyk, 82 F.3d at 75.

ii.    **Manginelli simply declares PHA to be responsible for any cost overruns.**

In assuming PHA's responsibility for all cost overruns in his "Completion Costs Method," Manginelli simply overlooks, or deliberately disregards, the actual circumstances of the Richard Allen project. As addressed above, Manginelli blithely dismisses NDK's need, and its ability as a sole bidder on a distressed contract awarded by a desperate surety, to impose a premium on the completion contract. Manginelli's report also is strikingly silent about other obvious causes for cost overruns: San Lucas was terminated in the winter, and the uncompleted construction site was subject to months of inclement weather and vandalism, requiring NDK to repair or replace items that had been damaged in the interim. Further, NDK's costs were inevitably increased by inefficiencies in assuming control of another contractor's site and remobilizing and coordinating work on a complicated, long-term construction project with multiple other contractors. Manginelli also ignores the effect of changes in the market for subcontractors and vendors – at the time the original contract was bid, there were few other projects to compete for those services and goods. However, by the time of the completion contract, subcontractors and vendors were in greater demand and therefore could impose their own cost increases on NDK.

Common sense requires an expert such as Manginelli to consider these factors in formulating his opinion about St. Paul's damages. In fact, Manginelli raises the same questions in his criticism of PHA's post-termination estimate. Manginelli Report at 8-9. Manginelli's opinion on this point is all the more questionable for his criticisms of PHA's

-20-

use of the next-highest original bid as a comparison. He actually enumerated the factors that might have led to the differences in the original bids:

> . . . differences in labor rates, material sources and subcontractors, as well as differences in the companies' current workload, availability of personnel, and bonding capacity.

Manginelli Report at 8  Yet for his "Completion Costs Method," Manginelli turns a blind eye to these issues, without even the perfunctory "review" he gives to the probability of a completion premium. This failure renders his "total cost" calculations useless:

> . . . . In order for a contractor to establish liability under the total cost theory, it is essential that the contractor establish liability, causation, and resultant injury. . . . When a contractor takes his total cost less his estimated cost under the contract pursuant to the total cost theory, adjustments must be made for various costs incurred which were not a result of the defendant's breach. . . . Thus, in order to justify an award under the total cost theory, evidence must be presented by the injured contractor which establishes with reasonable certainty that its increased costs were directly due to the actions of the defendant.

Glasgow, 529 A.2d at 579 (emphasis added). Where there is no basis for even an "educated guess" about how damages caused by a defendant can be "distinguished from those . . . which defendant is . . . exempt from" paying, the total cost method is not acceptable. Lichter, 305 F.2d at 219.

In summary, Manginelli starts with an assumption – that PHA's purported overpayments to San Lucas caused St. Paul's damages – and allows nothing to distract him from that goal. This "analysis" does not meet the requirements of Daubert and Kumho Tire, and must be excluded.

    **2.**    Manginelli's   calculation   based   upon   an <u>"Completion Estimate Method" must be precluded.</u>

        **a.**    Manginelli's  "Completion  Estimate  Method" suffers from many of the same infirmities as his <u>"Completion Cost Method."</u>

Manginelli provides an alternative calculation for St. Paul's claimed damages that is, again, simply a "total cost method." However, this second calculation uses as a starting point the PHA post-termination completion estimate rather than San Lucas' original bid. <u>Manginelli Report</u> at 8-9. Again, Manginelli simply takes the difference between the NDK completion contract and the PHA completion estimate, and attributes the entire $1,588,777.00 difference to PHA's alleged "overpayments"[12] to San Lucas. This "analysis" fails to solve any of the problems of the "total cost method," and thus should be excluded for the same reasons set forth in Section C.1. above.

        **b.**    Manginelli's  "Completion  Estimate  Method"  is <u>nothing other than a blind leap of illogic.</u>

This second calculation also has its own fatal weakness. Manginelli's opinion on this point is all the more questionable for his criticisms of the PHA estimate that forms his starting point. Manginelli himself expresses no confidence in the basis for the PHA estimate, and yet concludes that the higher NDK price must be reasonable despite his own utter failure to subject that bid to the scrutiny he demands of PHA. Manginelli simply notes that PHA concluded a completion contract would cost more than the balance remaining on the original contract. <u>Manginelli Report</u> at 8-9. Based solely upon this fact, and nothing else, Manginelli concludes that "jobsite conditions would not explain the difference between

---

[12] Overpayments estimated by Creamer to be only $1.18 million and by Manginelli himself as only $813,000.00.

the value of the estimate and the contract balance," and therefore "contract funds were paid to San Lucas for work that was either not performed or not properly completed." Id. at 9.

The reader is left to a futile search of Manginelli's report for the reasoned support for this conclusion – there is none. This makes his opinion useless. See, e.g., Hasenhauer v. The Celotex Corp., Civ. A. No. 93-385, 1996 WL 481529 at *6-8 (E.D. Pa., Aug. 22, 1996), Again, Manginelli offers nothing more than the "*ipse dixit*" rejected in Joiner, and the "analytical gap" between his data and his conclusion cannot be bridged.

### 3. Manginelli's "Line Item Analysis Method" also is irretrievably marred.

Finally, Manginelli turns to the only methodology that might shed some light on St. Paul's claimed damages (assuming that St. Paul can establish liability): a "line-item analysis" of the actual work supposedly left undone by San Lucas but paid for by PHA. Manginelli Report at 10-11. Strikingly, when Manginelli gets down to this level of detail, he finds overpayments of a mere $813,075.00 (thus implicitly acknowledging that PHA properly paid San Lucas $8,544,456.08). However, he reaches this point based only upon his adoption of the most pessimistic post-termination estimates for each line-item. No checks were done against NDK's actual experience on the completion contract, nor does he even use all of NDK's own estimates. Throughout his line-item analysis, he always uses the highest percentage for uncompleted (and the lowest percentage for completed) work on each line-item, regardless of which estimate was used.

Even here, where he might have advanced a supportable and supported opinion, Manginelli again offers an "*ipse dixit*" – for each line-item, the most pessimistic estimate (*i.e.,* the one most favorable to St. Paul's damages calculation) must be the most accurate.

-23-

4.    Manginelli's opinions on "Additional Payment Issues" are contradicted by the factual record, and therefore are inadmissible.

Manginelli closes his expert report with a series of subsidiary opinions about "Additional Payment Issues." These opinions likewise should be precluded.

a.    The contract language clearly states that PHA is not liable for San Lucas' failure to pay its subcontractors and suppliers.

Manginelli faults PHA for not reserving funds to pay San Lucas' contractors after receiving notice of such claims totaling $367,528.79. Manginelli Report at 11. Manginelli also states that St. Paul should be reimbursed for additional bond claims in the amount of $1,673,186.72. Id. This opinion flies in the face of the clear contract language – PHA was not required to make such reserves, nor may St. Paul attempt to absolve itself of the terms of its own bonds:

> The PHA shall **not** (1) determine or adjust any claims for payment or disputes arising thereunder between the Contractor and its subcontractors or material suppliers; **or,** (2) **withhold** any moneys for the protection of the subcontractors or material suppliers. The failure or refusal of the PHA to withhold moneys from the Contractor **shall in nowise** impair the obligations of any surety or sureties under any bonds furnished under this contract.

See General Conditions at ¶ 27(k) (emphasis added). The Performance Bond itself requires St. Paul to pay bond claims even if PHA had altered its payment procedures with San Lucas. Performance Bond, at 2. In other words, the governing contract language could not be any less ambiguous, and must be applied as written. Tookmanian v. Safe Harbor Water Power Corp., 505 F. Supp. 920, 922 (E.D.Pa. 1981) ("the plain and unambiguous words of a contract should be given their natural and ordinary meaning").

-24-

PHA was never responsible for claims by contractors and suppliers, and St. Paul cannot complain about having to perform the contractual obligations that it voluntarily assumed. See, e.g., Aniero Concrete Co., Inc. v. N.Y. City Constr. Auth., No. 94 Civ. 9111, 95 Civ. 3506, 1998 WL 148324 (S.D.N.Y. Mar. 30, 1998). Manginelli's opinions, to the extent they are contradicted by the factual record and the governing law, are inadmissible. Advent, 925 F.2d at 682 ("an opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse").

> **b.**   **Manginelli's opinion about "corrective work" should be stricken.**

Manginelli also offers an opinion that "there was a substantial amount of corrective work that had to be performed before PHA accepted many of the elements of work for which it had paid San Lucas." This is the sum total of that opinion – there is no analysis and no quantification of these claimed damages. In fact, Manginelli straightforwardly acknowledges that there are "no documents . . . to quantify this reported corrective work." In light of Manginelli's complete inability to conduct even a cursory analysis, much less provide an actual number for the jury's consideration, this opinion should be precluded *in toto*. It simply offers the jury no assistance in its fact-finding function, and only asks it to speculate about what the "corrective work" might have involved and might have cost.

In any event, such costs should have been captured in (a) NDK's costs for performing the completion contract, and its bid to St. Paul, and/or (b) the line-item analysis of work left undone or done improperly. Thus, admission of such an opinion invites the jury to double-count an unknown amount of damages in St. Paul's favor.

-25-

### c.    Manginelli's opinion regarding an "improper" reduction of the retainage should be precluded.

Finally, Manginelli's opinion about PHA's reduction of retainage under the contract should be excluded.  First, the Conditions of the contract with San Lucas permitted PHA to reduce the retainage to 5% when PHA determined that 50% of the work had been satisfactorily completed:  See General Conditions at ¶ 27(f).  The PHA General Conditions (attached to the Complaint as Exhibit "3") authorize the payment to the contractor of one-half of the retainage after half of the work has been completed:

> PHA shall follow State Law with regard to retainage. Ten percent shall be retained until 50% of the contract is completed.  When the contract is 50% completed, one-half of the amount retained by PHA shall be returned to the contractor:  Provided, That the architect or engineer approves the application for payment:  And provided further, That the contractor is making satisfactory progress and there is no specific cause for greater withholding.  The sum or sums withheld by the contracting body from the contractor after the contract is 50% completed shall not exceed 5% of the value of completed work based on monthly progress payment requests . . . .

PHA General Conditions at ¶ 24 (emphasis added).

Manginelli does not marry himself to any particular percentage, and therefore avoids the effect of this contract language entirely.   His reticence is understandable.   In its Complaint, St. Paul complained that 55% of the work was completed by the time San Lucas was terminated.  Although PHA disagrees, even that low percentage is beyond the threshold that permitted – in fact, required – PHA to reduce the retainage to 5%, and any position to the contrary suggests that PHA should have breached its own obligations to San Lucas.  Further, Creamer and Manginelli analyze the purported "overpayments" and implicitly acknowledge that PHA properly found more than 50% of the work to be completed.

Regardless, the Contracting Officer ("CO") on the Project concluded, after a detailed multi-step review for each payment request, that San Lucas had completed 82% of the Project by the time of the last payment. A CO's decision to accept or reject performance is entitled to high deference, and cannot be lightly ignored. See, e.g., Manning Elec. & Repair Co., Inc. v. United States, 22 Cl. Ct. 240, 244 (1991). More specifically, a surety bears a very high burden of proof in claiming damages for overpayments when a CO has decided to make progress payments and not to withhold funds. United States Fidelity & Guaranty Co. v. United States, 676 F.2d 622 (Ct. Cl. 1982) (deferring to Contracting Officer's decision). Cf. North American Constr. Corp. v. United States, 56 Fed. Cl. 73, 84 (2003) ( "[i]n the absence of an abuse of discretion, courts generally defer to the CO in determining equitable adjustments based upon the CO's availability at the construction site to evaluate conditions in conjunction with her expertise in the work required to perform projects").

Manginelli is completely silent on any factual bases for a finding that the Contracting Officer here abused her discretion in accepting San Lucas' pay estimates and in reducing the retainage to 5% as the contract required.[13] Rather he simply assumes that the reduction in the retainage was "improper." That unsupported assumption does not fulfill the requirements of Daubert and Kumho Tire, and his opinion on this issue must be precluded.

Finally, again Manginelli invites double-counting, for St. Paul's complaint about a retainage reduction is a subset of the claim for excessive overpayments. Even if St. Paul is

---

[13] In short, Manginelli does not make even a half-hearted effort to address the detailed pay estimates, the reports prepared by the Army Corps of Engineers reviewer, the progress shown by other contractors on the site, and San Lucas' daily progress reports – all of which support the Contracting Officer's approval of payments to San Lucas.

right, the amounts at issue for the reduced retainage should be captured in (a) NDK's bid and costs, and/or (b) the line item analysis of work left undone or done improperly.

### D. The Probative Value of This Testimony is Substantially Outweighed by the Danger That It Will Cause Unfair Prejudice, Confusion of the Issues and/or Mislead the Jury.

Rule 403 of the Federal Rules of Evidence sets forth, in pertinent part:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ..

Rule 403 also applies here, and this court may balance the probative value of these opinions against any prejudice. Daubert, 509 U.S. at 595. In fact, the court has greater discretion to exclude expert opinions under Rule 403 simply because it is more difficult for a jury to evaluate expert opinion than lay opinion. Hasenhauer 1996 WL 481529 at *6, citing Daubert and Paoli Railroad, 35 F.3d at 747.

As set forth in detail above, Creamer's and Manginelli's opinions regarding damages are based upon unsupported assumptions and employ methodologies which render their opinions nothing more than speculation and conjecture. Assuming *arguendo* that these opinions have a scintilla of probative value, such probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues and/or misleading the jury, likely to be caused by such opinions' faulty foundation and methodology. As such, Rule 403 warrants that Creamer's and Manginelli's testimony be precluded. See, e.g., Hasenhauer, 1996 WL 481529 at *7-8 (finding error in refusing to strike expert testimony under Rule 403 where expert failed to support opinion or to explain the reasons for his conclusions).

-28-

## CONCLUSION

For all of the foregoing reasons, Defendant Philadelphia Housing Authority respectfully requests that the Court enter an Order precluding or limiting the expert testimony of Anthony Creamer and William A. Manginelli.

Respectfully submitted,

**BLANK ROME LLP**

Dated: June 23, 2003                  By: _____

Denis James Lawler, Esquire
Daniel Rhynhart, Esquire
Rebecca Ward, Esquire
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

*Attorneys for Defendant
Philadelphia Housing Authority*

100847.00610/21160990v2

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Motion *in Limine* to Limit of

Preclude the Testimony of Plaintiff's Expert Witnesses was served this 23rd day of June,

2003 by first class mail upon counsel of record as noted below:

William J. Devlin, Jr., Esquire
Devlin & Devine
100 West Elm Street, Suite 200
Conshohocken, PA 19428

James Dunbar, Esquire
Paul F. Strain, Esquire
Venable Baetjer & Howard, LLP
1800 Merchantile Bank & Trust B
2 Hopkins Plaza
Baltimore, MD 21201-2978

-30-