IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Action No. 02-CV-3511 |
| PHILADELPHIA HOUSING AUTHORITY | * | |
| | * | |
| Defendant. | * | |
| *     *     *     *     * | *     *     *     * | |

## PLAINTIFF ST. PAUL MERCURY INSURANCE COMPANY'S MOTION REQUESTING PRETRIAL RULING ON BURDEN OF PROOF

Plaintiff St. Paul Mercury Insurance Company ("St. Paul"), by its undersigned counsel, hereby requests the Court's pretrial ruling that Defendant Philadelphia Housing Authority ("PHA") bears the burden of proof at trial on the issue of whether St. Paul was prejudiced by PHA's overpayments to San Lucas Construction Company.  St. Paul identified this issue in its Pretrial Memorandum as one that was unresolved and required attention before trial.  (See Plaintiff St. Paul Mercury Insurance Company's Pretrial Memorandum at 58.)  St. Paul relies on and incorporates the attached memorandum of law as support for this Motion.

Respectfully submitted,

**VENABLE, BAETJER AND HOWARD, LLP**

By: _James A. Dunbar /KEw_
Paul F. Strain
James A. Dunbar
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400
Attorneys for Plaintiff and Counter-Defendant
St. Paul Mercury Insurance Company d/b/a The
St. Paul Surety

**DEVLIN & DEVINE**

Dated: July 9, 2003

By: _William J. Devlin, Jr. /KEw_
William J. Devlin, Jr.
Devlin & Devine
100 West Elm Street, Suite 200
Conshohocken, Pennsylvania 19428
(610) 397-4600

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ST. PAUL MERCURY INSURANCE
COMPANY                                      *

                                             *
          Plaintiff,

                                             *
v.
                                             *          Civil Action No. 02-CV-3511
PHILADELPHIA HOUSING
AUTHORITY                                     *

          Defendant.                         *

          *    *    *    *    *    *    *    *    *

PLAINTIFF ST. PAUL MERCURY INSURANCE COMPANY'S
OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff St. Paul Mercury Insurance Company ("St. Paul"), by its undersigned

attorneys, hereby opposes the motion for partial summary judgment filed by the

Philadelphia Housing Authority ("PHA").

INTRODUCTION

This case involves PHA's improper payment of hundreds of thousands of dollars

to San Lucas Construction Company, Inc. ("San Lucas") for work it did not do, in

violation of St. Paul's rights as San Lucas' surety.

Shortly after St. Paul filed this action against PHA seeking to recover its damages

resulting from PHA's improper overpayments to San Lucas, PHA filed a motion to

dismiss. The motion to dismiss claimed that the construction contract between PHA and

San Lucas had been "modified" in a way that authorized PHA to make payments to San

Lucas for work that it had not done. The motion further claimed that St. Paul had waived

its right to object to contract "modifications" and therefore was not entitled to bring this

lawsuit. This Court denied PHA's motion to dismiss.[1]

Discovery in this case has affirmatively disproved PHA's contention that the contract was modified to permit payments for work that was not done. Sheila Maxwell, the contract administrator and contracting officer on the case, testified that she could not recall any such modification. (***Exhibit 1***, Maxwell Dep. at 65-67). Contract modifications were required to be in writing, and PHA has not produced a written modification permitting it to pay San Lucas for work that was not done.

Now, PHA has filed a virtually identical motion, re-labeled as a motion for partial summary judgment. The principal difference between the motion to dismiss and the motion for partial summary judgment is that PHA no longer contends that the contract was "modified" to permit it to pay San Lucas for work that was not done. Instead, PHA now claims that its payments to San Lucas for work that was not done were acts of "forbearance" to San Lucas, and that St. Paul waived its right to object to such acts of "forbearance."

PHA's present motion is just as meritless as the motion to dismiss. It suffers from three main problems:

1.    PHA has not produced in discovery or submitted in support of its motion a shred of evidence that supports its factual assertion that it engaged in an act of "forbearance" towards San Lucas.

2.    The evidence obtained in discovery by St. Paul conclusively establishes

---

[1] St. Paul raised the overpayment issue shortly after PHA called upon it to complete the project. To accommodate PHA's desire for prompt completion, however, St. Paul agreed in the Takeover Agreement to reserve its overpayment claim rather than demanding its immediate resolution. Significantly, PHA did not claim at the time of the Takeover Agreement that St. Paul had contractually waived the overpayment claims. That did not occur until St. Paul filed this lawsuit.

that there was no such act of deliberate "forbearance" by PHA. Michael Leithead, the original contracting officer on the San Lucas contract and now the second in command at PHA, testified that he had never, for anyone, authorized a payment under a PHA contract that exceeded the value of the work actually performed, and he certainly never did it for San Lucas. He further testified that except for one instance of criminal conduct in the late 1980s, which is irrelevant to this case, he is not aware of anyone at PHA who ever authorized a payment to a PHA contractor that exceeded the value of the work actually performed. (See *Exhibit 2*, Leithead Dep. at 168-169). That testimony disposes of PHA's "forbearance" assertion. At a minimum, it certainly creates a disputed issue of material fact as to whether PHA undertook any act of deliberate "forbearance" by which it paid San Lucas for work it had never performed.

3. PHA's assertion that St. Paul waived its right to bring this action is inconsistent with the facts, the language of the relevant contract documents, and the law. A surety's right to unpaid collateral that has not been diminished by improper overpayments to the contractor can only be waived by "the most unequivocal language in the guarantee agreement." Langeveld v. LRZH Corporation, 376 A.2d 931 (N.J. 1977). There is nothing in the contract documents that unequivocally waives St. Paul's right to bring its claim in this case. Further, it would be inconsistent with plain English to characterize PHA's overpayments to San Lucas as acts of "forbearance," especially when PHA's second-in-command has denied under oath any such "forbearance." Finally, most courts that have considered language similar to the language upon which PHA relies have held that it does not waive a surety's right to bring an overpayment claim. See, e.g., Ft. Worth Indep. Sch. Dist. v. Aetna Casualty & Surety Co., 48 F.2d 1, 4 (5th Cir. 1931).

St. Paul's collateral for its obligations on the Project included the funds to be paid under the contract but not yet paid to San Lucas. Id.

The Indemnity Agreement between St. Paul and San Lucas and its principals is in accordance with long-established custom and practice in the construction industry. It reinforces and is consistent with St. Paul's common law right of subrogation with respect to unpaid contract proceeds. See North American Specialty Ins. Co. v. Chichester Sch. Dist., 2000 WL 1052055, *6-7 (E.D. Pa., July 20, 2000); Langeveld v. LRZH Corp., 376 A.2d 931, 934 (N.J. 1977); see also Restatement (Third) of Suretyship and Guaranty, § 31.

III.    The Contract Provisions Relevant to PHA's Motion.

The performance bond was drafted by PHA and was part of the original bid package. It contained a modification clause in which St. Paul consented in advance to certain types of formal "modifications" to the terms of the construction contract or alterations to the work to be done under it. (See *Ex. 4* at 2.) That clause, in its entirety, reads as follows:

> The undersigned Principal Obligor and Surety hereby agree that no modification of the terms of the above mentioned contract or alteration in the work to be done under it, and forbearance on the part of either the Authority or of the Contractor to the other, either by the grant of an extension of time for the performance of the contract or otherwise, shall be deemed to release the undersigned or either of them, their or either of their heirs, executors, administrators or assigns, from their liability thereunder, notice to the Surety of any such modification, alteration, extension or forbearance hereby being waived.

(Id.) Neither this clause, nor any other language in the bond, releases, waives, or even mentions any claims by St. Paul arising out of the dissipation of its collateral as a result of overpayments by PHA to San Lucas.

PHA was required to withhold, as retainage, ten percent of progress payments. The contract documents contain two conflicting clauses describing how the retainage

subcontractors or material suppliers; or, (2) withhold any moneys for the protection of the subcontractors or material suppliers. The failure or refusal of the PHA/IHA to withhold moneys from the Contractor shall in nowise impair the obligations of any surety or sureties under any bonds furnished under this contract.

IV.    San Lucas's Flawed Performance of the Contract.

San Lucas began working under the contract in early 1998. From the very beginning, PHA was highly critical of San Lucas's performance, which was plagued by delays, poor workmanship, and San Lucas's failure to pay its subcontractors and suppliers. (See *Exhibit 8*, correspondence relating to San Lucas' performance problems.)

Some specific examples:

- On January 28, 1999, David M. Stembel, the Architect on the Project who is employed by Wallace Roberts and Todd, wrote a letter stating his significant concerns about the quality and timeliness of San Lucas' work. Stembel's letter stated, among other things, that "in recording progress against the contract schedule it is clear that the buildings in Phase I are as much as 6 months behind. It has not been demonstrated to WRT [the architectural firm] how San Lucas can make up the considerable lost time and meet your needs in turning over buildings in the first Quadrant for occupancy. From our perspective, there is room for improvement in San Lucas' performance and improvement is clearly needed to meet their contract with PHA."

(See *Exhibit 9*).

- The next day, PHA formally notified San Lucas that its performance to date was "marginal at best," and that San Lucas had "failed to initiate any sustained corrective action" to address ongoing problems. The problems identified by PHA at that time included the fact that if San Lucas maintained its current schedule "the first set of units would be completed 6 months behind schedule, which is unacceptable." PHA further criticized San Lucas for "poor quality of workmanship and unacceptable installation of basic construction materials …"

(See *Exhibit 10*.)

Despite these and many other problems, about two months later, on April 2, 1999, San Lucas requested that the retainage on the project be reduced from 10% to 5%. (See *Exhibit 11*.)

By letter dated April 7, 1999, PHA's construction manager, Ulise Rivera, unequivocally denied that request, for the following reasons:

> A month ago, when you verbally approach[ed] me with this request, I told you that I was very uncomfortable reducing the retainage at that time because there were many construction issues that are your responsibility under your contract that remained unresolved. A month later the same issues remain without solution. For instance, even though the Notice to Proceed was issued on 1/12/98, over 449 days ago, that is, one year and 3 months, you still have not finished one sample unit out of 150 units to be built on the project. At this late date, you still do not have approved shop drawings for the interior stairs, neither the permanent nor temporary stairs are in place to give access to all the units at every level on the site as required by the contract documents. At this late date you are still negotiating agreements with suppliers of stairs. The exterior doors are not delivered, nor installed, you have temporary enclosures on those openings. The kitchen cabinets have not been properly coordinated with the actual kitchen layouts, I am still waiting for the sketches with the field dimensions and the kitchen cabinets layouts. Building 43 is scheduled to start receiving tenants on May 1999, the exterior facade is not clean, the security fence installation has not started, the stairs are not in, the kitchen cabinets are not in, and the porches are not finished. You are behind schedule and you are not doing anything to get back on schedule.

(*__Exhibit 12__*).

Despite this compelling evidence that San Lucas was not entitled to a reduction in retainage under the applicable contract language, a few days later, PHA reversed itself and approved the retainage reduction to 5%. None of the witnesses deposed to date has been able to explain PHA's reversal in position. Mr. Rivera himself is deceased. PHA has produced no documentation supporting PHA's reversal of position.

That reversal did not comply, either procedurally or in substance, with the requirements for retainage reduction under the contract documents. Under Section 27(f) of the HUD General Conditions (the contract provision that St. Paul believes is applicable), retainage could be reduced only after the Contracting Officer determined that the contractor's performance and progress were satisfactory, in consultation with the Architect. Neither Mr. Leithead, who was then the Contracting Officer, nor Ms.

Maxwell, who was then the contract administrator and later became the Contracting Officer, had such a consultation. Mr. Leithead testified as follows:

> Q: Before approving the return of 5 percent of the retainage to San Lucas, did you receive a report from the architect that progress and performance were satisfactory?
>
> A: That would be directed through Ulise with Sheila Maxwell.
>
> Q: I take it by your answer that you did not?
>
> A: No, sir.
>
> Q: No, sir, I'm correct you did not receive such a report from the architect?
>
> A: I did not.
>
> Q: Did Sheila Maxwell, to your knowledge, receive the report from the architect that progress and performance were satisfactory, before you authorized return of the 5 percent retainage to San Lucas?
>
> A: I don't know.

(**_Ex. 2_**, Leithead Deposition at 68-69).

Ms. Maxwell, for her part, testified as follows:

> Q: Did you, yourself, consult with the architect as referenced in paragraph 27-F?
>
> A: No.

(**_Ex. 1_**, Maxwell Deposition at 70). PHA has produced no written evidence to show that Mr. Rivera himself, or any other PHA employee, ever consulted with the Architect before PHA reduced the retainage.

Even more important, PHA failed to comply with the substantive requirement that retainage could not be released unless San Lucas' performance and progress were satisfactory. Mr. Rivera's letter of April 7, 1999 (**_Ex. 12_**), together with the many prior documents attached as **_Exhibits 8, 9, and 10_**, affirmatively establish that neither San

Lucas' performance nor its progress were satisfactory in April 1999, and therefore it was not entitled to a retainage reduction.

Even if PHA were correct in its claim that Paragraph 24 of the PHA General Conditions, rather than Paragraph 27(f) of the HUD General Conditions, governs retainage, there is a material dispute of fact as to whether PHA complied with Paragraph 24 of the PHA General Conditions. Specifically, Paragraph 24 of the PHA General Conditions requires that retainage may not be reduced unless "the contractor is making satisfactory progress and there is no specific cause for greater withholding." San Lucas was not making satisfactory progress at the time that the retainage was reduced; Mr. Rivera's letter and the previous letters are virtually conclusive evidence of that.

By December 6, 1999, which was the date of San Lucas's twenty-third progress payment application, San Lucas claimed to have completed work with a total value of $9,850,032.72, or eighty-two percent of the adjusted contract value. In response to the twenty-three payment applications, PHA had paid a total of $9,357,531.08 to San Lucas, a sum that represented eighty-two percent of the contract value less five percent retainage, or $492,501.62. In fact, PHA had overpaid San Lucas by at least $813,000. (See *__Exhibit 13__*, Expert Report of William Manginelli.)

By letter dated December 10, 1999, PHA notified St. Paul of its intent to default San Lucas for its failure to perform the work under the contract. On January 24, 2000, PHA terminated the contract. The January 24, 2000 letter terminating the contract for default stated that San Lucas was in default because it had "failed to perform the work" under the contract "within the time required by its terms, or cure the conditions endangering performance . . . ." (*__Exhibit 14__*.)

PHA then demanded that St. Paul complete the contract work pursuant to the terms of the performance bond. The contract balance available to St. Paul at the time of termination was $2,711,000. (See ***Exhibit 15***, Takeover Agreement). Shortly after the termination, on February 17, 2000, PHA, through Mr. Rivera, estimated that there was $4,416,582 of work left to be completed, a sum far in excess of the available contract funds. (***Exhibit 16***).

**ARGUMENT**

I.   The Standard for Summary Judgment.

The Court may grant summary judgment only if the moving party can demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. P. 56. A party seeking summary judgment always bears the initial responsibility for informing the District Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Royal Indem. Co. v. Security Guards, Inc., 255 F.Supp. 2d 497 (E.D. Pa. 2003)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). As this Court itself has observed, the District Court must construe "the evidence in the light most favorable to the party opposing summary judgment to determine whether an issue of material fact exists. Summary judgment is appropriate only if there is insufficient evidence in opposition to present the opponent's claims to a jury." Stark Co. v. National Guardian Sec. Servs., 1990 WL 112110, at *1 (E.D. Pa. 1990).

II.    Disputed Issues Of Material Fact Prohibit The Grant Of Summary
       Judgment To PHA Based On The Assertion That St. Paul Has Waived Its
       Overpayment Claim.

A.     PHA Has Failed To Carry Its Burden Under <u>Celotex</u> To Establish An Act
       Of "Forbearance" By Which It Paid San Lucas For Work That San Lucas
       Did Not Do.

In this case, as opposed to most summary judgment motions, PHA does <u>not</u> claim

that St. Paul has failed to produce evidence to establish an element of its <u>prima facie</u> case.

For the purposes of the motion, PHA concedes the existence of that <u>prima facie</u> case.

Rather, the basis for PHA's motion for partial summary judgment is the affirmative

defense of waiver. <u>See</u> Fed. Rule Civ. P. 8(c). PHA contends that St. Paul contractually

waived its right to bring an overpayment claim. PHA bears the burden of proof to

establish its affirmative defense of waiver.

As support for its defense, PHA claims, in substance, that its overpayments to San

Lucas constituted deliberate acts of "forbearance" on its part towards San Lucas; that St.

Paul agreed that "forbearance" on the part of PHA would not release St. Paul from its

obligations; and therefore St. Paul waived any claim to recover the overpayment from

PHA.

Under <u>Celotex</u>, it is PHA's burden to establish, as part of this argument, an act of

forbearance on its part. It has utterly failed to do this. The only two exhibits to its

motion for partial summary judgment are the performance bond itself and an excerpt

from the construction contract. Neither in discovery nor in its submission to this Court

has PHA produced an affidavit or other evidence that its overpayment was somehow a deliberate act of "forbearance" by which it chose not to enforce contract rights.[2]

In fact, the evidence is completely to the contrary. Both of the responsible PHA representatives who have testified have <u>denied</u> that they undertook any act to permit PHA to pay San Lucas for work it did not do. Mr. Leithead, the contracting officer on the project through April, 1999, testified:

> Q: Have you ever, Mr. Leithead, authorized any payment to a PHA contractor that exceeded the value of the work actually performed?
>
> A: No.
>
> Q: And you certainly never did it for San Lucas, did you?
>
> A: No.
>
> Q: Do you know of any instance where anyone else at PHA ever authorized payment to a prime contractor that was more than the value of the work that the prime contractor performed?
>
> A: In my history of work with PHA?
>
> Q: Yes.
>
> A: Yes.
>
> Q: How many times?
>
> A: I couldn't tell you how many times.
>
> Q: Frequently?
>
> A: Apparently, it was. Yes.
>
> Q: It was, what?

---

[2] As will be discussed in the following section, St. Paul disputes whether the overpayments made by PHA to San Lucas can be characterized as a matter of law as an act of "forbearance" that St. Paul somehow waived its right to challenge.

A:    Probably late '89, early '90, there was a gentleman who was the contracting officer who was arrested for paying for work that wasn't done.

Q:    Except for the occasion of a PHA employ[ee] who authorized payment for work not done and who was prosecuted criminally for having done that, do you know of any other situations where anyone at PHA ever did that?  That is, authorize payment to a prime contractor beyond the value of the work actually done?

A:    Not that I know of, no.

(See **_Ex. 2_**, Leithead Deposition at 168-169.)

Ms. Maxwell's testimony was to the same effect.  She testified as follows:

Q:    When you were a contracting officer on PHA construction projects, what were your job responsibilities?

A:    As a contract officer, my job was to ensure that in payment requests, to ensure that the work was in fact done prior to submitting any documents for processing a payment.

Q:    And you carried that out by the process we have gone through in tortuous detail?

A:    Yes.

(**_Ex. 1_**, Maxwell Deposition at 47).

In short, the two people who were responsible for approving payment requests gave testimony in which they affirmatively denied any act of so-called "forbearance" on PHA's part when it overpaid San Lucas.  Mr. Leithead's testimony indicates that such acts of "forbearance" in the past have given rise to criminal prosecution.

PHA has failed to carry its burden of establishing a waiver on the part of St. Paul. It has not identified any act of so-called "forbearance" on its part.  Its employees have denied "forbearance."  At a minimum, there is a disputed issue of material fact that precludes summary judgment on this ground.

B.    Even If There Were No Dispute Of Material Fact, The Modification
Clause Of The Performance Bond Did Not As A Matter Of Law Permit
PHA To Impair St. Paul's Collateral By Making Payments To San Lucas
For Work That It Did Not Do Or Did Not Do Properly.

Suretyship involves a three-party relationship.  The obligee -- in this case PHA --

is entitled to performance by a principal -- in this case, San Lucas -- or alternatively, if

the principal defaults, by the principal's surety -- in this case, St. Paul.  See Continental

Bank v. Axler, 353 Pa. Super. 409, 510 A.2d 726 (1986), citing Meyer v. Industrial

Valley Bank and Trust Co., 428 Pa. 577, 239 A.2d 371 (1968)) (dissenting opinion by

Roberts, J.).

It is well established that in a suretyship arrangement, the surety is entitled to the

benefit of security -- such as unpaid contract proceeds -- held by the obligee.  See, e.g.,

Hochevar v. Maryland Cas. Co., 114 F.2d 948 (6th Cir. 1940); Ft. Worth Independent

Sch. Dist. v. Aetna Cas. & Surety Co., 48 F.2d 1, 4 (5th Cir. 1931) ("It is well settled that

a stipulation in a building contract that a percentage of the price shall be retained until the

final completion and acceptance of the work, is as much for the benefit of the surety as

for the protection of the owner . . . .").  Magistrate Judge Smith of this Court summarized

how this doctrine works in practice.

> Upon satisfaction of its obligations under the various bonds it has
> issued, the surety benefits from the equitable doctrine of subrogation.
> This doctrine operates independently of any contractual relations
> between the parties and is enforced on grounds of equity as a means of
> doing justice to one required to pay another's debt or to perform
> another's duty . . . .  Thus, when a surety completes performance of a
> construction contract or pays laborers and materialmen, the surety is
> equitably subrogated to the rights of the project owner to payment
> from contract retainage . . . .  Moreover, the surety may obtain
> unearned progress payments originally promised to the contractor,
> since it has performed a benefit for the owner . . . .  Finally, the surety
> may have a right to earned, but unpaid progress payments in the hands
> of the owner at the time of default by the principal.

North American Specialty Ins. Co. v. Chichester Sch. Dist., 2000 WL 1052055, *6 (July

20, 2000, E.D. Pa.).  It is equally well established that payment of substantial sums to a

contractor before they are due "will discharge a surety to the extent of the prejudice" suffered by the surety. <u>Chichester</u> at *12, <u>citing</u> <u>Continental Ins. Co. v. City of Virginia Beach</u>, 908 F. Supp. 341, 348 (E.D. Va. 1995) (<u>citing</u> <u>Southwood Builders, Ins. v. Peerless Ins. Co.</u>, 366 S.E. 2d 104 (Va. 1988)).[3/]

In its motion for partial summary judgment, PHA claims that in the modification clause of the performance bond, St. Paul waived its right not to have its collateral dissipated by improper overpayments to the contractor. That argument is not supported by the language of the modification clause, by Pennsylvania law, or by the general law of suretyship.

In interpreting the language of the modification clause, the words should be given their "natural and ordinary meaning." <u>Tookmanian v. Safe Harbor Water Power Corp.</u>, 505 F. Supp. 920, 922 (E.D. Pa. 1981). The language "should not be twisted to create vagaries or strained to produce ambiguity where none would otherwise exist." <u>Id</u>. Any ambiguities in the language should be construed against PHA, the drafter of the contract. <u>Dardovitch v. Haltzman</u>, 190 F.3d 125, 141 (3d Cir.1999) (<u>citing</u> <u>All-Pak, Inc. v. Johnston</u>, 694 A.2d 347, 351 n. 7 (Pa. Super. Ct. 1997) (citation omitted).

Under Pennsylvania law, these same basic rules are applied to interpreting a surety's obligations. <u>Pure Oil Co. v. Shlifer</u>, 175 A. 895, 897 (Pa. Super. 1934) (a surety contract "must be given effect according to its own expressed intention as gathered from all the words and clauses used, taken as a whole; due regard being had also to the surrounding circumstances . . . .").

---

[3/] St. Paul has discovered no authority in Pennsylvania as to which party -- the surety or the owner -- bears the burden of proof on the prejudice issue. St. Paul submits that in accordance with the better-reasoned cases from other jurisdictions, in this case the burden of proof on this issue should be placed upon the owner, PHA. St. Paul intends to submit a memorandum of law on this issue.

It is improper to interpret a surety contract to broaden the surety's risk beyond what the contract actually provides. In Langeveld, for example, the Supreme Court of New Jersey rejected one party's overly broad interpretation of language that would have permitted the impairment of the surety's collateral. The Court stated that "[t]his result [that is, impairment of collateral] should be permitted only where the instrument of guaranty specifically frees the creditor from liability for such impairment." Id., 376 A.2d at 935. It went on to observe, in language that is equally applicable to this situation:

> If the destruction or impairment of such a right (subrogation to unimpaired collateral) is to be waived by a guarantor, it should only be by the most unequivocal language in the guaranty agreement. The right does not originate in contract, and it cannot lightly be destroyed by contract.

Id. (quoting D.W. Jaquays & Co. v. First Security Bank, 419 P.2d 85, 89 (Az. 1966)) (emphasis added). The Restatement (Third) of Suretyship and Guaranty also adopts the view set forth in Langeveld that any waiver of a defense based on suretyship or impairment of collateral must be clearly and unequivocally stated. See Restatement (Third) of Suretyship and Guaranty § 48, Reporter's Note to cmt. d.

Applying these principles to the contract language in this case, it is plain that St. Paul has not waived its right to make an overpayment claim against PHA. There is nothing in the language of the modification clause that waives such a claim, either specifically or generally. In the modification clause, St. Paul agreed that it would not be released from liability in any of the following three situations: (1) "modification of the terms of the above mentioned contract;" (2) "alteration in the work to be done under it;" (3) "forbearance on the part of either the Authority or Contractor to the other, either by the grant of an extension of time for the performance of the contract or otherwise." This

language must be construed against PHA, as the party that drafted it. See Dardovitch, 190 F.3d at 141.

The overpayments about which St. Paul is complaining in this case have nothing to do with any of those three situations. PHA does not contend that the "alteration" language has anything to do with this case.

Similarly, there was no "modification." A "modification" of the contract is a defined term. A "modification" is required to be in writing and executed by PHA's contracting officer. There is no evidence that any such modification, authorizing the payment of sums to San Lucas for work it had not yet done or had not done properly, was ever executed. In fact, Ms. Maxwell did not recall any such modification. (*Ex. 1*, Maxwell Dep. at 65-67.)

Finally, and contrary to PHA's present argument, the "forbearance" language also is inapplicable. "Forbearance" means to refrain from doing something that one has a right to do. See, e.g., Black's Law Dictionary (6th Ed. 1990); Webster's Ninth New Collegiate Dictionary (1990). There is no sense in which PHA's payments to San Lucas for work it did not do can be characterized as "forbearance" -- especially when Mr. Leithead and Ms. Maxwell both testified that they did not authorize such overpayments. PHA, when it overpaid San Lucas, was not deliberately "refraining" from doing anything. Instead, under the plain meaning of the contract language, there is no evidence of any action or decision that can be characterized as "forbearance." St. Paul's agreement in the bond that "forbearance" extended by PHA to San Lucas would not release its obligations as surety is simply not the type of "unequivocal" language required by the case law to effect a waiver of the right to challenge overpayment.

The great majority of courts interpreting similar modification clauses have rejected the argument PHA advances here -- that language permitting "modification" or "forbearance" permits impairment of the surety's collateral by overpayment to the contractor, and prohibits an action by the surety to recover its losses by such overpayments. For example, in Ft. Worth, the language of the modification clause that allegedly barred an overpayment claim was essentially the same as the language inserted by PHA into the surety bond in this case, including the "forbearance" language. It provided:

> that any alterations which may be made in the terms of the Contract, or in the work to be done under it, or the giving by the Owner of any extension of time for the performance of the Contract, or any other forbearance on the part of either the Owner or the Principal to the other shall not in any way release the Principal and the surety or sureties, or either or any of them, their heirs, executors, administrators, successors or assigns from their liability hereunder, notice to the Surety or Sureties of any such alteration, extension or forbearance being hereby waived.

Id., 48 F.2d at 3. The Fifth Circuit ruled that the language did not bar an overpayment claim by the surety, when the owner had failed to retain the amount of funds called for by the contract.

Numerous other cases demonstrate that general contract language by which a surety consents to modifications or time extensions is not sufficient to waive overpayment claims. In Hochevar v. Maryland Cas. Co., 114 F.2d 948 (6th Cir. 1940), the surety had agreed that modifications, omissions or additions to the contract would not affect its obligations. The Sixth Circuit held that the modification language did not bar the surety's overpayment claim. See also Aetna Cas. & Surety Co. v. Robertson Lumber Co., 3 S.W.2d 895 (Tex. App. 1928) (owner's reservation of right to alter or modify plans without invalidating the contract did not prohibit overpayment claim); Blackburn v. Morel, 79 S.E. 492 (Ga. App. 1913) (contract provision permitting change or alteration in

the plans of the building did not bar overpayment claim).  In <u>Mergentime Corp. v.</u>
<u>Washington</u> <u>Metropolitan Area Transit Authority</u>, 775 F. Supp. 14, 23 (D. D.C. 1991),
the court held that where the owner had not complied with the contractual requirements
for modifying the payment schedule, unauthorized prepayments were not "duly
authorized" under the contract and outside the scope of the surety's waiver.

The Restatement (Third) of Suretyship and Guaranty also provides direct support
for St. Paul's claims.  The Restatement distinguishes between a contract "<u>modification</u>,"
which did not occur in this case (<u>see</u> Restatement §41), and "<u>impairment of collateral</u>,"
which is the basis of St. Paul's claim.  (<u>Id</u>. at §42).  In other words, the drafters of the
Restatement recognized the difference between contract modifications and unauthorized
impairments of collateral, and did not include an impairment claim within the term
"modification."

The cases upon which PHA relies do not support its argument that St. Paul is
barred from pursuing its overpayment claims.  In fact, several of them support St. Paul's
right to pursue this claim.  In <u>Aniero Concrete Co. v. General Accident Insurance Co.</u>,
1998 WL 148324, at *13 ( S.D.N.Y.), the surety had specifically waived the right to
challenge "any payment [under the construction contract] before the time required
therein."  This explicit waiver of an overpayment claim is in stark contrast to the
language in this case, in which St. Paul merely waived the right to be discharged in the
event of contract <u>modifications</u>.  Similarly, in <u>Zang v. Hubbard Bldg. & Realty Co.</u>, 125
S.W. 85 (Tex. 1910), the surety specifically waived its right to object to "any change in
the method and amount of the payments stipulated to be made . . . ." <u>Id</u>. at 87.  In
<u>Enterprise Hotel Co. v. Book</u>, 85 P. 333 (Or. 1906), the surety waived its right to object

to any contract payments "made at any other time or manner" than what was agreed in the contract. Id. at 334.

These cases demonstrate that the parties to a surety agreement can waive overpayment claims, and it has long been the practice of some owners to ask sureties to waive overpayment claims by specific unequivocal language to that effect. But PHA, when it drafted the performance bond in this case, did not seek or obtain such a waiver.

Most of the remaining cases PHA relies on do not concern overpayment claims. Rather, they arise out of change orders or other contract modifications that were specifically covered by the surety's consent to contract modifications. See, e.g., Massachusetts Bonding and Ins. Co. v. John R. Thompson Co., 88 F.2d 825 (8th Cir. 1937) (surety not discharged by change order relating to ventilation and steam fitting); Bloom v. Bender, 313 P.2d 568 (Cal. 1957) (surety not discharged by release of principal when it had consented to that release); State v. Am. Motorists Ins. Co., 463 N.E. 2d 1142 (Ind. App. 1984) (surety not discharged by changes to contract specifications and delivery dates when it had consented to such changes); Am-Haul Carting, Inc. v. Contractors Cas. & Surety Co., 33 F. Supp. 2d 235 (S.D.N.Y. 1998) (surety not discharged by change order where it had agreed in advance to such modifications); Bd. of Educ. of City of Sault Ste. Marie v. Chaussee, 177 N.W. 975 (Mich. 1920) (surety not discharged by increase in contract price to which it had consented in advance).

In fact, the only two cases cited by PHA in which a court indicated that a surety may have waived an overpayment claim through a modification clause are Employers Casualty Co. v. Irene Independent School District, 286 S.W. 539 (Tex. App. 1926) and Smith v. Molleson, 42 N.E. 669 (N.Y. 1896). The Employers Casualty decision is distinguishable because it was based, in part, upon the surety's explicit written consent to

the overpayment, given when the job was nearly finished. It was superseded by the later decision in Ft. Worth, supra, which squarely supports St. Paul's position. In Smith v. Molleson, the Court's holding was that there had been no material departure from the contract; its observations about the modification clause were, as it specifically recognized, dicta. 42 N.E. at 672.

In short, neither the language of the modification clause, nor the facts of the case, nor the law, supports PHA's assertion that St. Paul's claims arising out of the improper impairment of its collateral have been waived.

C.    St. Paul Did Not Otherwise Waive Its Right To Bring An Overpayment
      Claim In The Construction Contract.

The only remaining basis for PHA's "waiver" defense is paragraph 27(k) of the HUD General Conditions, which provides as follows:

> The PHA/IHA shall not (1) determine or adjust any claims for payments or disputes arising thereunder between the Contractor and its subcontractors or material suppliers; or, (2) withhold any moneys for the protection of the subcontractors or material suppliers, the failure or refusal of the PHA/IHA to withhold moneys from the contractor shall in nowise impair the obligations of any surety or sureties under any bonds furnished under this contract.

That provision was supplied by PHA as part of its prescribed contract language and therefore should be construed against it. See Dardovitch, 190 F.3d at 141 ("in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.") (quoting Restatement (Second) of Contracts §206). See also All-Pak v. Johnston, 694 A.2d 347, 351 n.7 (Pa. Super. Ct. 1997).

Contrary to PHA's contention, paragraph 27(k) does not constitute a waiver of all overpayment claims. That paragraph relates to a single topic: what happens when there

is a payment dispute between the prime contractor (in this case San Lucas) and one of its suppliers or subcontractors. Read in context, the language on which PHA relies -- that the failure of PHA to withhold monies from the prime contractor "shall in no wise impair the obligations of any surety" -- unambiguously refers to the earlier language of paragraph 27(k), which relates to payment disputes between the prime contractor and its subcontractors. The language, at most, means that PHA did not have to withhold monies from San Lucas after it received notice that some subcontractors were going unpaid, and its failure to do so did not discharge St. Paul. The language plainly was not intended to waive all overpayment claims by a surety, in the event of an overpayment that had nothing to do with a failure to pay subcontractors and suppliers.

Further, the language of paragraph 27(k) plainly fails to reach the standard established in cases such as Langeveld and in the Restatement, which requires a clear and unequivocal waiver of the right to challenge overpayments. In other words, paragraph 27(k) has no application to St. Paul's claim that PHA paid San Lucas for work it never did.

## CONCLUSION

For the reasons stated, PHA's Motion for Partial Summary Judgment should be denied.

_James A. Dunbar / KEW_

Paul F. Strain
James A. Dunbar
VENABLE, BAETJER AND HOWARD, LLP
2 Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201
(410) 244-7400

_William J. Devlin, Jr. / KEW_

William J. Devlin, Jr.
Federal Bar No. 42717
DEVLIN & DEVINE
100 West Elm Street, Suite 200
Conshohocken, Pennsylvania 19428
(610) 397-4614
_Attorneys for Plaintiff St. Paul Mercury
Insurance Company_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of July, 2003, Plaintiff St. Paul

Mercury Insurance Company's Opposition To Defendant Philadelphia Housing

Authority's Motion In Limine To Preclude The Testimony Of Plaintiff's Expert Witnesses

was mailed via first-class mail, postage prepaid, to:

> Denis James Lawler, Esquire
> Daniel E. Rhynhart, Esquire
> Blank Rome Comisky & McCauley, LLP
> One Logan Square
> Philadelphia, PA  19103-6998
> Counsel for Defendant and Counter-Plaintiff
> Philadelphia Housing Authority

James A. Dunbar