IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 02-CV-3511 |
| PHILADELPHIA HOUSING AUTHORITY | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \*

**PLAINTIFF ST. PAUL MERCURY INSURANCE COMPANY'S OPPOSITION TO DEFENDANT PHILADELPHIA HOUSING AUTHORITY'S MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES**

Plaintiff St. Paul Mercury Insurance Company ("St. Paul"), by its undersigned counsel, hereby opposes Defendant Philadelphia Housing Authority's Motion In Limine to Limit or Preclude the Testimony of Plaintiff's Expert Witnesses ("PHA's Motion in Limine").

## I. SUMMARY OF ARGUMENT

Under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the basic requirements for admissibility of expert testimony are that (1) it shall be made by a qualified witness, (2) it shall be made on a reliable basis, and (3) it shall be helpful to the trier of fact. St. Paul has proffered the testimony of two expert witnesses:

- Anthony B. Creamer III, a CPA, will testify that St. Paul was harmed and prejudiced when PHA overpaid San Lucas Construction Company ("San Lucas"), because San Lucas did not use the excess money it received to advance the completion of the construction project at the Richard Allen Homes ("the Project"); instead it dissipated that money for other purposes.

- William A. Manginelli, an engineer who has testified frequently in this court and others, will opine on the amount of St. Paul's damages based on his analysis of how much work San Lucas actually did in contrast to the much larger amount it was paid.

Both Mr. Creamer and Mr. Manginelli are undisputedly qualified, and offer reliable testimony that will be useful to the trier of fact. Recognizing the harm it will sustain from these conservative and well founded opinions, PHA misconstrues and mischaracterizes this testimony in an attempt to exclude it. PHA's motion in limine seeking such exclusion should be denied.

## II. ARGUMENT

### A. Mr. Creamer's Testimony Is Admissible

When a surety makes an overpayment claim, the surety must establish overpayment by the owner. See, e.g., North American Specialty Ins. Co. v. Chichester School Dist., 2000 WL 1052055 (E.D. Pa. 2000), at *12. It is St. Paul's position that the owner then has the burden to prove as an affirmative defense that the overpayments did not harm or prejudice the surety.[1] As Magistrate Judge Smith explained in his Chichester opinion,

> When determining the extent of prejudice, several considerations remain crucial. As noted above, the concept behind discharge of a surety for overpayments or advanced payments by the owner is that the unauthorized payments increase the surety's risk. As such, the court must take account of the effects of the overpayment, such as whether the unauthorized release reduced the contractor's incentive to complete the contract, thereby increasing the risk to the surety. National Sur. Corp. v. United States, 118 F.3d 1542, 1548 (Fed.Cir.1997). If unauthorized sums were ultimately expended for purposes of the contract, though, the amount at risk to the surety might be unaffected or even reduced. Id.; see also Argonaut Ins. Co., 699 F.2d at 420-421 (overpayments made by town to contractor hired to build sewer did not release surety of its obligation under performance

---

[1] There is a difference of opinion among the courts as to whether the surety or the owner bears the burden of proof on the prejudice issue. Chichester, *14 at n. 20. St. Paul intends to file a memorandum of law in support of its position that it is the owner's burden to establish the defense of prejudice.

> bond where materials for which contractor received unauthorized advances not only were delivered and stored on site, but were used in completing project after contractor defaulted); Ramada Development Co., 626 F.2d at 522 (the surety was not released to the extent of the improperly paid retainage because the contractor applied the released funds to progress on the contract).

Id. St. Paul anticipates that PHA will contend at trial that St. Paul was not prejudiced by PHA's overpayments to San Lucas.

Mr. Creamer's opinion addresses precisely this issue. First, he concludes, "[a]fter carefully reviewing San Lucas's cost control reports and periodic estimates for partial payment," that "there are significant discrepancies between the amount that San Lucas billed the Philadelphia Housing Authority and the costs that San Lucas incurred for work performed for the PHA between November 1997 and December 1999." (Anthony B. Creamer, III's May 20, 2003 "Analysis of San Lucas Construction Company, Inc.'s Cost Control Reports and Periodic Estimates for Partial Payment," attached hereto as Exhibit 1, at 3.) Second, based on the given data, Mr. Creamer opines that "it does not appear that the approximately $1.2 million in excess billings was used in the completion of the PHA project." (Id.)

Mr. Creamer bases these conclusions on his analysis of two separate sets of business records: San Lucas' internal cost reports, and PHA's own partial payment records. (Id. at 1.) Although PHA objects that the cost reports may be inaccurate, they are unquestionably admissible business records of the type on which an expert reasonably may rely. See Fed. R. Evid. 703 (even inadmissible facts or data may form the basis of an expert's opinion "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.")

"Under Daubert, the trial court makes a determination whether: 1) the proposed witness is qualified as an expert, 2) the expert employs a reliable reasoning or methodology; and 3) the reasoning or methodology is relevant." Zemaitatis v. Innovasive Devices, Inc., 90 F. Supp. 2d 631, 633 (E.D. Pa. 2000). These three restrictions on admitting expert testimony have been summarized respectively as "qualifications, reliability and fit." See ID Security Systems Canada, Inc. v. Checkpoint Sys, Inc., 198 F. Supp. 2d 598, 602 (E.D. Pa. 2002)(quoting Elcock v. Kmart Corp., 233 F.3d 734, 741 (3rd Cir. 2000)).

PHA does not contend that Mr. Creamer is unqualified to give the opinion he renders, or that his opinions are a poor fit to the issues of this case; instead, PHA attacks the reliability of Mr. Creamer's opinion, characterizing it as "misleading in its simplicity" and based on unsupported assumptions. (PHA's Motion in Limine at 10.) Specifically, PHA argues that Mr. Creamer's report does not acknowledge "any number of easily probable reasons for the divide" between San Lucas's received payments and its costs. (Id. at 11.) PHA then lists its own unsupported suppositions as to what those "reasons" might be, including speculations that maybe "some vendors or subcontractors had not submitted bills" or perhaps "San Lucas had contested the amounts and thus had not recorded [them as] liabilities." (Id. at 11.) PHA also hypothesizes that San Lucas possibly "managed to negotiate favorable pricing with its suppliers and subcontractors, which *might* likewise explain the differences" between San Lucas' recorded payments received and costs. (Id.)(emphasis added). PHA cites no record evidence that any of these circumstances actually occurred.

The first and most important point is that PHA has misconstrued the relevance of Mr. Creamer's testimony. His testimony is not intended to establish that San Lucas was paid for work it did not do. His testimony establishes that the overpayments that were made injured and caused prejudice to St. Paul because San Lucas did not use them to advance the Project. Thus, PHA's entire analysis has missed the mark.

Further, PHA's argument is without legal merit. PHA fails to explain how Mr. Creamer's methodology can be deficient both in relying on "unsupported assumptions," and in failing to rely on PHA's own unsupported assumptions. Transparently, PHA objects not to Mr. Creamer's methods, but to his conclusion that San Lucas necessarily did not put PHA's payments into the Project, when the payments to San Lucas greatly exceeded its costs. Disagreement with an expert's conclusions is not a sound basis for a Daubert objection. See Zemaitatis, 90 F. Supp. 2d at 633 ("The [Daubert] test is flexible and should focus on reasoning and methods not conclusions.") PHA may take issue with assumptions underlying Mr. Creamer's conclusions, but that creates at most an issue for cross-examination and jury consideration, not a basis for excluding the expert's testimony. See Schieber v. City of Philadelphia, 2000 WL 1843246 at *4 (E.D. Pa. 2000)(where defendants criticized experts for calculating damages on assumption concerning length of decedent's work-life, Court held "this criticism is for jury consideration.")

PHA attempts to hold St. Paul and its experts, including Mr. Creamer, to a higher threshold of admissibility than this Court or the Third Circuit requires. "Plaintiffs are not required to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only

have to demonstrate by a preponderance of [the] evidence that their opinions are reliable." Protocomm Corp. v. Novell Advanced Servs., Inc., 171 F. Supp. 2d 473, 478 (E.D. Pa. 2001)(citation and internal quotation omitted). "Thus, the admissibility test is not whether the opinion has the 'best foundation' or whether it is 'demonstrably correct;' rather, 'the test is whether the particular opinion is based on valid reasoning and reliable methodology." Id. at 478 (quoting Kannankeril v. Terminix Int'l Inc., 128 F.3d 802, 806 (3rd Cir. 1997)).

Mr. Creamer's methods—reviewing and analyzing business records detailing a construction project's payments and costs on the basis of his professional knowledge and experience—are not objectionable, and cannot be the basis for excluding his testimony. See ID Security, 198 F. Supp. 2d at 602 (because Daubert factors are not "easily applied when testing opinions concerning complicated business transactions," reliability analysis "may focus upon personal knowledge or experience, as opposed to scientific foundations")(citations and internal quotation omitted).

That is, where, as here, a certified public accountant properly prepares opinions based upon his experience and "relevant business documents," a plaintiff cannot exclude the accountant's opinions under the guise of attacking his methods. See Protocomm, 171 F. Supp. 2d at 480. In Protocomm, where the defendants, like PHA, objected that an accountant's opinions were "divorced from the facts," the Court nevertheless found the accountant's testimony admissible under Daubert and its progeny, explaining:

> It appears to this Court that defendants are really arguing that [accountant's] opinions are inaccurate in light of the facts. In other words, they focus not on whether the reasoning is valid and the methodology reliable, but rather on whether the conclusions themselves are *correct*. That is not the proper inquiry in a test for admissibility. Again, if defendants believe [accountant's] testimony to be feeble, they can

challenge his opinions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof....".

Id. at 481 (quoting Daubert, 509 U.S. at 596).

In accordance with the foregoing authorities, PHA's motion to exclude Mr. Creamer's testimony should be denied.

### B.   Mr. Manginelli's Testimony Is Admissible

#### 1. Mr. Manginelli Used the Reliable Line Item Method to Calculate Damages

Mr. Manginelli's first principal opinion, and the main focus of his work, is a Line Item Analysis by which he has determined that PHA overpaid San Lucas by $813,075. Mr. Manginelli conducted the Line Item Analysis by taking "the completion percentage for each line item, as indicated on San Lucas' twenty-third payment application, [and] compar[ing] [it] to a completion percentage determined from the other available information at the time of the San Lucas termination." (William A. Manginelli's May 2003 "Richard Allen Homes Modernization Project Summary Expert Report," attached hereto as Exhibit 2, at 9.) To the extent that San Lucas was paid for work that, based on the available information, was not performed, Mr. Manginelli has calculated a damage figure.

The information Mr. Manginelli reviewed in calculating his damage figures is extensive. In addition to reviewing San Lucas's payment applications, Mr. Manginelli reviewed the videotapes of the site taken by completion contractor NDK Construction, Inc. ("NDK") just after San Lucas was terminated, and a report on the site compiled by Contract Completion, Inc. ("CCI") while it was developing the St. Paul relet package. (Id. at 4.) Mr. Manginelli also reviewed PHA's own work completion estimate, and

NDK's own contract line items. (Id.) In addition, Mr. Manginelli conducted interviews of St. Paul, NDK, and CCI personnel who were on the construction site. (Id.) Mr. Manginelli compared all of these sources of information "in order to determine the most reasonable completion percentage for each of the San Lucas contract line items." (Id. at 9.)

Based on this analysis, Mr. Manginelli identified specific items in the Project that were not done at all, or not done to the extent claimed by San Lucas, but were still paid for by PHA. The total of the work paid for by PHA, but not done by San Lucas, was at least $813,000.

PHA apparently does not contest that Mr. Manginelli's Line Item Analysis is an appropriate methodology. (See PHA's Motion in Limine at 23.) As with Mr. Creamer, PHA makes no argument that Mr. Manginelli is unqualified to offer the opinions he renders, or that his opinions are a poor fit to the issues in this case. See Zemaitatis, 90 F. Supp. 2d at 633; Elcock, 233 F.3d at 741.

PHA's sole criticism of Mr. Manginelli's use of the line item method of calculating St. Paul's damages is its assertion that he always uses the highest percentage for uncompleted (and the lowest percentage for completed) work on each line item. (PHA's Motion in Limine at 23.) This assertion is simply false and Mr. Manginelli's report establishes that it is false. Attached as Exhibit 3 is a chart identifying ninety-seven separate line items on which Mr. Manginelli, in the exercise of his judgment, did not use the lowest possible completion percentage figure. Even if PHA's assertion were true, however, it would not be a ground for exclusion; instead it would simply be a matter for the jury to take into account.

Because PHA essentially concedes that Mr. Manginelli's use of the line item method to calculate St. Paul's damages was proper, and because it simply disagrees with his conclusions, Mr. Manginelli's first principal opinion is fully admissible.

### 2. Mr. Manginelli's Opinion That PHA Wrongfully Failed To Withhold Retainage Is Admissible

Mr. Manginelli's second principal opinion is that "PHA's improper reduction of the contract retainage denied St. Paul the use of the retainage funds in the amount of $492,501.65 that should have been available to St. Paul to complete the work." (See Ex. 2 at 10-11.) Mr. Manginelli reached this conclusion by reviewing the available documentation described above. In particular, he relied upon an April 7, 1999 letter written by Ulise Rivera of PHA to San Lucas denying its request to reduce the retainage. That letter stated "that many construction issues remained unresolved, that San Lucas had not completed a single housing unit in one year and three months of performance, and that San Lucas was behind schedule." (See Exhibit 2 at 10.)

Mr. Manginelli further concluded that "San Lucas was not making sufficient progress as of May 1999 to justify a reduction in the contract retainage" and that "PHA did not increase the contract retainage back to ten percent, as required by the contract." (Id.) Therefore, he added together the dollar amounts of the 5% retainage that PHA improperly failed to withhold from San Lucas beginning with Payment Application No. 15 for work performed from April 9 to May 9, 1999, which reflected the reduction in retainage and which was approved by PHA despite its rejection letter days earlier, through Payment Application 23, the last approved San Lucas payment application.

PHA contends that Mr. Manginelli should not be permitted to testify about the improper reduction of the retainage because, in its opinion, it was *required* to reduce the

retainage to five percent. PHA relies exclusively on ¶ 24 of the PHA General Conditions, which states that:

> PHA shall follow State Law with regard to retainage. Ten percent shall be retained until 50% of the contract is completed. When the contract is 50% completed, one-half of the amount retained by PHA shall be retained by the contractor: Provided, That the architect or engineer approves the application for payment: And provided further, ***That the contractor is making satisfactory progress and there is no specific cause for greater withholding.*** The sum or sums withheld by the contracting body from the contractor after the contract is 50% completed shall not exceed 5% of the value of completed work based on monthly progress payment requests. . . .

(See PHA's Motion in Limine at 3)(quoting PHA General Conditions at ¶ 24) (emphasis added).

PHA's argument is meritless. St. Paul respectfully submits that ¶ 24 of the <u>PHA</u> General Conditions is the wrong contract provision and does not control. Further, even if ¶ 24 of the PHA General Conditions *did* control, Mr. Manginelli's opinion would still be admissible.[2/]

Regardless of which contract provision the Court deems applicable, PHA failed to comply, and Mr. Manginelli's opinion is admissible. Under either provision, PHA was not permitted to reduce retainage unless progress was "satisfactory." There is ample evidence that neither San Lucas's performance nor its progress on the job were

---

[2/] St. Paul submits that the relevant retainage provision is contained in the <u>HUD</u> General Conditions ¶ 27(f). That paragraph, which Mr. Manginelli cited, provides:
> Except as otherwise provided in State law, the PHA/IHA shall retain ten (10) percent of the amount of progress payments until completion and acceptance of all work under the contract; except, that if upon completion of 50 percent of the work, the Contracting Officer, after consulting with the Architect, determines that the Contractor's performance and progress are satisfactory, the PHA/IHA may make the remaining payments in full for the work subsequently completed. If the Contracting Officer subsequently determines that the Contractor's performance and progress are unsatisfactory, the PHA/IHA shall reinstate the ten (10) percent (or other percentage as provided in State law) retainage until such time as the Contracting Officer determines that performance and progress are satisfactory.

(See Ex. 2 at 10)(quoting HUD Conditions ¶ 27(f)).

satisfactory, and that the retainage should not have been reduced regardless of which contract provision applied. For example, the April 7, 1999 letter from Ulise Rivera, informing San Lucas that its progress on the job was not satisfactory and that its request that PHA reduce the retainage was therefore denied, is compelling evidence that San Lucas had not satisfied the contractual standard for retainage reduction. (See Ex. 2 at 10.) Rivera's letter was not the first indication that San Lucas's progress and performance were unsatisfactory. A January 28, 1999 letter from David Stembel, the project architect to PHA (see Ex. 4 hereto), and a January 29, 1999 letter from PHA to San Lucas (see Ex. 5 hereto) also indicate that San Lucas's progress and performance were unsatisfactory shortly before the retainage reduction.

Because PHA's arguments for excluding Mr. Manginelli's testimony about the retainage reduction are based solely on the incorrect assertion that PHA was *required* to reduce the retainage, the Court should reject them. Regardless of which contract provision controls, Mr. Manginelli relied on the most relevant and significant piece of available evidence in forming his opinion that San Lucas's progress was not satisfactory and that PHA should not have reduced the retainage to five percent -- PHA's own letter informing San Lucas that its progress on the job was not satisfactory. Indeed, there is no more sound basis for Mr. Manginelli's opinion than PHA's own documents. Therefore, Mr. Manginelli's second principal opinion is fully admissible.

### 3. PHA's Remaining Criticisms Are Not A Valid Basis For Excluding Expert Testimony Based on Daubert Principles

PHA's motion in limine also attacks Mr. Manginelli's use of the "Completion Costs Method" and "Completion Estimate Method" as improper attempts to use the Total Cost Method to calculate damages. PHA misapprehends Mr. Manginelli's inclusion of

these calculations in his report. As Mr. Manginelli explained in his report, he examined the status of the Project "using three separate methods"—the "Completion Costs Method," the "Completion Estimate Method," and the "Line Item Method." Neither the "Completion Costs Method" nor the "Completion Estimate Method" represents an attempt to calculate St. Paul's damages using the Total Cost Method, in which "a contractor's damages is the difference between a contractor's actual costs and its original bid." Net Constr., Inc. v. C&C Rehab and Constr., Inc., 256 F.Supp. 350, 355 (E.D. Pa. 2003). Rather, these two calculations are *alternatives* that support the outcome of Line Item Method calculations, which demonstrate that PHA overpaid San Lucas by at least $813,075, and the conclusion that St. Paul was injured by the overpayments by at least $492,501.65, the amount of retainage it should have had available to it to complete the job.

Because limited data was available to review for purposes of the Line Item Method calculations (for instance, the documents Mr. Manginelli reviewed "did not include any detailed documentation by PHA describing the progress of the work or the status of the work at periodic intervals to support the approved payment applications," (see Ex. 2 at 4), Mr. Manginelli used the two other methods to confirm his Line Item Method findings, and to demonstrate that the Line Item Method calculations were probably considerably below the amount of actual damage incurred by St. Paul.

Furthermore, even if Mr. Manginelli had used the "Completion Costs Method" and/or the "Completion Estimate Method" as a type of Total Cost Method damages calculation, the use of the Total Cost Method would be appropriate and admissible here. Both Pennsylvania state courts and the United States Court of Appeals for the Third

Circuit have approved the use of the total cost method. See E.C. Ernst, Inc. v. Koppers Co., Inc., 626 F.2d 324, 327 (3d Cir. 1980) (reversing the district court's rejection of the total cost method because under Pennsylvania law, "damages need not be proved with mathematical certainty, only reasonable certainty"; and predicting that Pennsylvania courts would allow the total cost method approach); In re Meyertech Corp., 831 F.2d 410, 420 (3d Cir. 1987) (although total cost method not applicable, it is available if the plaintiff can establish "a reasonable basis for allocating its increased costs to the defendant.")

In fact, Pennsylvania law recognizes the validity of the use of the Total Cost Method in circumstances where, as here, there is no other method for calculating damages. See John F. Harkins Co., Inc., v. School District of Pennsylvania, 313 Pa. Super. 425, 460 A.2d 260 (1983); Larry Armbruster & Sons v. State Public School Bldg. Auth., 95 Pa. Comm. Ct. 310, 312, 505 A.2d 395, 397 (1986) (allowing damages to be assessed using total cost method for increased labor and overhead costs incurred by estimating total man hours per week and multiplying that number by the actual costs for the additional 24 weeks of labor, and holding that "mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the result of the Authority's conduct"); Baltimore Contractors, Inc. v. Albro Metal Prods. Corp., No. 79-4231 and 81-3887 (E.D. Pa. 1984), cited in In re Meyertech Corp., 831 F.2d 410, 420 (3d Cir. 1987) (use of total cost theory to award damages for sub-contractors excess labor costs and overhead appropriate in absence of another method to calculate damages with a reasonable degree of certainty.)

In Harkins, 313 Pa. Super. at 431, 460 A.2d at 263, the court set forth four factors to determine whether the Total Cost Method is appropriate for calculating damages: "(1) the nature of the particular losses make it impossible or highly impracticable to determine damages with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses."

Further, as the court stated in E.C. Ernst, Inc., 626 F.2d at 327-28, "evidence of damages may consist of probabilities and inferences," and "objections normally made to the [total cost method] approach, such as that the bid may not be a reasonable estimate, can be adequately handled by making them a question of fact in each case." (Id.)

There will be evidence at trial to satisfy each element of the Harkins test. The nature of the losses St. Paul suffered make it difficult to determine damages with absolute precision. As Mr. Manginelli explained in his report, the evidence available for calculating damages by the Line Item Method was limited because "no direct conversion method was found to resolve the PHA estimate [of the value of remaining contract work at the time of San Lucas's termination] and the NDK line items [for completion of the work] to the San Lucas payment application line items." (See Ex. 2 at 9.)

Mr. Manginelli also adequately explained why PHA's self-serving attempts to explain away the fact that "[t]he total of the PHA estimate [of the value of the remaining contract work] exceeded the available contract balance by $1,863,985," such as the spread of the original bids, market conditions, and jobsite conditions, were not valid. (Id. at 8-9.) Mr. Manginelli demonstrated that St. Paul's additional costs were reasonable and

could not have been responsible for the additional costs it incurred. He observed that the completion premium St. Paul incurred,

> is not typical for this type of project – residential general construction. Therefore, the fact that the completion work may have had an associated premium does not appear to fully explain the discrepancy between the contract balance and the value of the completion contract. Rather, based on a review of NDK's bid, it appears that contract funds were paid to San Lucas for work that was either not performed or not properly completed.

(Id. at 8.)

More importantly, however, PHA's attack on Mr. Manginelli's use of the Completion Costs Method is not based on his methodology, but on PHA's disagreements with the assumptions underlying his conclusions. For example, PHA complains that Mr. Manginelli failed to establish that San Lucas's original bid was realistic, that the actual costs on the completion contract were reasonable, that the increased costs are not the responsibility of San Lucas and NDK, that he should not have used the Consumer Price Index in calculating the materials escalation rate, and that PHA is responsible for cost overruns. These disputes about the assumptions underlying Mr. Manginelli's opinions, however, do not form the basis of a proper Daubert challenge. See Schreiber, 2000 WL 1843246 at *4. Rather, PHA's contentions that Mr. Manginelli's assumptions are improper are based on no more than the fact that PHA would make alternative assumptions that favor its view of the disputed facts in the case. As with its criticisms of Mr. Creamer's opinions, PHA fails to explain how Mr. Manginelli's methodology can be deficient both in relying on unsupported assumptions, and in failing to rely on PHA's own unsupported assumptions.

Mr. Manginelli established in his opinion, and ample evidence to be introduced at trial will demonstrate, that his assumptions were reasonable. (See Ex. 2 at 4-8.) To the

extent that there is a genuine factual dispute on these issues, PHA is free to cross-examine Mr. Manginelli about these issues at trial or otherwise to introduce evidence that it believes established that San Lucas's bid was unrealistic, that the costs of the completion contract were unreasonable, that the increased costs are the responsibility of San Lucas or NDK, that Mr. Manginelli should have used a different escalation rate for increases in the costs of materials, and/or that PHA is not responsible for any cost overruns. Such defenses or competing damages theories, however, do not render Mr. Manginelli's opinions unreliable and therefore inadmissible. A jury is competent to examine the assumptions underlying Mr. Manginelli's opinions, which will be scrutinized on cross-examination and by PHA's own expert's testimony, and to decide whether to accept or reject them.

PHA similarly attacks Mr. Manginelli's use of the Completion Estimate Method solely on the basis of assumptions underlying his opinions (i.e., that no other factor such as job site conditions explains the difference between PHA's own estimate of the value of the work performed by San Lucas and the balance remaining on the original contract). Here again, Mr. Manginelli has offered a reasonable explanation for why he made the assumptions he did in forming his opinion. (See Ex. 2 at 8-9.) Therefore, there are no grounds upon which to exclude his opinions. Rather, PHA is free to cross-examine Mr. Manginelli about these assumptions so that the jury may decide whether to credit them.

For these reasons, even if Mr. Manginelli's use of the Completion Costs Method and/or the Completion Estimate Method amounted to a Total Cost Method approach, it would be appropriate and admissible pursuant to Harkins and its progeny.

C.  **The Probative Value Of Mr. Creamer's and Mr. Manginelli's Testimony Is Not Substantially Outweighed By The Danger That It Will Cause Unfair Prejudice, Confusion Of The Issues, And/Or Mislead The Jury**

PHA argues for exclusion of Mr. Creamer's and Mr. Manginelli's testimony under Federal Rule of Evidence 403, which prohibits admission of evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (2003).  This Court has repeatedly held, however, that pretrial exclusion of expert testimony on Rule 403 grounds is and should be a rare step, reserved for the exceptional case in which there is something "particularly confusing about the scientific evidence at issue—something other than the general complexity" of such evidence." See, e.g., In re Orthopedic Bone Screw Products Liability Litigation, 1997 WL 230818 at *10 (E.D. Pa. 1997)(citation omitted).

PHA does not and cannot identify anything "particularly confusing" about the testimony of Mr. Creamer and Mr. Manginelli.  Even if there were something particularly mystifying about their areas of expertise and expected testimony (namely accounting and construction), which there is not, PHA fails to explain why ordinary measures such as proper cross-examination of the witnesses, contrary testimony, and instruction of the jury could not remedy any perceived problem.  The availability and efficacy of such routine measures is an important factor the Court must consider before excluding expert testimony on the basis of Rule 403, for it must not construe its gatekeeping function "to focus too much on flaws in the opinion, losing sight of the adversarial process and the role of the jury." Surace v. Caterpillar, Inc., 1995 WL 303895 at *3 (E.D. Pa. 1995),

aff'd in part, 111 F.3d 1039 (3d Cir. 1997). "Flaws in the method or reasoning of the expert whose opinion rests [on] an otherwise reliable foundation can be probed during cross-examination and attacked collaterally through other witnesses." Id.

Even where proffered expert testimony has been in a more controversial realm than that of Mr. Creamer and Mr. Manginelli, and more probably "purely subjective" and therefore unreliable, this Court has found there to be an adequate remedy through cross-examination, and no basis for exclusion under Rule 403. See, e.g., United States v. Gricco, 2002 WL 746037 (E.D. Pa. 2002)(handwriting analysis). In this case, PHA may cross-examine Mr. Creamer and Mr. Manginelli, present the explanatory opposing testimony of their own witnesses, and propose jury instructions to cure any perceived confusion of the jury. There is no basis for precluding their testimony altogether under Rule 403.

The Federal Rules have a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." Miller v. Hoffman, 1999 WL 415403 at *1 (E.D. Pa. 1999)(citations omitted), aff'd, 225 F.3d 649 (3d Cir. 2000). "Rule 702 specifically embraces this policy, and has a liberal policy of admissibility." (Id.) (citations and internal quotation omitted). Nothing in Rule 403, as applied to the facts of this case, overrides that policy. Therefore, on this additional basis, PHA's Motion in Limine should be denied.

### III. CONCLUSION

On the basis of the foregoing grounds and authorities, Plaintiff St. Paul Mercury Insurance Company respectfully requests that Defendant Philadelphia Housing Authority's Motion In Limine to Limit or Preclude the Testimony of Plaintiff's Expert Witnesses be denied.

Respectfully submitted,

*signature: James A. Dunbar /KEW*

Paul F. Strain
James A. Dunbar
VENABLE, BAETJER AND HOWARD, LLP
2 Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201
(410) 244-7400

*signature: William J. Devlin, Jr. /KEW*

William J. Devlin, Jr.
Federal Bar No. 42717
DEVLIN & DEVINE
100 West Elm Street, Suite 200
Conshohocken, Pennsylvania 19428
(610) 397-4614
*Attorneys for Plaintiff St. Paul Mercury Insurance Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of July, 2003, Plaintiff St. Paul Mercury Insurance Company's Opposition To Defendant Philadelphia Housing Authority's Motion In Limine To Preclude The Testimony Of Plaintiff's Expert Witnesses was mailed via first-class mail, postage prepaid, to:

>Denis James Lawler, Esquire
>Daniel E. Rhynhart, Esquire
>Blank Rome Comisky & McCauley, LLP
>One Logan Square
>Philadelphia, PA  19103-6998
>Counsel for Defendant Philadelphia Housing Authority

William J. Devlin, Jr.