# THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, : : : Plaintiff, : : v. : CIVIL ACTION NO. 02-CV-3511 : PHILADELPHIA HOUSING : AUTHORITY, : : Defendant. : | |

**DEFENDANT PHILADELPHIA HOUSING AUTHORITY'S
TRIAL MEMORANDUM (AS TO COUNT II)**

By Order dated August 20, 2003, the Court severed the claim asserted by plaintiff St. Paul Mercury Insurance Company ("St. Paul") in Count II of the Complaint from the remaining counts and scheduled it for trial commencing on September 15, 2003.[1]

Defendant Philadelphia Housing Authority ("PHA"), by its undersigned counsel, respectfully submits this Trial Memorandum to familiarize the Court with the facts underlying Count II (which are, for the most part, undisputed) and to explain PHA's contentions regarding the applicable law.

---

[1] By letter dated September 8, 2003, Plaintiff's counsel advised the Court that the parties agreed to waive their right to a jury trial with respect to Count II.

## PRELIMINARY STATEMENT

In the original Construction Contract with San Lucas Construction Company ("San Lucas"), PHA agreed to a scheduled value of $158,000 for work to be performed in renovating a management office. PHA will establish at trial that San Lucas began this work, but never completed it. Instead, after San Lucas had performed work with a value of $74,490, PHA removed the remaining work from the scope of the contract and demolished the building in which the management office was to be located. In Count II of the Complaint, St. Paul seeks to be paid for this <u>deleted</u> work that neither San Lucas, nor the Completion Contractor, NDK, performed.

As explained more fully below, none of the evidence to be adduced by St. Paul can overcome the fundamental legal maxim governing this case: "no work, no pay."

For three reasons, judgment should be entered in favor of PHA on Count II of the Complaint. First, under the Takeover Agreement, PHA is required to pay St. Paul the remaining Contract Balance only "as and when such sums or amounts shall become due under the Contract." Because the remaining work on the management office was deleted and never performed, that part of the Contract Price applicable to it never became "due under the Contract" and therefore is not owed to St. Paul under the Takeover Agreement.

Second, while St. Paul has attempted to disavow its acceptance of Contract Modification No. 11, it is undisputed that on December 11, 2000, Ms. Christine Alexander, with full authority from St. Paul to approve contract modifications and periodic estimates, executed the proposed Contract Modification No. 11 and delivered it

via fax back to PHA.  Only when PHA subsequently sent to St. Paul revised paperwork to correct an <u>eight</u> <u>cent</u> mathematical error, which proposed <u>no</u> change at all to the amount of the deduction and which <u>increased</u> the amount of the remaining Contract Balance (albeit, if only by eight cents), did St. Paul refuse to sign the documentation.  It is hornbook law that an offer cannot be revoked after it has been accepted.  St. Paul did, in fact, accept Contract Modification No. 11, and it cannot now escape that acceptance.

Finally, under paragraph 8 of the Takeover Agreement, St. Paul may not take refuge in an arbitrary refusal to agree to a deductive modification to the construction contract.  To the contrary, paragraph 8 of the Takeover Agreement provides that the Surety's consent to deductive modifications will not be "unreasonably withheld."  Consequently, even if the Court were to find that St. Paul never accepted Contract Modification No. 11, PHA would still be entitled to an adjustment decreasing the remaining Contract Balance.

Consistent with the facts and argument set forth below, the Court should enter judgment in favor of PHA and against St. Paul on Count II of the Complaint.

## STATEMENT OF FACTS

St. Paul's claims arise out of a Contract for Construction ("Construction Contract") relating to a project owned and managed by PHA, the Richard Allen Homes public housing project ("the Project").  <u>See</u> Complaint, ¶¶5, 6.  (A copy of the Construction Contract is attached to Plaintiff's Complaint as Exhibit "1.")  Under the terms of the Construction Contract, San Lucas was to renovate certain existing single-

family units and construct or renovate other buildings in the Project, for the fixed price of $11,890,000.  See Complaint, ¶¶6, 7.

In connection with the Project, San Lucas requested that St. Paul, as surety, issue payment and performance bonds.  *Id.* at ¶19.  On or about October 16, 1997, in exchange for payment of a $108,588 premium, St. Paul issued a Performance Bond and a Materialmen's Bond.  *Id.* at ¶¶23, 24.  (A copy of the Performance Bond is attached to Plaintiff's Complaint as Exhibit "6.")  Pursuant to those bonds, St. Paul held itself out as jointly and severally bound with San Lucas to PHA for the entire amount of the $11,890,000 contract.

On January 24, 2000, after St. Paul demanded that PHA freeze all contract payments to San Lucas, and after San Lucas abandoned the Project, PHA terminated the construction contract with San Lucas.  *Id.* at ¶ 39.  PHA and St. Paul then entered into negotiations regarding a Takeover Agreement that would ensure completion of the project while preserving all of the parties' rights and claims arising out of the Construction Contract and the Performance and Payment Bonds.

On March 17, 2000, David Lebor, Esquire, counsel for PHA, wrote to Andrew Ruck, Esquire, counsel for St. Paul, enclosing Mr. Lebor's mark-up of the Proposed Takeover Agreement.[2]  In both its draft and final forms[3], the Takeover Agreement recited that St. Paul was "willing to undertake the completion of the remaining Contract work"

---

[2] A true and correct copy of that March 17, 2000 letter with enclosure is attached hereto and marked Exhibit "A."
[3] On March 21, 2000, Mr. Ruck wrote back to Mr. Lebor, enclosing a blacklined version of the Takeover Agreement.  A true and correct copy of that March 21, 2000 facsimile transmission cover sheet with attachment is attached hereto as Exhibit "B."

4

provided the "entire unpaid balance of the Contract Price (as hereinafter defined)" was paid to it:

> WHEREAS, Surety is willing to undertake the completion of the remaining Contract work in the manner hereinafter related, provided the entire unpaid balance of the Contract Price (as hereinafter defined), including undisbursed retainage, together with any additional amount of money added to the Contract Price after the date hereof on account of extra work or changes agreed to by Owner in writing pursuant to the terms and provisions of the Contract is paid to Surety or its designee…

The unpaid balance of the Contract Price was thereafter defined as the "Contract Balance," which the Takeover Agreement noted was the amount of $2,711,413.84 as of Requisition No. 23 and Change Orders 1 through 8 through December 6, 1999:

> WHEREAS, as of Requisition No. 23, the adjusted contract price, including Change Orders 1 thru 8 through 12/6/99 is $12,068,944.92 (hereinafter called the "Contract Price") and as of the date hereof there remains a balance including retainage still held and unpaid by Owner, in the amount of $2,711,413.84 (hereinafter called the "Contract Balance") of which $90,414.72 per Requisition No. 24 has been approved for payment but has not been paid by the Owner. Therefore, upon execution of this Agreement, Owner will pay over to Surety the amount of $90,414.72. (Exhibit D).

The Takeover Agreement was finalized and signed by the parties on April 6, 2000.[4] It is clear from a cursory reading of the Takeover Agreement that the parties contemplated the Contract Balance could increase, if extra work was added. Thus, with respect to additions, the fourth recital stated that the unpaid balance of the Contract Price would be paid "…together with any additional amount of money added to the Contract Price on account of extra work or changes…" Similarly, in Paragraph 2, PHA agreed to pay St. Paul the remaining Contract Balance "plus any amounts for extra work performed

5

pursuant to the terms and provisions of the Contract under written change orders approved and assigned by Owner."

It was equally clear that the remaining Contract Balance would be <u>decreased</u> in the event work was not completed or deleted from the scope of the Contract. Paragraph 8 of the Takeover Agreement expressly authorized deductive Change Orders. Paragraph 8 stated that such deductive change orders could only be made with the Surety's prior written approval. At the request of Mr. Lebor, counsel for PHA, language was inserted in the Takeover Agreement which provided that the Surety's approval could not be unreasonably withheld or delayed:

> The Authorized Individual has no authority to negotiate deductive Change Orders, credits, back charges or net deductions from the Original Contract or the Contract Balance of any nature whatsoever without the Surety's prior written approval. Approvals which are to be made by Surety shall not be unreasonably withheld or delayed and if not given within four (4) days from its receipt therefor, shall be deemed to have been approved.

The Contract Balance to be paid by PHA to St. Paul would only include payment for work actually performed. Thus, in the fourth recital, at the request of Mr. Lebor, language was included confirming that the unpaid balance of the Contract Price would be paid to St. Paul only "…as and when such sums or amounts shall become due under the Contract." Similarly, in paragraph 2, again at the request of Mr. Lebor, the parties provided that "[T]he parties hereto agree that all such payments shall only be made to Surety or the Completion Contractor to the extent the Contract balance is due and payable under, and pursuant to the terms and

---

[4] A true and correct copy of the executed Takeover Agreement (without exhibits) is attached hereto as

6

provisions of, the Contract." Indeed, the very fact that the parties used the term "Contract Balance" rather than a fixed numerical sum is itself compelling proof that they intended that the amount would vary, rising or falling, as the demands of the Project required.

On December 11, 2000, Tim Trzaska, PHA's Project Engineer, faxed Christine Alexander, Equire, Surety Claims Attorney for St. Paul, a proposed deductive change order titled "Contract Modification No. 11."[5] On the same day, December 11, 2000, Mr. Trzska also faxed Ms. Alexander a copy of the progress payment request, Periodic Estimate #32 ("PE #32"), for work completed by NDK for the period 11/1/00 through 11/30/00.[6] An Excel spreadsheet showing the detail of the 37 items that comprised the payment request was included with PE #32. For the management office, the spreadsheet reflected that out of the scheduled value of $158,000, $74,940 was completed, and retainage of $3,747 was being held, leaving a balance to be finished of $83,060. Contract Modification No. 11 proposed a credit of $83,060 because this remaining work had been deleted from the contract scope. Thus, in the section entitled "Description of Change," Contract Modification No. 11 stated:

> This modification is for a credit for work deleted from the contract scope. Management office renovations stopped due to the default of the General Contractor for construction. Due to the construction delay, PHA deleted the balance of the renovations from the contract scope. The credit is the balance left on the approved schedule of values.

---

Exhibit "C."
[5] A true and correct copy of that December 11, 2000 facsimile transmission cover sheet from Mr. Trzaska to Ms. Alexander, with attached proposed Contract Modification No. 11, is attached hereto as Exhibit "D."
[6] A true and correct copy of that December 11, 2000 facsimile transmission cover sheet from Mr. Trzaska to Ms. Alexander, with attachments, is attached hereto as Exhibit "E."

7

> The credit of $83,060.00 is considered fair and reasonable according to the approved schedule of values.

It is undisputed that Ms. Alexander, on behalf of St. Paul, signed both pages of Contract Modification No. 11, agreeing to the Certification on the first page and the Description of Change on the second. Ms. Alexander faxed back the signed pages to PHA on December 11, 2000.[7] Thus, as of December 11, 2000, PHA had proposed, and St. Paul had accepted, Contract Modification No. 11. With that Modification No. 11, Ms. Alexander also signed and returned Periodic Estimate No. 32, which clearly identified the remaining "balance to do" line item for "MO" (Management Office) as $83,060.[8]

Two months later, on February 11, 2001, Len Trower, PHA Contract Specialist, sent a Memorandum to Ms. Alexander stating that Modifications 9, 10 and 11, and Periodic Estimate No. 33 had to be re-done by PHA in order correct a "mathematical error."[9] Mr. Trower sent to Ms. Alexander a revised Contract Modification No. 11, dated February 22, 2001[10]. Significantly, in the revision, no change was made to the price of the deductive modification to which the parties had already agreed. The amount of the credit remained $83,060. Instead, in the revision, the overall contract amount (and hence,

---

[7] A true and correct copy of that December 11, 2000 facsimile transmission cover sheet from Ms. Alexander to Mr. Trzaska, with attachments, is attached hereto as Exhibit "F."
[8] Id. A true and correct copy of Payment Estimate No. 32 is also attached hereto as Exhibit "G," and PHA documented the negotiations between Mr. Trzaska and Ms. Alexander for Contract Modification No. 11 in an internal "Memorandum of Negotiation: Contract Modifications." A true and correct copy of that Memorandum of Negotiation is attached hereto as Exhibit "H."
[9] A true and correct copy of that February 11, 2001 Memorandum is attached hereto as Exhibit "I."
[10] A true and correct copy of the proposed revised Contract Modification No. 11, dated February 22, 2001, is attached hereto as Exhibit "J."

100847.00610/11249384v1

the remaining Contract Balance to be paid to St. Paul)was revised <u>upward</u> by 8 cents as a result of rounding all numbers to the nearest dollar.

On April 10, 2001, Ms. Alexander sent a letter to Mr. Trower and Phil Johnson of PHA, advising them that St. Paul disputed Contract Modification No. 11.[11]  In her letter, Ms. Alexander incorrectly understood Contract Modification No. 11 to be a backcharge applicable to work for which PHA had already paid:

> As we understand it, change order number 11 seeks to deduct from the amount of contract money payable to St. Paul the sum of $83,060 for pre-default/termination work that San Lucas either did not perform or did not complete, but for which PHA paid San Lucas.

In fact, as noted earlier, Contract Modification No. 11 was not a "backcharge" at all, but rather was a credit for work that <u>was neither performed nor paid for</u>.  On August 7, 2001, counsel for PHA, Mr. Lebor, sent a letter to Ms. Alexander demanding payment of the $83,060 and explaining that she had already executed Modification No. 11 on December 11, 2000:[12]

> Lyncoln Trower of PHA has advised me that your denial is based on your belief that under the Takeover Agreement PHA is obligated to pay Surety the balance of the underlying contract plus any approved increases thereto negotiated or authorized pursuant to the provisions of the Takeover Agreement.  I am advised that it is the Surety's position that deductions from the contract sum are impermissible.  Paragraph 8, at the top of page 4, of the Takeover Agreement is not consistent with that interpretation.  It states, in pertinent part:
>
>> The Authorized Individual has no authority to negotiate deductive Change Orders, credits, back charges or net deductions.. without the Surety's … approval…(which) shall not be unreasonably withheld or delayed…

---

[11] A partial copy of that April 10, 2001 letter is attached hereto as Exhibit "K."
[12] A true and correct copy of that August 7, 2001 letter is attached hereto as Exhibit "L."

>    Accordingly, any deductive change order would require the Surety's approval and such approval could not be unreasonably withheld or delayed. You approved the deductive change on behalf of the Surety pursuant to your execution of change order number 11 on December 11, 2000 (copy enclosed). Because of an insignificant $1 accounting discrepancy increasing the final revised contract sum from $12,035,816 to $12,035,817 a revised modification/change order was submitted to you for signature which you denied because of the $83,060 which you had already approved and which, in any event pursuant to the Takeover Agreement, you could not unreasonably deny. Accordingly, please confirm that PHA is, in fact, not due to the Surety and will not be required to be paid to Surety.

In response to this communication, on September 26, 2001, counsel for St. Paul, Mr. James A. Dunbar, sent a letter to Mr. Lebor, again disputing Contract Modification No. 11, but this time advancing a different theory for rejecting the credit.[13] Mr. Dunbar said it was St. Paul's understanding that San Lucas had actually completed the work on the administrative office, but, at PHA's request, the office was subsequently demolished:

>    Your letter asserts that PHA is entitled to have St. Paul approve a deductive change order in the amount of $83,060 relating to the cost associated with an administrative office on the Richard Allen Homes site, apparently because PHA no longer wants the administrative office. While we continue to look into the matter, it is our present understanding that San Lucas Construction Co., Inc., St. Paul's principal, actually completed the work on the administrative office but, at PHA's request, the office was subsequently demolished.
>
>    Under the circumstances, there is no basis for the deductive change order PHA seeks, and there is no valid approval by St. Paul of that change order.

On August 14, 2003, Mr. Trower faxed Ms. Aleander various contract completion documents, including Contract Modification No. 11 as executed by Ms. Alexander, executed by Vernon Cooney on behalf of PHA.[14]

---

[13] A true and correct copy of that September 26, 2001 letter is attached hereto as Exhibit "M."
[14] A true and correct copy of that August 14, 2003 letter is attached hereto as Exhibit "N."

10

## ARGUMENT

I.  **The Takeover Agreement Does Not Authorize Payment For Work That Was Not Performed**

Under Pennsylvania law, the purpose of contract interpretation is to ascertain and effectuate the objectively manifested intentions of the contracting parties. *Pacitti v. Macy's,* 193 F.3d 766, 773 (3d Cir. 1999). If the contract as a whole is susceptible to more than one reading, the Court, sitting non-jury as the factfinder, must resolve the matter. *Id*. If, however, the contract is unambiguous, and can be interpreted only one way, the court interprets the contract as a matter of law. *Id.* The standard for determining whether a contract is ambiguous is well-settled:

> In determining whether a contract is ambiguous, the court 'assumes the intent of the parties to an instrument is ''embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'' *Id.* (citing *County of Dauphin v. Fidelity & Deposit Co.,* 770 F.Supp. 248, 251 (M.D.Pa.), *aff'd,* 937 F.2d 596 (3d Cir. 1991)). This does not mean, however, that the court is confined to the " four corners of the written document." *Hullett*, 38 F.3d at 111 (citing *Mellon Bank*, 619 F.2d at 1011). Rather, the court reads the contract in the context in which it was made. *See Hullett*, 38 F.3d at 111 (citing *Stewart v. McChesney,* 498 Pa. 45, 444 A.2d 659,662 (1982)). Therefore, to determine the parties' intentions, the court may consider, among other things, "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Hullett,* 38 F.3d at 111 (quoting *Mellon Bank*, 619 F.2d at 1011).

*Id.*

In the instant case, the parties entered into the Takeover Agreement so that the balance remaining on the price of the Construction Contract could be paid to St. Paul, as surety, in connection with St. Paul's completion of the Project. This Contract Balance was not payable in one lump sum. Instead, the parties agreed that it would be paid only "as and when such sums shall become due under the Contract." *See* Takeover Agreement, Recitals and ¶2. Even though a Completion Contractor, NDK, was engaged by St. Paul to complete the Project, the payments made by PHA to St. Paul followed the Schedule of Values contained in the original Construction Contract between PHA and San Lucas, as demonstrated by the Periodic Estimates, including Periodic Estimate No. 32, reflecting that the management office was only 47% complete.

Regardless of whether St. Paul accepted Contract Modification No. 11, it would not be entitled to payment of the $83,060 attributable to the remaining work associated with renovating the management office absent proof that the work was actually performed. Inasmuch as neither San Lucas nor NDK ever submitted a progress payment request showing that the work was completed, PHA had no obligation to pay St. Paul that part of the Contract Price attributable to this scheduled value.

In short, no payment is due under the Takeover Agreement because that part of the Contract Balance was never earned.

## II. St. Paul Could Not Unreasonably Withhold Its Approval of Deductive Contract Modifications

St. Paul will undoubtedly argue that it rejected the second, revised tender of Contract Modification No. 11. Whatever superficial appeal this argument may have, it suffers from two glaring flaws. First, as noted above, regardless of the <u>amount</u> of the Contract Balance, payments were due under the Takeover Agreement only if they were earned. This one was not. Second, at the request of PHA's attorney, language was included in the Takeover Agreement which both authorized deductive modifications and provided that the surety's approval of them could not be unreasonably withheld:

> The Authorized Individual has no authority to negotiate deductive Change Orders, credits, back charges or net deductions from the Original Contract or the Contract Balance of any nature whatsoever without the Surety's prior written approval. Approvals which are to be made by Surety shall not be unreasonably withheld or delayed and if not given within four (4) days from its receipt therefor, shall be deemed to have been approved.

Where, as here, the work was deleted from the Contract and never performed, St. Paul's refusal to approve a deductive modification is patently unreasonable. Indeed, in Periodic Estimate No. 32, which was submitted by St. Paul the same day, St. Paul agreed and represented to PHA that $83,060 worth of work remained to be finished in connection with the management office. Consequently, PHA is entitled to a reduction in the Contract Balance, even if St. Paul refused to agree to it.

### III.   St. Paul Accepted Contract Modification No. 11.

Finally, St. Paul's protests to the contrary notwithstanding, it is clear that St. Paul actually did accept Contract Modification No. 11.

The hoary law of offer and acceptance provides that acceptance is complete upon dispatch, while a revocation occur only after it has been received by the other party:

> "Was the revocation of the offer effective or did it come too late? While an acceptance is complete where a letter is deposited in the mail, a retraction of an offer can have no effect until it is communicated to the person to whom the offer is made and the revocation can take effect only if it is communicated to the other party before its acceptance. 'An offer to contract, communicated by post must be considered as continually made until it reaches the other party. If he accepts before knowledge of a retraction of the offer, the contract is binding.'" *(Citations omitted.)*

*Owen M. Bruner Co. v. Standard Lumber Co.,* 63 Pa. Super. 283 (1915). *See also*, 17 C.J.S. §63d.[15] In this case, PHA proposed Contract Modification No. 11 via fax on December 11, 2000, and St. Paul executed and delivered it back to PHA via fax on the same day. At this point, a valid and binding contract existed with respect to the modification. Having communicated its acceptance of PHA's proposal, St. Paul lost the power to revoke its acceptance.

That PHA subsequently tendered a revised Contract Modification No. 11—two months later—to correct an eight cent mathematical error, is of no aid to St. Paul. Under Pennsylvania law, a reply which suggests changes or additions to the terms of an offer

---

[15] Generally, "[b]efore concluding that there is a valid contract under Pennsylvania law, the court must 'look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration.'" *Blair v. Scott Specialty Gases,* 283 F. 3d 595, 603 (3d Cir. 2002), *citing ATACS Corp. v. Trans World Communications, Inc.,* 155 F. 3d 659,666 (3d Cir. 1998). These elements are easily established in the case of Contract Modification No. 11.

may be either an acceptance or a counteroffer, and this question is typically for the factfinder to decide. *See Honeywell, Inc. v. American Standards Testing Bureau, Inc.,* 851 F. 2d 652, (3rd Cir. 1998), *cert. denied,* 488 U.S. 1010 (1999). Here, there was no change suggested to the substantive terms of the proposed modification itself. Both the scope of the work to be deleted and the price of the credit were the same.

## **CONCLUSION**

For all of the foregoing reasons, the Court should enter judgment in favor of PHA and against St. Paul on Count II of the Complaint.

Dated: September 12, 2003

Respectfully submitted,

BLANK ROME LLP

By: _____
DENIS JAMES LAWLER
Attorney I.D. No. 17154
CHRISTOPHER A. LEWIS
Attorney I.D. No. 29375
DANIEL RHYNHART
Attorney I.D. No. 78248
One Logan Square
Philadelphia, PA 19103-6998
(215) 569-5500

*Attorneys for Defendant*
*Philadelphia Housing Authority*

Case 2:02-cv-03511-NS   Document 69   Filed 09/12/2003   Page 16 of 17

16

## CERTIFICATE OF SERVICE

I certify that on this 12th day of September, 2003, I did cause to be served a true and correct copy of the foregoing Response of Defendant Philadelphia Housing Authority to Plaintiff St. Paul's Motion to Preclude Testimony of Certain Expert Witnesses by facsimile (without exhibits) and Federal Express (with exhibits), upon counsel of record as follows:

>Paul F. Strain, Esquire
>James A. Dunbar, Esquire
>Venable, Baetjer & Howard LLP
>210 Allegheny Avenue
>P.O. Box 5517
>Towson, Maryland 21204

_____
DANIEL E. RHYNHART