## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 02-CV-3511 |
| | : | |
| PHILADELPHIA HOUSING AUTHORITY, | : | |
| | : | |
| **Defendant.** | : | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANT PHILADELPHIA HOUSING AUTHORITY (FOR COUNT II)

Defendant Philadelphia Housing Authority ("PHA") proposes the following findings of fact and conclusions of law in connection with the Bench Trial held before the Honorable Norma Shapiro on September 15, 2003, relating to Count II of Plaintiff's Complaint:

### FINDINGS OF FACT

### I.    Parties, Jurisdiction and Venue

1.    Plaintiff St. Paul Mercury Insurance Company ("St. Paul") is a corporation organized under the laws of Minnesota with its principal place of business in

St. Paul, Minnesota.  Among other lines of business, St. Paul serves as a surety with respect to construction projects.  (Complaint, ¶1.)

2.    Defendant Philadelphia Housing Authority ("PHA") is an instrumentality of the Commonwealth of Pennsylvania that was organized in 1937 pursuant to the Housing Authorities Law, 35 P.S. §§1541, 1550 et seq., with its principal place of business in Philadelphia, Pennsylvania.  PHA owns and manages public housing projects in the Philadelphia area.  (Complaint, ¶2; Answer, ¶2.)

3.    Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a) because St. Paul and PHA are of diverse citizenship, and because the amount in controversy, exclusive of interest and costs, exceeds $75,000.  This Court has personal jurisdiction over PHA because PHA has its principal place of business in the Eastern District of Pennsylvania.

4.    Venue is proper under 28 U.S.C. §1391(a)(1).

## II.    The Proceedings

5.    On May 31, 2002, St. Paul filed the Complaint in this civil action, asserting four counts arising from its issuance of a Performance Bond in connection with the Richard Allen Homes public housing project owned and managed by PHA.

6.    On November 8, 2002, PHA filed an Answer, Affirmative Defenses and Counterclaim to the Complaint, which, among other things, denied all liability.

7.    By Order dated August 20, 2003, this Court severed the claim asserted by St. Paul in Count II of the Complaint from the remaining counts and scheduled it for trial commencing on September 15, 2003.  Thereafter, by letter dated

2

September 8, 2003, St. Paul's counsel advised the Court that the parties had agreed to waive their right to a jury trial with respect to Count II.

8.    Trial without a jury on Count II of St. Paul's Complaint was held before this Court on September 15, 2003. During the trial, in its case-in-chief, St. Paul presented testimony from Christine Alexander, Senior Surety Attorney for St. Paul. (Tr. at 23.) In its defense, PHA presented testimony from Timothy Trzaska, formerly a project engineer for PHA, and one of three project engineers for the Richard Allen Homes Project. (Tr. at 80.)

9.    In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this Court now finds the following facts and states separately its conclusions of law with respect to Count II of the Complaint.

### III.    The Takeover Agreement and Modification No. 11

10.    On April 6, 2000, PHA and St. Paul entered into a Takeover Agreement relating to a contract (the "Contract") between PHA and San Lucas Construction Co., Inc. ("San Lucas") for all general construction work performed on the Richard Allen Homes Project (the "Project."). Copies of the Takeover Agreement were admitted into evidence as Plaintiff's Exhibit No. 25, and Defendant's Exhibit D-1. (Transcript of Hearing, September 15, 2003, at 25, 112-113).

11.    Paragraph 1 of the Takeover Agreement provided that the recitals contained in the Takeover Agreement were incorporated by reference as if fully set forth therein.

12.    In the fourth recital of the Takeover Agreement, St. Paul agreed to undertake the completion of the remaining work under the Contract, provided that the unpaid balance of the Contract Price (as later defined) was paid to St. Paul "as and when such sums or amounts shall become due under the Contract":

> WHEREAS, Surety is willing to undertake the completion of the remaining Contract work in the manner hereinafter related, provided the entire unpaid balance of the Contract Price (as hereinafter defined), including undisbursed retainage, together with any additional amount of money added to the Contract Price after the date hereof on account of extra work or changes agreed to by Owner in writing pursuant to the terms and provisions of the Contract is paid to Surety or its designee <u>as and when such sums or amounts shall become due under the Contract</u>. (Emphasis supplied.)

13.    The Takeover Agreement defined the "Contract Price" and the "Contract Balance" as follows, in pertinent part:

> WHEREAS, as of Requisition No. 23, the adjusted contract price, including Change Orders 1 thru 8 through 12/6/99 is $12,068,944.92 (hereinafter called the "Contract Price") and as of the date hereof there remains a balance including retainage still held and unpaid by Owner, in the amount of $2,711,413.84 (hereinafter called the "Contract Balance") of which $90,414.72 per Requisition No. 24 has been approved for payment but has not been paid by the Owner. Therefore, upon execution of this Agreement, Owner will pay over to Surety the amount of $90,414.72.

14.    Paragraph 2 of the Takeover Agreement provided, among other things, that  PHA would pay the remaining Contract Balance to St. Paul "as and when due under the Contract" and payments would be made only "…to the extent the Contract Balance is due and payable under, and pursuant to the terms and provisions of, the Contract:"

Owner will pay to the Surety the remaining Contract Balance as and when due under the Contract, which Contract Balance Owner and Surety agree is $2,711,413.84 as of Requisition No. 23 (the last requisition paid), plus any amounts for extra work performed pursuant to the terms and provisions of the Contract under written change orders approved and signed by Owner. The parties hereto agree that all such payments shall only be made to Surety or the Completion Contractor to the extent the Contract Balance is due and payable under, and pursuant to the terms and provisions of, the Contract. Without limiting the generality of the foregoing and without Owner waiving any claims, suits, counterclaims, defenses or actions Owner may have against Contractor, Owner agrees that it will not offset from the payment of the Contract Balance to Surety any amount which is due or Owner believes is due to Owner by Contractor pursuant to any claim, suit, action or counterclaim Owner may have against Contractor under the Contract or otherwise whether at law or in equity.

15.    Ms. Alexander testified at trial that, under the Takeover Agreement, St. Paul had to comply with the same requirements of the Contract between PHA and San Lucas, in that St. Paul had to submit periodic estimates to PHA, showing work completed, and St. Paul could only be paid for the work that was completed. (Alexander Cross-Examination, Tr. at 53.)

16.    As set forth in paragraph 2 of the Takeover Agreement, the Contract Balance to be paid by PHA to St. Paul could be increased for extra work performed pursuant to written change orders approved and signed by PHA.

17.    In analogous fashion, paragraph 8 of the Takeover Agreement provided that the Contract Balance could be decreased through a deductive modification, but only if the modification were approved by St. Paul. Paragraph 8 further provided that the surety's approval of deductive modifications could not be unreasonably withheld:

5

The Authorized Individual has no authority to negotiate deductive Change Orders, credits, back charges or net deductions from the Original Contract or the Contract Balance of any nature whatsoever without the Surety's prior written approval. Approvals which are to be made by Surety shall not be unreasonably withheld or delayed and if not given within four (4) days from its receipt therefor, shall be deemed to have been approved.

18.    One item to be completed by San Lucas in the original Contract was a management office, designated "MO" in the schedule of values for the Project. (Trzaska Direct Testimony, Tr. at 87.)

19.    The work to be completed for the item designated "MO" consisted of two parts:  a management office and a mail room.  (Trzaska Direct Testimony, Tr. at 87-88.)

20.    San Lucas built and completed the mail room, but PHA never required San Lucas to complete the management office, and San Lucas never did so. (Trzaska Direct Testimony, Tr. at 88.)

21.    Periodic Estimate No. 32 ("PE #32") was admitted into evidence as Defendant's Exhibit D-3.  (Tr. at 122-113.)  PE #32 shows that PHA paid San Lucas $74,940 for completing the mail room, but that a balance of $83,060 was left over for the management office work which was never done.  (Trzaska Direct Testimony, Tr. at 89.)

22.    Neither St. Paul nor its completion contractor, NDK, ever built the management office.  (Trzaska Direct Testimony, Tr. at 94.)

23.    St. Paul presented no evidence to show that NDK actually performed the renovations to the management office or that St. Paul paid NDK for this work.

24.    Mr. Trzaska testified that he had a conversation with Ms. Alexander in which he told her that he was going to send her a change order to reduce the Contract by the amount that was left for the management office because PHA didn't plan to do that work.  (Trzaska Direct Testimony, at 89.)

25.    Ms. Alexander testified that PHA sent her three proposed modifications to the Contract between PHA and San Lucas.  (Alexander Direct Testimony, at 36.)

26.    Executed copies of Contract Modification Nos. 9 and 10 were admitted into evidence as Exhibit D-11.  (Tr. at 112-113.)

(a)    Contract Modification No. 9 was executed by Ms. Alexander on behalf of St. Paul and increased the Contract Price by $33,720 from $12,068,945 (as originally cited in the Takeover Agreement) to $12,102,665.  This gave St. Paul an additional $33,720 for work which San Lucas had done before the Takeover Agreement, but which had not been included in the Contract Balance set forth in the Takeover Agreement.  (Alexander-Cross, Tr. at 46, ll. 16-22.)

(b)    Contract Modification No. 10 was executed by Ms. Alexander on behalf of St. Paul and increased the Contract Price by $16,212 from $12,102,665 to $12,118,877.  (Exhibit D-11.)

27.    By reason of Contract Modifications Nos. 9 and 10, the Contract Balance was increased by $49,932, from $2,711,413.84 to $2,761,345.84. (Exhibit D-11).

28.    Contract Modification No. 11 was admitted into evidence as Exhibit D-4.  (Tr. at 112-113.)  Contract Modification No. 11 was executed by Ms. Alexander on

7

behalf of St. Paul and decreased the Contract Price from $12,118,876.92 to

$12,035,816.92.

      29.    On April 10, 2001, Ms. Alexander acknowledged this increase in the

Contract Balance.  (Exhibit P-46.)  That letter recaps the changes in the amount due from

PHA to St. Paul under the Takeover Agreement as follows:

> In the Takeover Agreement, PHA agreed and promised
> to pay the remaining contract balance of $2,711,413.84,
> which was subsequently increased by change order to
> $2,761,345.84, to St. Paul despite the overpayment issue.
> Our records reflect that the amount paid to date by PHA to
> St. Paul is $2,561,345.92, which leaves a remaining contract
> balance due to St. Paul of $199,999.92.  Your deductive
> change order number 11 would change the remaining contract
> balance to $2,678,285.80, which would leave a remaining
> contract balance due St. Paul of $116,939.92.  (Emphasis
> added.)

      30.    As set forth in Ms. Alexander's letter (P-46), St. Paul received the

funds which represented the increase in the Contract Balance from the $2,711,413.84

(referred to in the Takeover Agreement) to $2,761,345.84 (the balance after adding on the

increases set forth in Modifications Nos. 9 and 10).  (See Tr. at 48, lines 21 to 49, line 2.)

      31.    Ms. Alexander testified at trial that Mr. Trzaska told her that these

documents would not affect what PHA would pay to St. Paul under the Takeover

Agreement.  (Alexander-Direct Tr. at 33, ll. 16-20, and 44; ll. 3-22.)  This testimony was

inconsistent with the documents signed, and as set forth above, factually incorrect.  Mr.

Trzaska denied telling her so.  (Tr. at 90, l. 20 to 91, l. 2.)

32.     PHA paid to St. Paul $116,940 at the bar of the court on August 19,

2003. (Transcript, August 19, 2003, at 22-23)  As a result of that payment, St. Paul had

received the Contract Balance set forth in the Takeover Agreement, plus the additional

amounts due under Modifications Nos. 9 and 10. (Exhibit P-46); the only portion of the

$2,711,413.84 (Contract Balance per Takeover Agreement) which St. Paul has not

received is the $83,060 at issue in this case.

33.     Contract Modification 11 contained the following language above

Ms. Alexander's signature on page 2:

DESCRIPTION OF CHANGE:

This Modification is for a credit for work deleted from the
contract scope.  Management office renovations stopped due to the
default of the General Contractor for construction.  Due to the
construction delay, PHA deleted the balance of the renovations from
the contract scope.  The credit is the balance left on the approved
schedule of values.

The credit of $83,060.00 is considered fair and reasonable
according to the approved schedule of values.

See Exhibit D-4, at p. 2.

34.     Ms. Alexander testified that she signed the proposed Modification

No. 11 on behalf of St. Paul (Alexander Cross-Examination, Tr. at 37 and 54), and faxed

it back to Mr. Trzaska (Alexander Cross-Examination, Tr. at 55.)  Modification No. 11 is

quite clear and in writing.  (Tr. at 117, ll. 20-22.)

35.     Subsequently, PHA sent Ms. Alexander a revision of Contract

Modification No. 11. (Alexander Cross-Examination, Tr. at 66.)  A copy of the revision

was admitted into evidence as Plaintiff's Exhibit 44. (Tr. at 114.)

9

36. The revision to Contract Modification No. 11 made no change to the amount of the proposed contract deduction, which remained at $83,060. Instead, the revision rounded all sums to the nearest dollar, and as a result of this methodology, the revision increased the Contract Price from $12,035,816.92 to $12,035,817.

37. Ms. Alexander refused to execute the revised Contract Modification No. 11 (Alexander Cross-Examination, Tr. at 67.)

### IV.    Conclusions of Law

38. Under Pennsylvania law, if a contract is unambiguous, and can be interpreted only one way, the court interprets the contract as a matter of law. *Pacitti v. Macy's*, 193 F. 3d 766, 773 (3d Cir. 1999).

39. The Takeover Agreement unambiguously provides that PHA is obligated to pay St. Paul the Contract Balance only as and when such amounts are due under the original Contract between PHA and San Lucas.

40. Because PHA never required anyone to complete the management office, and no one ever did perform this work, PHA never owed San Lucas, or St. Paul, the part of the Contract Balance applicable to this work.

41. Even if the Takeover Agreement were ambiguous, which I conclude that it is not, I would find that it was the parties' intent under the Takeover Agreement that PHA pay St. Paul an amount equal to that which PHA would have been obligated to pay to the original contractor, San Lucas, minus such amounts that had already been paid, increased or decreased by any adjustments to the scope of the work.

42.    I find that the parties intended the Takeover Agreement to preclude PHA from imposing any offset against St. Paul for any amount which PHA believed was due back to it from San Lucas for any reason. See Takeover Agreement, ¶2, Plaintiff's Exhibit No. 25.

43.    I find that the parties did not intend the Takeover Agreement to require PHA to pay St. Paul for work that had not been performed by San Lucas, for which San Lucas had not requested payment, and for which PHA did not pay San Lucas, where the work did not have to be performed by St. Paul or its completion contractor, NDK.

44.    Under the unambiguous provisions of paragraph 8 of the Takeover Agreement, St. Paul, as surety, was required to give its prior written approval of deductive modifications to the Contract Balance, which approval could not be unreasonably withheld.

45.    This clause is consistent with PHA's right, as the owner of the project under the Contract, to determine the scope of the work it desires, including eliminating certain work, but to require the Surety's approval in determining the amount to be deducted on account of the eliminated work.

46.    By executing Contract Modification No. 11 and faxing it back to PHA, Ms. Alexander gave the "Surety's prior written approval" of the deductive modification for the deletion of the management office from the scope of work, as required by paragraph 8 of the Takeover Agreement.

100847.00610/21195155v9

47.    During the trial,  St. Paul introduced no evidence to dispute the value of the work deducted from the Contract by Contract Modification No. 11.

48.    Where, as here, the work was deleted from the Contract and never performed, St. Paul's refusal to approve a deductive modification would have been patently unreasonable.  Consequently, PHA would be entitled to a reduction in the Contract Balance even if St. Paul had refused to sign Modification No. 11.

49.    Even if Contract Modification No. 11 signed by Ms Alexander were considered to be insufficient to constitute "prior written approval" under paragraph 8 of the Takeover Agreement, the Surety's approval of a deductive modification was deemed approved if not given with four (4) days from its receipt.  Consequently, I conclude that under the Takeover Agreement, St. Paul's approval of the deductive modification, which was faxed to it on December 11, 2001, was deemed to have occurred as of December 16, 2001.

50.    PHA communicated to St. Paul its intent to be bound by Contract Modification No. 11 by sending St. Paul a revision which made no change to the amount of the deduction and merely increased by an immaterial amount ($.08) the New Contract Amount due to St. Paul.

51.    The revised Modification No. 11 sent by PHA to St. Paul on March 15, 2001 (P-44) merely sought to correct an eight cent ($0.08) difference in the Contract Price and the Contract Balance, did not constitute a rejection of St. Paul's approval of the original Modification No. 11 on December 11, 2000 (Exhibit D-4), and is immaterial.

12

52.    At trial, St. Paul contended that PHA had considered eliminating the management office even before the Takeover Agreement was signed.  (Tr. at 105, l. 20 to 112, l. 6.)

53.    In light of the clear language of the Takeover Agreement, the fact that St. Paul signed and faxed Modification No. 11 to PHA on December 11, 2001, that St. Paul did not object to the deductive modification within four days, but most of all because the work involved was never done by anyone, I conclude that it is immaterial when PHA determined to delete that work.  Furthermore, St. Paul did not show when that decision was actually made.

54.    Additionally, St. Paul argues that the fact that PHA submitted Modification No. 11 after the work of the completion contractor was done, somehow prejudiced St. Paul.  (Tr. at 56, line 23 to 57, line 5.)

55.    PHA's obligations to St. Paul under the Takeover Agreement are completely independent of St. Paul's obligations to NDK, its completion contractor.

56.    If St. Paul obligated itself, under its completion contract with NDK, to pay NDK the full amount of its fixed-price contact with NDK, despite the fact that work might be deleted from the scope of the original contract and not have to be constructed, then any such cost must be borne by St. Paul.  No evidence was offered to establish such a claim.

100847.00610/21195155v9

57.    For the foregoing reasons, I will enter judgment in favor of

Defendant, PHA, and against Plaintiff, St. Paul, on Count II of the Complaint.

Respectfully submitted,

BLANK ROME LLP

Dated:  September 24, 2003          By: _____
                                         DENIS JAMES LAWLER
                                         Attorney I.D. No. 17154
                                         CHRISTOPHER A. LEWIS
                                         Attorney I.D. No. 29375
                                         DANIEL RHYNHART
                                         Attorney I.D. No. 78248
                                         One Logan Square
                                         Philadelphia, PA 19103-6998
                                         (215) 569-5500

                                         *Attorneys for Defendant*
                                         *Philadelphia Housing Authority*

100847.00610/21195155v9

## CERTIFICATE OF SERVICE

I, Lisa F. Troilo, hereby certify that I am an employee of Blank Rome LLP, as secretary to Denis James Lawler, Esquire, and that a true and correct copy of the foregoing Defendant Philadelphia Housing Authority's Proposed Findings of Fact and Conclusions of Law Relating to Trial on Count II of Plaintiff's Complaint has been served this 24th day of September, 2003, by facsimile and first class mail upon counsel of record as noted below:

James A. Dunbar, Esquire
Venable LLP
210 Allegheny Avenue
P.O. Box 5517
Towson, Maryland 21204

William J. Devlin, Jr., Esq.
Devlin & Devlin
100 West Elm Street, Suite 200
Conshohocken, PA  19428

LISA F. TROILO