IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * Civil Action No. 02-CV-3511 |
| PHILADELPHIA HOUSING AUTHORITY | * |
| | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \*

## PLAINTIFF'S PROPOSED FINDING OF FACT AND CONCLUSIONS OF LAW

Plaintiff St. Paul Mercury Insurance Company ("St. Paul"), by its undersigned attorneys, submits these proposed findings of fact and conclusions of law with respect to the trial of Count II of the Complaint in this action.

### PROPOSED FINDINGS OF FACT[1]

1. In November, 1997, the Philadelphia Housing Authority ("PHA") contracted with San Lucas Construction Company, Inc. ("San Lucas") to perform general construction work at the Richard Allen Homes. (PX 25, p. 1).

2. The number assigned to the construction contract between PHA and San Lucas was No. 9589. (Trzaska, Tr. p. 91).

3. St. Paul provided performance and payment bonds to PHA as the surety for San Lucas. (PX 25, p. 1).

---

[1] Plaintiff's exhibits are referred to as "PX__. Defendant's exhibits are referred to as "DX__." The testimony relied upon herein is identified by the name of the witness, followed by the page of the trial transcript on which the relevant testimony appears.

4. PHA terminated San Lucas' right to proceed under Contract No. 9589 for default on January 24, 2000, and called upon St. Paul to ensure performance of the contract. (PX 25, p. 1).

5. Contract No. 9589, as originally entered into between San Lucas and PHA, required San Lucas, among other things, to renovate an existing building in Quadrant C-2 of the Richard Allen Homes for a mailroom and a management office. (Trzaska, Tr. 87, 105).

6. Prior to the termination of San Lucas's right to proceed under Contract No. 9589 for default, it completed the renovation of the mailroom located in Quadrant C-2, but did not undertake the renovation of the management office located in Quadrant C-2. (Trzaska, Tr. 88).

7. By July 26, 1999, PHA was preparing to re-develop Quadrant C-2 of the Richard Allen Homes, including the demolition of all of the structures in Quadrant C-2. (PX 9).

8. By March 10, 2000, after San Lucas' right to proceed under Contract No. 9589 had been terminated for default but before PHA and St. Paul entered into a Takeover Agreement, PHA had decided that all residents in Quadrant C-2 had to be relocated so that demolition of all units could begin. (PX 21).

9. Despite PHA's decision to move out the residents and demolish the buildings in Quadrant C-2, there is no evidence that PHA and San Lucas ever entered into a change order pursuant to which the renovation of the management office in Quadrant C-2 was removed from the scope of work required under Contract No. 9589.

10. St. Paul and PHA entered into a Takeover Agreement dated April 6, 2000. (PX 25).

11. PHA never informed St. Paul prior to the execution of the Takeover Agreement that it had decided to demolish all of the buildings in Quadrant C-2 rather than requiring renovation of the management office, or that it wished to delete the renovation of the management office from the scope of the contract work. (Alexander, Tr. 26-27).

12. Paragraph 4 of the Takeover Agreement required St. Paul to "cause to be performed all of the remaining work required by" Contract No. 9589. (PX 25, ¶4).

13. As of the time the parties entered into the Takeover Agreement, Contract No. 9589 included Modifications Nos. 1 through 8. (PX 25, p. 1).

14. Accordingly, the completion of the management office in Quadrant C-2 was within the scope of work required of St. Paul when it entered into the Takeover Agreement with PHA on April 6, 2000.

15. Paragraph 2 of the Takeover Agreement provided that "Owner will pay to the Surety the remaining Contract Balance as and when due under the Contract, which Contract Balance Owner and Surety agree is $2,711,413.84 as of Requisition No. 23 (the last requisition paid), plus any amounts for extra work performed pursuant to the terms and provisions of the Contract under written change orders approved and signed by Owner." (PX 25, ¶2).

16. The Takeover Agreement defined the term "Contract" as the contract between San Lucas and PHA entered into on or about November 6, 1997 -- that is, Contract No. 9589 (PX 25, p. 1).

17. The Takeover Agreement defined the term "Contract Balance" as "the amount of $2,711,413.84." (PX 25, p. 1).

18. The Takeover Agreement provided that "in the event of a conflict between the terms of this Agreement and the terms of the Contract, this Agreement shall take precedence." (PX 25, ¶14).

19. Paragraph 14 of the Takeover Agreement provided "this Agreement shall not be changed, amended or altered in any way except in writing and executed by both the Owner and Surety." (PX 25, ¶14).

20. Paragraph 8 of the Takeover Agreement provided, in part, that "the Authorized Individual has no authority to negotiate deductive Change Orders, credits, back charges or net deductions from the Original Contract or the Contract Balance of any nature whatsoever without the Surety's prior written approval. Approvals which are to be made by Surety shall not be unreasonably withheld or delayed and if not given within four (4) days from its receipt therefor, shall be deemed to have been approved." (PX 25, ¶8).

21. The St. Paul employee who represented St. Paul with respect to the Takeover Agreement and the work done thereunder was Christine T. Alexander. Ms. Alexander had previously handled more than twelve Takeover Agreements. (Alexander, Tr. 24).

22. St. Paul hired NDK General Contractors, Inc. ("NDK") to complete the work on the project.

23. When St. Paul hired NDK to complete the work on the project, the renovation of the management office was within the scope of the work required to be completed by St. Paul under the Takeover Agreement.

24. By December 2000, NDK had completed its work on the Richard Allen Homes. (Alexander, Tr. 30-31).

25.     After the project was substantially complete, Timothy Trzaska of PHA presented to St. Paul a series of documents that he characterized as clean up documentation that was needed to close out the contract and get the final payment to St. Paul. (Alexander, Tr. 33).

26.     As part of the clean-up documentation, Mr. Trzaska provided proposed Modifications Nos. 9 and 10 to St. Paul. These modifications had previously been executed by San Lucas, and represented work done by San Lucas, but they had not been executed by PHA. St. Paul executed Modifications Nos. 9 and 10 at PHA's request. (Alexander, Tr. 33, 36-37).

27.     On December 11, 2000, Mr. Trzaska presented to St. Paul additional clean-up documentation, this time proposed Contract Modification No. 11. (Alexander Tr. 33-37, PX 33). The proposed modification (PX 33) purported to modify Contract No. 9589, which was the original contract between PHA and San Lucas. It did not purport to modify either the "Contract Balance," as that term was defined in the Takeover Agreement, or the Takeover Agreement itself. When PHA presented proposed Contract Modification No. 11 to St. Paul, the proposed modification had not been executed by PHA.

28.     Mr. Trzaska presented proposed Contract Modification No. 11 to Ms. Alexander as clean-up documentation that would not affect the amount of money that St. Paul would receive under the Takeover Agreement. (Alexander, Tr. 33).

29.     Mr. Trzaska acknowledged in his trial testimony that he did not discuss with Ms. Alexander whether proposed Modification No. 11 would diminish the amount that St. Paul would receive under the Takeover Agreement. (Trzaska, Tr. 90-91).

30.     Proposed Modification No. 11, by its own terms, required that "only the Contracting Officer may execute a contract modification on behalf of the Authority." (PX 33).

31.     At the time that PHA provided to St. Paul proposed Modification No. 11 to St. Paul, Lyncoln Trower was the contracting officer.  (Trzaska, Tr. 96).

32.     There is no evidence that Mr. Trower or anyone else ever executed the December, 2000 version of proposed Modification No. 11 on behalf of PHA.[2]  Therefore, proposed Modification No. 11 never was executed by both parties, as required by its own terms and by ¶14 of the Takeover Agreement, and never became effective.

33.     Mr. Trzaska testified that when proposed Modification No. 11 was presented to St. Paul, PHA was trying to "balance out the contract," by which he meant Contract No. 9589. (Trzaska, Tr. 91).  Mr. Trzaska did not have sufficient knowledge of the Takeover Agreement to determine what, if any, effect the proposed modification would have on the Contract Balance payable to St. Paul under the Takeover Agreement.

34.     After St. Paul signed the clean-up documentation submitted to it by PHA, including various pay applications and proposed Contract Modifications 9, 10 and 11, PHA informed St. Paul that there were errors that required PHA to redo them.  PHA promised to send revised documentation to St. Paul, but did not do so.  (Alexander, Tr. 38-39).

35.     As a consequence of not receiving the revised documentation that had been promised by PHA, Ms. Alexander telephoned PHA (Alexander, Tr. 38-39).  During a telephone conversation that occurred on or about February 27, 2001, Mr. Trower told Ms. Alexander that PHA had revoked all the paperwork.  He stated that PHA had determined that it had overpaid San Lucas by $150,000 and was determining how to reconcile the overpayment with the contract

---

[2] Counsel stated, without benefit of evidentiary support, that the December 2000 version of proposed Modification No. 11 was signed by PHA in August 2003.  Even if evidence of such a modification had been proffered and

*(Footnote continued on next page)*

funds due to St. Paul (PX 39). At this point Ms. Alexander did not know what new paperwork St. Paul would receive. (Alexander, Tr. 38-39). Ms. Alexander responded to Mr. Trower by stating that it would be improper for PHA to deduct any amount from the contract funds due to St. Paul, pursuant to proposed contract modifications or otherwise. (Alexander, Tr. 40, 73, PX 39).

36. Ms. Alexander sent a letter with respect to the February 27 conversation to Mr. Trower. The letter, dated February 27, 2001 (PX 39), confirmed Ms. Alexander's conversation with Mr. Trower. The letter stated, in part, as follows:

> As we discussed, you advise that your department has determined there was an overpayment in the area of $150,000.00 by PHA to San Lucas and that PHA is determining how to reconcile this overpayment with the contract money due to St. Paul. When St. Paul and PHA negotiated the Takeover Agreement, St. Paul advised PHA that our investigation revealed there was a substantial overpayment by PHA to San Lucas. We were unable to resolve the overpayment issue during our negotiations. So, we specifically reserved this issue for resolution after the project was complete. In the Takeover Agreement, PHA agreed and promised to pay the remaining contract balance of $2,711,413.84, which was subsequently increased by change orders to $2,761,345.84, to St. Paul despite the overpayment issue. Therefore, the $150,000 portion of the overpayment that you and I discussed should not be deducted from contract money due to St. Paul under the Takeover Agreement.

37. Mr. Trower has never disputed the facts stated in Ms. Alexander's letter confirming the February 27 telephone conversation. (Alexander, Tr. 73).

38. On March 7, 2001, Ms. Alexander sent an additional letter to Mr. Trower and to Phil Johnson, another employee of PHA, in which she further disputed PHA's attempt to reduce

---

*(Footnote continued from previous page)*
admitted, which it was not, PHA's signature on a document it had rejected and St. Paul had revoked in 2001 was plainly too late.

the agreed Contract Balance of $2,711,413.84 that was payable to St. Paul under the Takeover Agreement. (PX 41).

39. By memorandum dated March 11, 2001, PHA threatened to reserve the sum of $116,940 as "temporary security" until the deletion amount for the management office received formal approval. (PX 42). PHA carried out this threat and never paid this sum to St. Paul until August, 2003.

40. On March 15, 2001, PHA transmitted to St. Paul a revised version of proposed Modification No. 11. (PX 44). There is no evidence that either St. Paul or PHA ever executed this revised form of Proposed Modification No. 11.

41. By letter dated April 10, 2001, Ms. Alexander stated that St. Paul disputed the new version of Proposed Contract Modification No. 11. This letter was consistent with her earlier conversations with and letters to PHA stating that St. Paul disputed any attempt by PHA to delete any amount from the agreed Contract Balance of $2,711,434. (PX 46).

42. PHA has not paid to St. Paul $83,060 of the agreed Contract Balance under the Takeover Agreement. (Alexander, Tr. 31).

43. There has never been any amendment to the Takeover Agreement executed by the parties that would permit PHA to withhold $83,060 from the agreed Contract Balance payable to St. Paul under the Takeover Agreement. Nor has there been any oral agreement to that effect.

44. There is substantial evidence that the proposed contract modifications, pay estimate documents, and other contract documents provided by PHA to St. Paul did not and were not intended to reflect the reality of the construction project, but rather were a way for PHA to manage its books. For example:

  (a) Those documents did not reflect the large disparity between the actual amount paid by St. Paul to complete the project and the much smaller amount of the Contract Balance that PHA retained when San Lucas's right to proceed was terminated. (Alexander, Tr. 62-63).

  (b) PHA, which prepared the pay estimates, sometimes handled the same item in distinctly different ways. In Pay Estimate No. 32, which was submitted by PHA after the project was completed, PHA characterized $83,060 as work remaining to be done with respect to the renovation of the management office. In Pay Estimate No. 33, PHA characterized that $83,060 work as having been performed, but then deducted it pursuant to Proposed Change Order No. 11, which was never executed by PHA. (Trzaska, Tr. 101-104).

  (c) On March 22, 2001, Mr. Trower sent to Ms. Alexander a letter that purported to instruct St. Paul to proceed with the work detailed in Change Orders No. 9 and 10 (PX 45) -- even though that work had long since been completed by San Lucas.

## CONCLUSIONS OF LAW

1. In the Takeover Agreement, PHA promised to pay St. Paul the agreed "Contract Balance," a defined term, of $2,711,413.84.

2. This written promise has never been modified or amended by means of a writing signed by both parties, as was required under the Takeover Agreement.

3. A modification to a contract requires a new meeting of the minds between the parties to the contract. "To modify a contract requires a new meeting of minds, and a modified instrument is tantamount to a new contract." Matevish v. School Dist. of Borough of Ramey, 74 A.2d 797, 800 (Pa. Super. Ct. 1950); see also Apgar v. State Employees' Retirement Sys., 655

A.2d 185 (Pa. Commw. Ct. 1994)("Our courts continue to recognize that once a contractual obligation vests, no matter how innocuous it may appear, the same cannot be altered, amended or changed by unilateral action")(citation and internal quotation omitted).  Also, "[t]he subsequent modification must be clearly established." Betterman v. American Stores Co., 80 A.2d 66, 71 (Pa.), cert. denied, 342 U. S. 827 (1951).

4. Therefore, the evidence required to establish a contract modification is the same as the evidence required to establish a contract.  To form an enforceable contract, there must be an offer, acceptance, consideration or meeting of the minds. Jenkins v. County of Schuylkill, 658 A.2d 380, 383 (Pa. Super. Ct., app. denied, 666 A.2d 1056 (Pa. 1995); accord Perry v. Tioga County, 694 A.2d 1176, 1178 (Pa. Commw. Ct. 1997).  "A 'meeting of the minds' occurs when both parties mutually assent to the same thing, as evidenced by the offer and its acceptance." Aircraft Guaranty Corp. v. Strato-Lift, Inc., 103 F. Supp. 2d 830, 836 (E.D. Pa. 2000).  "Stated otherwise, under ordinary contract law, contracts are enforceable when parties reach a mutual agreement, exchange consideration and have set forth the terms of their bargain with sufficient definiteness to be specifically enforced." Id.

5. The burden of proof as to whether the Takeover Agreement was modified rests with Defendant PHA, the proponent of the modification.  It is an established principle of Pennsylvania law that "[]the burden of proving a modification or a change in a prior contract rests on the party asserting it." Knight v. Gulf Ref. Co., 166 A. 880, 882 (Pa. 1933). See also Stein v. Arjay Mach. Co., 137 A.2d 460, 461 (Pa. 1958) ("defendant had "burden of proof in his endeavor to establish a modification of the original contract or the substitution of a new one");

East Texas Motor Freight v. Lloyd, 484 A.2d 797, 800 (Pa. Super. Ct. 1984) ("The burden of proving modification is upon the party asserting such modification.")

6.  Furthermore, to the extent that PHA is asserting that the Takeover Agreement was modified orally, the proof of the modification must be by "evidence which is clear, precise and convincing." Empire Properties, Inc. v. Equireal, Inc., 674 A.2d 297, 304 (Pa. Super. Ct. 1996) (citations omitted); see also Nicolella v. Palmer, 248 A.2d 20, 23 (Pa. 1968) ("[W]here the writing contains an express provision that it constituted the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence . . . .")

7.  There is no evidence that any Contracting Officer at PHA for this project ever signed any form of Proposed Contract Modification No. 11 or any proposed modification that would have the effect of reducing the "Contract Balance" under the Takeover Agreement by any amount.

8.  When PHA submitted the unsigned Proposed Modification No. 11 to St. Paul, PHA contemplated an offer by St. Paul, in the form of its signature on the Proposed Modification, followed by an acceptance by PHA, which would be signified by PHA's signature. PHA's failure to sign any version of Modification No. 11 means that there was never an agreement as to proposed Modification No. 11 between the parties. To the extent that St. Paul's signature on the December version of the proposed Modification is deemed an offer by St. Paul, PHA never accepted it. Rather, PHA rejected it when informed St. Paul that the proposed modification would have to be redone and re-executed by St. Paul. Further, St. Paul revoked the

offer by means of Ms. Alexander's written and oral communications to PHA in February, March and April 2001.

9. Even if the proposed modification had been executed by PHA, it would not have been effective to reduce the Contract Balance under the Takeover Agreement because it did not explicitly do so; rather, proposed Modification No. 11, if executed properly, would have affected only the original Contract No. 9589 with San Lucas, not the Takeover Agreement.  Further, the evidence established that Ms. Alexander never understood that PHA proposed to deduct $83,060 or any other amount from the agreed Contract Balance under the Takeover Agreement until late February, 2001.  Thus, there was never an objective or subjective meeting of the minds between St. Paul and PHA as to a reduction in the Contract Balance agreed to in the Takeover Agreement.

10. PHA therefore has failed to carry its burden of proving that the Takeover Agreement, or the Contract Balance term thereof, was modified in any way.

11. PHA argued for the first time in its Pre-trial Memorandum filed three days before trial that certain language in paragraph 2 of the Takeover Agreement authorized it to deduct $83,060 from the Contract Balance due to St. Paul, even without a properly executed amendment signed by both parties.  This assertion is without merit.  If it had merit, PHA would not have made multiple attempts to have St. Paul execute a contract modification to authorize the deduction.  Therefore, PHA's conduct is completely at odds with its belated effort at contract interpretation.

12. Further, contrary to PHA's contention, the "as and when" language contained in paragraph 2 of the Takeover Agreement does not mean that PHA has a unilateral right to refuse to pay St. Paul for work that it decided, after the project had been completed, to delete from the

contract scope. Rather, that language simply related to the timing of when payments would be made by PHA to St. Paul. It does not in any way authorize PHA to unilaterally diminish the agreed Contract Balance of $2,711,434.

13. To interpret the language as urged by PHA would create an irreconcilable conflict within paragraph 2 of the Takeover Agreement between the agreed amount of the "Contract Balance," which PHA unconditionally agreed to pay to St. Paul, and the "as and when" clause. Rather than interpreting the paragraph as creating such a conflict, it is reasonable to harmonize the provisions by interpreting the "as and when" language as simply relating to the timing of payment, rather than creating a condition precedent to payment. See In re Trust of Binenstock, 410 Pa. 425, 434, 190 A.2d 288, 293 (Pa. 1963) ("Clauses of a contract . . . which seem to conflict will be construed, if possible, as consistent with one another.") (citing 3 Corbin, Contracts § 547 (3d ed. 1960)); see also Keystone Fabric Laminates, Inc. v. Federal Ins. Co., 407 F.2d 1353, 1356 (3d Cir. 1969) ("It is axiomatic in contract law that two provisions of a contract should be read so as not to be in conflict with each other if it is reasonably possible."). As more fully explained in Kingston Dodge, Inc. v. Chrysler Corp., 449 F. Supp. 52, 54 (M.D. Pa. 1978):

> It is a general principle of contract law that all writings forming a part of the same contract are to be interpreted together, and if there appear to be repugnant clauses they must be reconciled if possible and an interpretation of one part will not be given which will annul another part . . . . It is axiomatic that two provisions of a contract should be read so as not to be in conflict with each other if reasonably possible.

Id. at 54 (citations omitted).

14. PHA's argument that St. Paul has acted unreasonably in refusing to agree to an amendment to the Takeover Agreement to deduct $83,060 from the contract balance is without

merit. PHA bears the burden of proof to establish that St. Paul's decision not to agree to a modification of the Takeover Agreement to reduce the contract balance was unreasonable. See Broad & Branford Place Corp. v. J.J. Hockenjos Co., 132 N.J.L. 229, 39 A.2d 80, 82-83 (1944) (decided under New Jersey law).

15. If a contract states that consent shall not be unreasonably withheld, "equity principles will apply." See Erban v. Monforton, 740 P. 2d 677, 679 (Mont. 1987). The question of the reasonableness or unreasonableness of a party's action in withholding its consent is one of fact. Robbins v. Hunts Food, 391 P. 2d 713, 717-718 (Wash. 1964). "It is to be measured by the action which would be taken by a reasonable man in like circumstances. Reason, fairness, and good faith must be the guide. Whim, caprice or opportunism, however expedient the end, will not suffice." Id., citing Broad & Branford Place Corp. v. J.J. Hockenjos Co., 39 A.2d 80 (1944).

16. St. Paul's decision not to agree to a deletion of $83,060 from the Contract Balance defined in the Takeover Agreement was not unreasonable, and PHA has not provided evidence to carry its burden that it was unreasonable.

    a. St. Paul's decision was reasonable because the remaining work for the renovation of the management office was within the scope of the Takeover Agreement when St. Paul and PHA entered into the Takeover Agreement, and St. Paul hired a completion contractor to finish the work that was within the scope of the Takeover Agreement.

    b. At the time that PHA entered into the Takeover Agreement with St. Paul, PHA already had planned to demolish the building in which the management office renovations were supposed to take place, and consequently knew that the work would not be required, but

PHA never disclosed this information to St. Paul before the work on the project was finished. PHA has provided no evidence to explain this failure to disclose material facts to St. Paul.

        c.     PHA waited until after the work on the project was completed to seek proposed Modification No. 11, and did not disclose its desire to reduce the agreed Contract Balance under the Takeover Agreement by $83,060 until late February 2001 at the earliest. There is no evidence that at this point in time St. Paul had any ability to reduce its expenses on the project by obtaining a reduction in the price from its completion contractor. Nor is there any evidence that the completion contractor had not already incurred significant expenses preparing to renovate the management office. Thus, there is no evidence that St. Paul had any opportunity to protect itself against loss by reason of PHA's belated attempt to reduce the Contract Balance, in a project in which St. Paul already had sustained millions of dollars in losses.

        d.     Further, PHA has never provided to St. Paul a version of proposed Contract Modification No. 11 that was signed by PHA. Accordingly, <u>neither</u> party has yet given its consent to a proposed deduction to the Contract Balance, in the form required by the Takeover Agreement. It cannot be said that St. Paul's decision not to sign a proposed contract modification is unreasonable where PHA itself has not signed.

17.     Accordingly, PHA is in breach of the Takeover Agreement and owes St. Paul as damages $83,060, plus pre-judgment interest.

Respectfully submitted,

_____
Paul F. Strain
James A. Dunbar
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, MD  21201
(410) 244-7400
Attorneys for Plaintiff
St. Paul Mercury Insurance Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this _____ day of _____, 2003, **Plaintiff St. Paul Mercury Insurance Company's Plaintiff's Proposed Finding of Fact and Conclusions of Law** was telecopied and mailed via first-class mail, postage prepaid, to:

    Denis James Lawler, Esquire
    Daniel E. Rhynhart, Esquire
    Blank Rome Comisky & McCauley, LLP
    One Logan Square
    Philadelphia, PA  19103-6998
    Counsel for Defendant
    Philadelphia Housing Authority

                                              James A. Dunbar