IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ST. PAUL MERCURY INS. CO. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA HOUSING AUTH. | : | NO. 02-3511 |

**MEMORANDUM AND ORDER**

**Norma L. Shapiro, S.J.**                                    **March 19, 2004**

     In November 1997, Defendant Philadelphia Housing Authority ("PHA") contracted with San Lucas Construction Co. ("San Lucas") to perform general construction work at the Richard Allen Homes housing project ("the Project") owned and managed by PHA. Plaintiff St. Paul Mercury Insurance Company ("St. Paul") provided performance and payment bonds to PHA as surety for San Lucas. On May 31, 2002, St. Paul filed this civil action against PHA, alleging four counts arising from the issuance of its performance bond. By Order dated August 20, 2003, Count II (Breach of Takeover Agreement) was severed from the remaining counts and tried non-jury.[1] In accordance with Fed. R. Civ. P. 52(a), the following are findings of fact and conclusions of law with respect to Count II:

---

[1] By letter dated September 8, 2003, St. Paul's counsel advised the court that the parties had agreed to waive their right to a jury trial with respect to Count II.

1

## I. Findings of Fact

### Parties, Jurisdiction and Venue

1. St Paul is a corporation organized under the laws of Minnesota with its principal place of business in St. Paul, Minnesota.  Among other lines of business, St. Paul issues insurance as surety to construction contractors.

2. PHA is an instrumentality of the Commonwealth of Pennsylvania, organized in 1937 pursuant to the Housing Authorities Law, 35 P.S. §§1541, 1550 et seq., with its principal place of business in Philadelphia, Pennsylvania.  PHA owns and manages public housing projects in the Philadelphia area.

### The Agreement

1. In November 1997, PHA contracted with San Lucas Construction Company, Inc. ("San Lucas") to perform general construction work at the Richard Allen Homes. P Exh. 25.

2. The number assigned to the construction contract ("the Contract") between PHA and San Lucas was No. 9589.  Tr. at 91.

3. On January 24, 2000, PHA terminated San Lucas' right to proceed under the Contract for default, and called upon St. Paul to ensure performance of the Contract.  P Exh. 25.

4. On April 6, 2000, PHA and St. Paul entered into a Takeover Agreement ("the Agreement") (admitted into evidence as P Exh. 25) reciting the terms and conditions by which St. Paul agreed to undertake completion of the work remaining under the

Contract. P Exh. 25.

5. The Agreement defined the term "Contract" as contract number 9589 between San Lucas and PHA.  P Exh. 25.

6.   The Agreement defined the "Contract Price" and the "Contract Balance" as follows:

> Whereas, as of Requisition No. 23, the adjusted contract price, including Change Orders 1 thru 8 through 12/6/99 is $12,068,944.92 (hereinafter called the "Contract Price") and as of the date hereof there remains a balance including retainage still held and unpaid by Owner, in the amount of $2,711,413.84 (hereinafter called the "Contract Balance")

7. Paragraph 1 of the Agreement provided that the recitals contained in the Agreement were incorporated by reference as if fully set forth therein.  P Exh. 25.

8. Paragraph 2 of the Agreement provided, among other things, that PHA would pay the remaining Contract Balance to St. Paul "as and when due under the Contract" and payments would be made only "...to the extent the Contract Balance is due and payable under, and pursuant to the terms and provisions of, the Contract."[2] P Exh. 25.

9. The Contract Balance to be paid by PHA to St. Paul could be increased for extra work performed pursuant to written change

---

[2]"Owner will pay to the Surety the remaining Contract Balance as and when due under the Contract, which Contract Balance Owner and Surety agree is $2,711,413.84 as of Requisition No. 23 (the last requisition paid), plus any amounts for extra work performed pursuant to the terms and provisions of the Contract under written change orders approved and signed by Owner."

orders approved and signed by PHA.[3]

10. Paragraph 8 of the Agreement provided the Contract Balance could be decreased through a modification, but only if the modification were approved by St. Paul. Paragraph 8 further provided that the surety's approval of modifications decreasing the price could not be unreasonably withheld.[4] P Exh. 25.

11. The Agreement provided that "in the event of a conflict between the terms of this Agreement and the terms of the Contract, this Agreement shall take precedence." P. Exh. 25.

12. Paragraph 14 of the Agreement provided, "this Agreement shall not be changed, amended or altered in any way except in writing and executed by both the Owner and Surety." P Exh. 25.

Management Office Renovation

13. St. Paul hired NDK General Contractors, Inc. ("NDK") to complete the work on the project. Tr. at 15.

14. One item in the original Contract to be completed by San Lucas was a management office, designated "MO" in the schedule of values for the Project. Tr. at 87.

---

[3] See n. 2 supra.

[4] "The Authorized Individual has no authority to negotiate deductive Change Orders, credits, back charges or net deductions from the Original Contract or the Contract Balance of any nature whatsoever without the Surety's prior written approval. Approvals which are to be made by Surety shall not be unreasonably withheld or delayed and if not given within four (4) days from its receipt therefor, shall be deemed to have been approved."

4

15. The work to be completed for the item designated "MO" consisted of a management office and a mail room. Tr. at 87-88.

16. San Lucas built and completed the mail room. (Tr. 88)

17. Periodic Estimate No. 32 ("PE #32") (admitted into evidence as D Exh. 3) shows that PHA paid San Lucas $74,940 for completing the mail room, but that a balance of $83,060 was carried for the management office work. D Exh. 3.

18. When St. Paul hired NDK to complete the work on the project, the renovation of the management office was within the scope of the work St. Paul was required to complete under the Agreement.

19. The management office renovation was never completed. At some point in time, PHA decided that it was no longer necessary to renovate the management office.

20. By December 2000, NDK had completed its work on the Project. Tr. at 30-31.

Modification 11

21. The St. Paul employee who represented St. Paul with respect to the Agreement and the work done thereunder was Christine T. Alexander ("Alexander"). Tr. at 24.

23. After the project was substantially complete, Timothy Trzaska ("Trzaska") of PHA presented St. Paul with a series of documents he characterized as clean up documentation needed to close out the contract and make final payment to St. Paul. Tr.

at 33.

24. Contract Modification No. 9 was executed by Alexander on behalf of St. Paul on November 14, 2000 and increased the Contract Price by $33,720 from $12,068,945 (as originally cited in the Agreement) to $12,102,665.  This additional $33,720 was for work San Lucas had completed before the Takeover Agreement, but had not been included in the Contract Balance. When Alexander signed Contract Modification No. 9 it was not yet signed by PHA. P Exh. 31.

25. Contract Modification No. 10 was executed by Alexander on behalf of St. Paul on November 14, 2000 and increased the Contract Price by $16,212 from $12,102,665 to $12,118,877. This additional $16,212 was for work San Lucas had completed before the Agreement, but had not been included in the Contract Balance. When Alexander signed Contract Modification No. 10 it was not yet signed by PHA. P Exh. 31.

26. By reason of Contract Modifications Nos. 9 and 10, the Contract Balance was increased by $49,932, from $2,711,413.84 to $2,761,345.84.   P Exh. 31; Tr. at 46.

27. Contract Modification No. 11 (admitted into evidence as D Exh. 4) was executed by Alexander on behalf of St. Paul on December 11, 2000 and decreased the Contract Price by $83,060 from $12,118,876.92 to $12,035,816.92 When Alexander signed Contract Modification No. 11 it was not yet signed by PHA. D Exh.

4

28.  In February 2001, Trzaska informed Alexander that there was an error in the execution of Contract Modifications 9, 10 and 11. PHA promised to send revised documents but did not do so. Tr. at 38.

29.  As a consequence of not receiving the revised documents from PHA, Alexander telephoned PHA.  During a telephone conversation on or about February 27, 2001, Lyncoln Trower ("Trower"), PHA's contracting officer, told Alexander that PHA had revoked all the paperwork.  He stated that PHA overpaid San Lucas by $150,000 and was determining how to reconcile the overpayment with the contract funds due St. Paul. P Exh. 39.

30.  Alexander sent a letter to Trower with respect to this February 27, 2001 conversation.  The letter, dated February 27, 2001, confirmed Alexander's conversation with him, and stated in part:

> As we discussed, you advise that your department has determined there was an overpayment in the area of $150,000.00 by PHA to San Lucas and that PHA is determining how to reconcile this overpayment with the contract money due to St. Paul.  When St. Paul and PHA negotiated the Takeover Agreement, St. Paul advised PHA that our investigation revealed there was a substantial overpayment by PHA to San Lucas.  We were unable to resolve the overpayment issue during our negotiations. So we specifically reserved this issue for resolution after the project was complete.  In the Takeover Agreement, PHA agreed and promised to pay the remaining contract balance of $2,711,413.84, which was subsequently increased by change orders to $2,761,345.84, to St. Paul despite the overpayment issue.  Therefore the $150,000 portion of the overpayment that you and I discussed

7

>   should not be deducted from contract money due to St.
>   Paul under the Takeover Agreement.

P Exh. 39. The contract balance stated in the letter reflects the changes made to the Contract Balance by Contract Modifications 9 and 10. Id.

    31.  On March 7, 2001, Alexander sent to Trower and to Phil Johnson, another employee of PHA, a letter stating: "In the Takeover Agreement, PHA agreed and promised to pay the remaining contract balance of $2,711,413.84, which was subsequently increased by change orders to $2,761,345.84, to St. Paul despite the overpayment issue." P Exh. 41. The contract balance stated in the letter reflects the changes made to the Contract Balance by Contract Modifications 9 and 10. Id.

    32.  By memorandum dated March 11, 2001, Trower reiterated the need for Alexander to execute Contract Modification No. 11 to delete the $83,060 management office balance and stated PHA would reserve $116,940 as "temporary security until the matter of the deletion amount for the management office receives formal approval." P Exh. 42. PHA subsequently withheld the $116,940 as temporary security. Id.

    33.  On March 12, 2001, Contract Modification No. 9 was re-executed by Alexander on behalf of St. Paul, and increased the Contract Price by $33,720 from $12,068,945 (as originally cited in the Agreement) to $12,102,665.  When Alexander signed this revised Contract Modification No. 9 it was not yet signed by PHA.

This revised Contract Modification No. 9 was approved and signed by PHA on March 20, 2001. P Exh. 45.

34. On March 12, 2001 Contract Modification No. 10 was re-executed by Alexander on behalf of St. Paul and increased the Contract Price by $16,212 from $12,102,665 to $12,118,877. When Alexander signed this revised Contract Modification No. 10 it was not yet signed by PHA. This revised Contract Modification No. 10 was approved and signed by PHA on March 20, 2001. P Exh. 45.

35. On March 15, 2001, PHA transmitted to St. Paul a revised version of Contract Modification No. 11 . P Exh. 44.

36. By letter dated April 10, 2001, Alexander stated that St. Paul disputed the revised Contract Modification No. 11.

37. PHA paid St. Paul $116,940 at the bar of the court on August 19, 2003. As a result of that payment, St. Paul had received the Contract Balance set forth in the Agreement, plus the additional amounts due under Modifications 9 and 10.

38. The only payment St. Paul has not received is the disputed $83,060 for the management office.

## II. Discussion

St. Paul's breach of contract claim is based on PHA's refusal to remit the outstanding Contract Balance of $83,060 for the management office. St. Paul asserts that PHA is in breach of the Takeover Agreement because PHA was obligated to pay St. Paul the entire balance of the underlying Contract. St. Paul contends

that because it never executed the revised version of Contract Modification No. 11, the $83,060 was never deleted from the Contract Price.  PHA maintains that under the Agreement, and the underlying construction contract, it has no obligation to remit payment for an element of the Project never completed.  The issue before the court is whether PHA is in breach of the Takeover Agreement for failure to pay $83,060 under the Contract.

A court's purpose in examining a contract is to interpret the intent of the contracting parties, as they objectively manifest it. <u>Pacitti by Pacitti v. Macy's</u>, 193 F.3d 766, 773 (3d Cir. 1999).  First, the court must make a preliminary inquiry whether the contract is ambiguous. <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 613 (3d Cir. 1995) This question is an issue of law for the court to resolve.

A term is ambiguous if it is susceptible to reasonable alternative interpretations. <u>Id.</u> at 614.  <u>See also</u> <u>Mellon Bank, N.A. v. Aetna Business Credit, Inc.</u>, 619 F.2d 1001, 1011 (3d Cir. 1980)(defining ambiguity as an "intellectual uncertainty [or] the condition of admitting two or more meanings, of being understood in more than one way, or referring to two or more things at the same time . . . ."). If the court determines that a given term in a contract is ambiguous, the interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their

respective interpretations. See Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994).

To determine whether a contract is ambiguous, the court looks to the express language of the agreement, and assumes the intent of the parties is embodied in the writing itself. Pacitti, 193 F.3d at 773. When the words are clear and unambiguous, the intent is to be discovered only from the express language of the agreement. Id. Where the intent is unclear from the express language, to determine the parties' intentions, the court may consider, among other things, "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Id., citing Hullett, 38 F.3d at 111.

The Takeover Agreement unambiguously manifests an intent that St. Paul, as surety, would receive the balance remaining on the Contract Price in return for its completion of the Project:

> Surety is willing to undertake the completion of the remaining Contract work in the manner hereinafter related, provided the entire unpaid balance of the Contract Price (as hereinafter defined), including undisbursed retainage, together with any additional amount of money added to the Contract Price after the date hereof on account of extra work or changes agreed to by Owner in writing pursuant to the terms and provisions of the Contract is paid to Surety or its designee as and when such sums or amounts shall become due under the Contract.

P Exh. 25. Nothing in the Agreement contemplates paying St. Paul

11

for work not actually completed.  Rather, the Agreement states St. Paul would be paid only "as and when such sums shall become due under the Contract."  Id.  Accordingly, the payments made by PHA to St. Paul followed the Schedule of Values contained in the original Construction Contract between PHA and San Lucas, as demonstrated by the Periodic Estimates, including Periodic Estimate No. 32, reflecting that the management office was only 47% complete.

The Agreement also unambiguously manifests the parties' intent to adjust the Contract Price through written modifications.  Paragraph 8 clearly states that the "Authorized Individual, the individual authorized to represent St. Paul in its dealings with PHA, has "the authority to negotiate and sign change orders for extra work (work that is different from, in excess of, or beyond the scope of the work required by the Original Contract)."  P Exh. 25. The Agreement unambiguously contemplates deductions by written change orders reducing the scope of the work; the Agreement states that St. Paul granted:

>    no authority to negotiate deductive Change Orders,
>    credits, back charges or net deductions from the Original
>    Contract or the Contract Balance of any nature whatsoever
>    without the Surety's prior written approval.

Id.  The Contract Price could only be adjusted by written modification signed by both parties.

However, the Agreement also unambiguously provides:

12

"[a]pprovals which are to be made by Surety shall not be unreasonably withheld or delayed and if not given within four (4) days from its receipt therefor, shall be deemed to have been approved." Id.  Should St. Paul unreasonably withhold or delay written approval of a Change Order, the Contract Price would automatically be adjusted, despite the failure to sign.

Under Pennsylvania law, a modification to a contract requires a new meeting of the minds between the parties to the contract. Matevish v. School Dist. Of Borough of Ramey, 74 A.2d 797, 800 (Pa. Super. Ct. 1950); see also Apgar v. State Employees' Retirement Sys., 655 A.2d 185 (Pa. Commw. Ct. 1994)("Our courts continue to recognize that once a contractual obligation vests, no matter how innocuous it may appear, the same cannot be altered, amended or changed by unilateral action"). Contract Modification No. 11 was properly executed only if there were an offer, acceptance, and meeting of the minds. Jenkins v. County of Schuylkill, 658 A.2d 380 (Pa. Super. Ct. 1995), app. denied, 666 A.2d 1056 (Pa. 1995).

However, the words of this Agreement expressly stated that approval of a change order "shall not be unreasonably withheld or delayed," so the proper inquiry is whether St. Paul unreasonably withheld its signature from the revised version of Contract Modification No. 11, and if so, under the Agreement, the modification "shall be deemed to have been approved."

To determine what was reasonable under the Agreement, we look no farther than the four corners of the document. Nothing in the Agreement contemplates that St. Paul would receive payment from PHA for work under the Contract never completed. As surety, St. Paul stepped into the shoes of the defaulting construction company, San Lucas, and fulfilled its obligation to complete the Project. As compensation, St. Paul was to receive remuneration "as and when such sums shall become due under the Contract." P Exh. 25.

Here, there is no evidence the $83,060 for the renovation of the management office ever came due under the Contract. There is no evidence that the management office was ever renovated. Tr. at 88. PHA apparently decided not to complete the management office because the Project was behind schedule. Id. This decision is reflected by PHA's submission of Contract Modification No. 11 to St. Paul on December 11, 2001.

Although, Alexander apparently misunderstood its significance, she properly and reasonably executed Contract Modification No. 11 and returned it to PHA. However, when PHA discovered an immaterial mathematical mistake (a difference of $.08) and resubmitted Contract Modification No. 11, Alexander refused to sign. Under the Agreement, PHA was entitled to a reduction in the Contract Balance for work never performed by St. Paul, or its contractor NDK. St. Paul's refusal to reexecute the

14

revised Contract Modification No. 11 was patently unreasonable, so Contract Modification No. 11 is deemed to have been approved. The Contract Balance was properly reduced by $83,060 and PHA does not owe that amount to St. Paul.

### III. Conclusions of Law

1. There is subject matter jurisdiction under 28 U.S.C. §§1332(a).

2. There is venue under 28 U.S.C. §1391(a).

3. Under Pennsylvania law, if a contract is unambiguous, the court interprets the contract as a matter of law. Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir. 1999).

4. The Takeover Agreement unambiguously provided that PHA was obligated to pay St. Paul the Contract Balance only as and when such amounts were due under the Contract between PHA and San Lucas.

5. Because PHA never required anyone to complete the management office, and no one performed this work, PHA never owed San Lucas,, or St. Paul, the Contract Balance applicable to this work.

6. Under the unambiguous provisions of paragraph 8 of the Takeover Agreement, St. Paul, as surety, was required to give prior written approval of deductions modifying the Contract

15

Balance, which approval could not be unreasonably withheld.

    7.   This clause is consistent with PHA's right under the Contract, as the owner of the Project, to determine the scope of the work, including elimination of certain work, with the Surety's approval in determining the amount to be deducted on account of the work eliminated.

    8. Where, as here, the work was deleted and never performed, St. Paul's refusal to approve a deduction modifying the Contract Price was patently unreasonable.

    9.   PHA was entitled to a reduction in the Contract Balance of $83,060, despite St. Paul's refusal to sign revised Contract Modification No. 11.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**ST. PAUL MERCURY INS. CO.**      :   CIVIL ACTION
                                   :
**v.**                             :
                                   :
**PHILADELPHIA HOUSING AUTH.**     :   NO. 02-3511

### ORDER

**AND NOW**, this 19th day of March, 2004, after a non-jury trial at which counsel and witnesses for both parties were heard, it is hereby **ORDERED** that:

Partial Judgment is entered for defendant Philadelphia Housing Authority and against plaintiff St. Paul Mercury Insurance Company on Count II only.

                            _____
                                Norma L. Shapiro, S.J.